GLANCY PRONGAY & MURRAY LLP
Robert V. Prongay (#270796)
Kara M. Wolke (#241521)
Alexa J. Mullarky (#307932)
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone: (310) 201-9150
Facsimile:  (310) 201-9160
Email:  info@glancylaw.com

*Attorneys for Lead Plaintiff Gregory Callendar*
*and the Proposed Plaintiff Class*

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| In Re CytRx Corporation Securities Litigation | Case No.: 2:16-CV-05519-SJO-SK |
| | **FIRST AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS** |
| | **JURY TRIAL DEMANDED** |

# **TABLE OF CONTENTS**

I.      OVERVIEW OF THE ACTION ................................................................. 1

II.     JURISDICTION AND VENUE ................................................................ 10

III.    PARTIES ................................................................................................. 11

IV.     SUBSTANTIVE ALLEGATIONS .......................................................... 12

        A.      Background of Applicable FDA Procedures and Regulations ............ 12

        B.      Overview of CytRx and Its Development of Aldoxorubicin to Treat Soft Tissue Sarcoma ..................................................................... 14

        C.      The SPA and Design of Phase 3 Aldoxorubicin Study ...................... 15

        D.      Patient Death and Partial Clinical Trial Hold ..................................... 18

        E.      After the Approximate 2-Month Hold Is Lifted, Defendants Continue to Insist that the Phase 3 Study Remained On-Track ............................. 20

        F.      The Truth Emerges: The Revelation of Delays and Materialization of Defendants' Previously Undisclosed Risks Threatening the Phase 3 Study Causes CytRx's Stock Price to Plummet .............................................. 25

        G.      Post-Class Period Events Shed Further Light on Defendants' Fraud... 29

V.      MATERIALLY FALSE AND MISLEADING CLASS PERIOD STATEMENTS .. 33

VI.     ADDITIONAL SCIENTER ALLEGATIONS ................................................ 64

        A.      The Company Did Not Generate Meaningful Revenue and Was Dependent Upon the Continued Development of Aldoxorubicin for Its Survival ....................................................................................... 64

        B.      Defendants Have Historically Employed Pump and Dump Schemes to Raise Much Needed Capital ................................................................. 66

      C.     Both Individual Defendants Enjoyed Generous Stock Option Grants During the Class Period ........................................................... 67

VII.   LOSS CAUSATION ........................................................ 69

VIII.  PRESUMPTION OF RELIANCE .................................... 69

IX.    INAPPLICABILITY OF THE STATUTORY SAFE HARBOR AND BESPEAKS CAUTION DOCTRINE ............................................... 70

X.     PLAINTIFF'S CLASS ACTION ALLEGATIONS ....................... 71

XI.    CAUSES OF ACTION ................................................... 73

XII.   PRAYER FOR RELIEF .................................................. 77

XIII.  DEMAND FOR TRIAL BY JURY ................................... 77

Lead Plaintiff Gregory Callendar ("Plaintiff" or "Lead Plaintiff"), by and through his undersigned attorneys, individually and on behalf of all other persons similarly situated, alleges the following based upon personal knowledge as to Plaintiff's own acts, and on information and belief as to all other matters. The within allegations are based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review and analysis of: (i) CytRx Corporation ("CytRx" or the "Company")'s public filings with the Securities and Exchange Commission ("SEC"); (ii) company press releases and presentations; (iii) public reports and news articles; (iv) research reports by securities and financial analysts; (v) economic analyses of securities movement and pricing data; (vi) transcripts of CytRx's investor calls; and (vii) other publicly available material and data defined herein. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

I.    **OVERVIEW OF THE ACTION**

1.    This is a federal securities class action brought on behalf of a class consisting of all persons or entities, other than CytRx, Steven A. Kriegsman, and John Y. Caloz (together, "Defendants") and their affiliates, who purchased or otherwise acquired CytRx common stock from November 18, 2014 to July 11, 2016, inclusive, (the "Class Period"), seeking to recover compensable damages caused by Defendants' violations of federal securities laws (the "Class").

2.    CytRx's primary focus during the Class Period was the clinical development of a cancer drug known as aldoxorubicin. CytRx owns no other marketable drugs, and aldoxorubicin was the Company's only late-stage product candidate for which Defendants were seeking approval from the U.S. Food and Drug Administration ("FDA") during the Class Period.

3.    According to Defendants, CytRx expected to complete patient enrollment in the pivotal global Phase 3 clinical trial of aldoxorubicin by the end of 2015, with Phase 3 efficacy results to be released in the first half of 2016, the submission of a New

Drug Application ("NDA") based on the Phase 3 results by the end of 2016, and FDA approval and market launch projected for 2017.

4.      Aldoxorubicin is a modified version of doxorubicin – the current standard of care for treating advanced, metastatic soft tissue sarcoma, a type of cancer that develops in soft tissues like fat, muscle, nerves, connective tissues, fibrous tissues, blood vessels, or deep skin tissues. Doxorubicin has significant and dangerous side effects, however, such as toxicity in the heart and other organs, that limit its dosage to a level below its maximum potential anti-tumor capabilities.

5.      Attempting to address the toxicity concern, CytRx created aldoxorubicin, which is intended to bind to albumin in the blood and allow the drug to be delivered to and accumulate preferentially at a tumor site (where tissue tends to be more acidic), thereby reducing toxic side effects to the heart and other healthy tissues, while at the same time allowing for more extended dosing of the drug. According to Defendants, the longer a patient could be dosed with aldoxorubicin (and thus, the more doxorubicin able to be delivered to tumor sites), the higher the likelihood that the Phase 3 trial results would demonstrate the drug's efficacy and support approval.

6.      The planned aldoxorubicin NDA would apply to the use of the drug as a "second-line" treatment for soft tissue sarcoma, meaning, essentially, after "first-line" treatments, including doxorubicin, had failed to work.

7.      As announced by CytRx on April 23, 2013, the Phase 3 clinical trial of aldoxorubicin as a second-line treatment for soft tissue sarcoma was to be conducted pursuant to a Special Protocol Assessment ("SPA") agreement with FDA. According to Defendants, the SPA meant that "the FDA agrees that the design and analyses proposed in the Phase 3 trial protocol are acceptable to support regulatory approval of the product candidate with respect to effectiveness of the indication studied…."[1]

_____

[1] *See* CytRx year 2014 Form 10-K, filed on March 10, 2015 (the "2014 Form 10-K").

8.     Pursuant to the SPA, the primary endpoint of the Phase 3 aldoxorubicin trial would be progression free survival ("PFS"), which is delayed tumor growth as compared to a comparator drug.

9.     In January 2014, Defendants announced that the SPA was amended to allow dosing patients with aldoxorubicin until disease progression, as opposed to dosing of doxorubicin which was limited due to its toxicity. Defendants explained that this opportunity for longer dosing and patient follow-up "creat[ed] the potential for substantially improved Phase 3 efficacy results[,]"[2] an apparent benefit under the SPA that Defendants would continue to tout throughout the Class Period.

10.     The Class Period begins on November 18, 2014, when Defendants issued a press release announcing that the FDA had placed a partial clinical hold on the Phase 3 clinical trial of aldoxorubicin following the death of a patient who had received the drug through the Company's expanded access, or "compassionate use," program.[3]

11.     The patient who died as a result of aldoxorubicin treatment suffered from metabolic acidosis, which is increased body tissue acidity. Because aldoxorubicin is designed to release concentrated amounts of doxorubicin preferentially to acidic environments, such as tumor sites, and this particular patient had increased acidity throughout the body (*i.e.*, increased acidity *not* limited to tumor sites), doxorubicin was released into non-cancerous tissues, leading to toxicity and, ultimately, death.

12.     In CytRx's November 18, 2014 press release, Defendants stated that, during the pendency of the partial clinical hold, "[a]ll currently enrolled patients can continue receiving aldoxorubicin treatment, or comparator drugs, as per study protocols, but no new patients can be enrolled until the clinical hold is lifted."

_____

[2] 2014 Form 10-K.

[3] Defendants did not submit a copy of this press release with, or otherwise disclose the partial clinical hold on, a Form 8-K, "the 'current report' companies must file with the SEC to announce major events that shareholders should know about." *See* https://www.sec.gov/answers/form8k.htm

Defendants expressed their belief that the partial hold issue would be resolved "expeditiously" and stated that "enrollment rates and timelines for [the Company's] ongoing trials [would] remain materially unchanged." Defendants substantially repeated these representations in a press release dated December 3, 2015.

13.     Approximately two months after the hold was first announced, in a press release dated January 20, 2015, Defendants announced that the FDA had removed the partial clinical hold and that CytRx "expect[ed] enrollment and dosing in the ongoing clinical trials to be back underway soon." Defendants again assured investors that that "enrollment rates and timelines for its trials will remain materially unchanged," with market launch of aldoxorubicin "projected to commence in 2017."

14.     At the time the hold was announced and throughout the Class Period, however, Defendants knew or recklessly disregarded and failed to disclose that the timeline for completion of the Phase 3 clinical trial of aldoxorubicin, and the results of the Phase 3 study themselves, faced significant risks due to the effect of the partial clinical hold on *both* currently enrolled patients and new patients.

15.     More specifically, while misleadingly assuring the market that the partial clinical hold would not (and did not) interrupt the study as to currently enrolled patients, Defendants misrepresented and failed to disclose that amended study protocols, in fact, posed a significant risk of interruption to dosing for existing patients.

16.     While vaguely stating in their November 18, 2014 announcement that the study protocols would be amended "to include an appropriate inclusion/exclusion criteria, an additional patient screening assessment and an evaluation of serum electrolytes prior to aldoxorubicin administration," Defendants did not disclose the fact that *treatment for any currently-enrolled patient who failed the "evaluation of serum electrolytes" – i.e., an acidosis test – would be deferred until the patient's acid-base normalized*. To the contrary, in announcing the hold, Defendants misleadingly assured investors that "[a]ll currently enrolled patients can continue receiving aldoxorubicin

treatment, or comparator drugs, as per study protocols" and that "enrollment rates and timelines for its ongoing trials will remain materially unchanged."

17.     In announcing the lifting of the hold on January 20, 2015, Defendants vaguely referred to "modified study parameters intended to avoid potential risks," but did not explain what the "modified" parameters were or that patients who failed interim acidosis testing would be subject to delayed aldoxorubicin dosing during the course of the Phase 3 trial. And Defendants again misleadingly reassured investors of Defendants' belief that "enrollment rates and timelines for [CytRx's] ongoing trials will remain materially unchanged."

18.     Moreover, further underscoring the increased risk of delay to the Phase 3 study as to existing patients is the fact that soft tissue sarcoma patients are predisposed to developing lactic acidosis, a type of metabolic acidosis, thereby presenting a significant risk that the treatment cycles of all patients could be delayed as a result of the study's revised protocols.

19.     Furthermore, both the study design and Defendants' publicly announced timelines for Phase 3 study and NDA were based upon specific assumptions regarding enrollment timing and length of drug exposure and follow-up. For example, the study assumed an "18 month accrual period and a 15 month follow-up period after enrollment of the last subject."[4] Pursuant to these enrollment and the length of drug exposure/follow-up assumptions, the study assumed that a total of 191 PFS events would "power" the study at 90% and produce efficacy results to support an NDA.[5]

_____

[4] While the SPA itself is currently unavailable to Plaintiff, this aspect of the study design can be gleaned from Defendants' presentation at a conference for the European Society of Medical Oncology in September 2014. According to a September 22, 2014 CytRx press release, the presentation was to be posted to the Company's website on or about September 29, 2014. While the presentation is no longer available on CytRx's website, a copy was located in the course of Lead Counsel's investigation in this case, available at: www.poster-submission.com/cdrom/download_poster/37/27972/461TiP

[5] *Id.*

20.     As stated above, because Defendants knew that longer patient exposure substantially increased efficacy results – and they, in fact, touted such extended exposure as a benefit of the SPA likely to increase efficacy results – they knew also that any delays in enrollment, or interruption in patient dosing, which had the impact of limiting patient exposure to aldoxorubicin, conversely risked affecting the Phase 3 results and ability to submit an NDA on the stated timelines.

21.     Moreover, as detailed herein, during the Class Period, Defendants saw that, as a result of the interruptions caused by the hold, enrollment in the Phase 3 study became heavily weighted toward the back-end of the enrollment period, with later enrollees necessarily receiving a shorter dosing period (*i.e.*, decreased exposure) by the time of the 191-event trigger of data analysis.

22.     Despite the foregoing, Defendants continued to reassure the market that the aldoxorubicin study remained on track throughout the Class Period. For example, on December 1, 2015, Defendants announced that, despite the temporary interruption posed by the partial clinical hold, the Phase 3 trial had actually completed enrollment "ahead of schedule" and stated their expectation that CytRx would "report the primary endpoint of top-line progression free survival (PFS) in the first half of 2016, and pre-commercial launch activities are underway."

23.     On April 4, 2016, Defendants published a press release announcing that the Phase 3 study had hit the 191 event trigger necessary to begin data analysis, and that the results would be available in June 2016. The press release proclaimed: "Reaching the number of events is an important milestone for the aldoxorubicin Phase 3 trial[.]"

24.     As reported in an article published on the investment research website *Seeking Alpha* after the end of the Class Period on July 19, 2016, however, at the time Defendants announced that the study had achieved the requisite 191 events to trigger data analysis, they knew or recklessly disregarded that as a result of the partial clinical hold, approximately 25% of all patients were randomized within three to five months of data analysis, half of all patients were enrolled within only eight months of data

1  analysis and nearly two-thirds of all patients were enrolled within one year of data

2  analysis. Defendants also knew actual enrollment, drug exposure and follow-up time

3  periods failed to comport with the study design's assumed "18 month accrual period

4  and a 15 month follow-up period after enrollment of the last subject" to reach 90%

5  power at the time of data analysis.

6      25.    As detailed herein, contrary to Defendants' benign descriptions of the

7  clinical hold and their assurances throughout the Class Period that the hold did not

8  materially impact the aldoxorubicin study and timelines, the hold and related revised

9  protocols created a significant risk that the occurrence of 191 events would trigger data

10  analysis prematurely, *i.e.* before a sufficient number of patients had received

11  aldoxorubicin for long enough to fully power the study.

12      26.    Indeed, throughout the Class Period, Defendants recklessly disregarded the

13  material risks raised by the hold and the amended protocols and/or had no reasonable

14  basis to believe that the Phase 3 study results would produce efficacy results sufficient

15  to support an NDA on the represented timelines. As stated above, whereas Defendants

16  touted the "substantially improved Phase 3 efficacy results" conferred by prolonged

17  aldoxorubicin exposure, Defendants also were acutely aware that delays in enrollment

18  and/or interruptions to dosing due to FDA-imposed interim testing requirements

19  presented significant risk to efficacy results and, by extension, the ability to submit an

20  NDA.

21      27.    To be sure, as the Class Period progressed and certainly prior to

22  Defendants' announcement of the completion of enrollment in December 2015,

23  Defendants knew that that the partial hold had, in fact, materially impacted enrollment

24  timing – the supposedly "early" completion of enrollment notwithstanding – because of

25  the fact that enrollment ended up being heavily "weighted" toward the end of the

26  enrollment period, presenting the material risk that insufficient time would be available

27  for dosing and follow-up before the 191 event trigger occurred.

28

28.     Moreover, by April 2016, when Defendants announced that the 191 event trigger had occurred, thereby triggering data analysis, Defendants further knew the precise extent to which these "late" enrollments impacted (and ran afoul of) the assumptions regarding enrollment timing, follow-up, and study power upon which the study design was based. In light of this, Defendants were acutely aware of, yet recklessly disregarded and failed to disclose, the risks that insufficient exposure and follow-up posed to the study's ability to generate efficacy results sufficient to support an NDA.

29.     Defendants' motivation to minimize, misrepresent and/or conceal potential problems with the Phase 3 aldoxorubicin study become apparent when viewed in light of the Company's financial situation at the time. Prior to and during the Class Period, the Company generated *de minimis* revenue and survived almost entirely on serial fundraising, including, for example: a $23 million offering in October 2012; a $25.9 million offering in October 2013; an $86 million offering in February 2014; a $28.8 million offering in July 2015; and a $40 million long-term loan facility secured in February 2016, tied to aldoxorubicin. (The October 2013 and February 2014 offerings later became the subject of a "pump and dump" shareholder lawsuit that Defendants settled for $8.5 million in January 2016.[6]) Moreover, for the two years encompassing 2015 and 2016, the Individual Defendants collectively pocketed almost $6,000,000 (not including stock option grants that were awarded in December 2016 and have not yet been valued) in total compensation.

30.     In short, during the time leading up to and throughout the Class Period, CytRx was desperate for operating cash and resorted to every form of available financing it could find to fund its operations. The Company's fundraising ability, indeed its very existence, was dependent on keeping the aldoxorubicin Phase 3 study alive.

---

[6] *In re CytRx Corp. Sec. Litig.*, No. 2:14-CV-01956-GHK (PJWx) (C.D. Cal.).

31.    Against this backdrop, Defendants misrepresented and failed to disclose that the timelines and ultimate results of the Phase 3 trial of aldoxorubicin were subject to significant risks posed by (i) the further amendment to the SPA, which potentially delayed the progress of the trial as to not only *new* but also as to *current* trial enrollees, contrary to Defendants' false assurance that dosing for patients enrolled prior to the hold was not interrupted as a result of the hold, and (ii) the delays and interruptions suffered by the Phase 3 trial as a result of the hold and amended protocols, which presented significant risk to the study's ability to generate Phase 3 efficacy results sufficient to support an NDA within the stated timelines.

32.    After the market closed on July 11, 2016, the falsity of Defendants' prior assurances was revealed and the very risks that Defendants had concealed materialized, when Defendants announced the aldoxorubicin Phase 3 trial results, stating that "[f]or the current evaluation, the study did not show a significant difference between aldoxorubicin and investigator's choice therapy for PFS[.]" Rather than concede a failure of the efficacy of the drug, however, Defendants insisted that the perceived failure seen in the results was due to a lack of maturity of the study and data, explaining that "[b]ecause enrollment was interrupted by a partial clinical hold in November 2014," there had been insufficient "follow-up for the nearly two-thirds of patients who entered the Phase 3 study after the hold was resolved an enrollment resumed[,] [] result[ing] in nearly half of all patients being" excluded from the PFS evaluation. Defendants further stated that CytRx would "conduct a second analysis, which will include longer patient follow-up and  allow for greater maturation of all endpoints[,]" and that the Company would announce the results of this additional evaluation and hold an end-of-Phase 3 meeting with the FDA in the fourth quarter of 2016.

33.    On this news and materialization of the risk, the price of CytRx's stock tumbled $1.50 per share, or over 59%, to close at $1.01 per share on July 12, 2016, on unusually heavy trading volume. The Company's stock price continued to decline over

1   the next two trading days as investors digested the news, falling an additional 10%, to

2   close at $0.90 per share on July 14, 2016.

3       34.    As a result of Defendants' materially false statements, CytRx's stock

4   traded at artificially inflated levels during the Class Period. When the truth was

5   disclosed and the risks concealed by Defendants' false and misleading statements were

6   realized – culminating in Defendants' admissions that the Phase 3 study failed to yield

7   efficacy results because of the delays caused by the hold, that CytRx was unable to

8   conduct necessary follow-up with Phase 3 trial patients, and that the NDA submission

9   and commercialization of aldoxorubicin would be materially delayed as a result – the

10  price of the Company's shares plummeted, causing Lead Plaintiff's and the Class's

11  losses and wiping out more than half of shareholder value. Moreover, CytRx's share

12  price has failed to recover and has only further declined since the end of the Class

13  Period, hovering around a measly 40 cents at the time of this filing.

14      35.    In the end, while Class Period investors have suffered tens of millions of

15  dollars in damages as a result of Defendants' actions, the Individual Defendants have

16  prospered greatly from developing what at least some industry analysts have observed

17  to be an ineffective drug. As Adam Feuerstein, a noted biotech analyst writing for

18  TheStreet.com, opined in an article dated November 29, 2016: "If you're looking for a

19  reason to explain why CytRx would seek FDA approval for a drug based on a failed

20  clinical trial, just follow the money. It flows directly from shareholders into

21  Kriegsman's bank account."[7]

22  **II.    JURISDICTION AND VENUE**

23      36.    The claims asserted herein arise under and pursuant to §§ 10(b) and 20(a)

24  of the Securities Exchange Act of 1934 (the "Exchange Act", 15 U.S.C. §§ 78j(b) and

25  78t(a)) and Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5).

26  _____

27  [7] *See* Adam Fuerstein, *CytRx CEO Pockets Millions of Dollars as Failed Sarcoma Drug*

28  *Moves to FDA* (Nov. 29, 2016).

37.     This Court has jurisdiction over the subject matter of this action pursuant to § 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331.

38.     Venue is proper in this District pursuant to § 27 of the Exchange Act (15 U.S.C. § 78aa and 28 U.S.C. § 1391(b)), as a substantial part of the conduct complained of herein occurred in the District, the Company maintains its principal executive offices within the District, and the Company conducts business in this District.

39.     In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## III.   PARTIES

40.     Lead Plaintiff Gregory Callendar, as set forth in the Certification previously filed and incorporated herein by reference, acquired CytRx common stock at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

41.     Defendant CytRx is a Delaware corporation with its principal executive offices in Los Angeles, California. Throughout the Class Period, CytRx common stock was actively traded on the NASDAQ Global Select Market ("NASDAQ") under the symbol CYTR.

42.     Defendant Steven A. Kriegsman ("Kriegsman") has served as the Company's Chief Executive Officer ("CEO") since July 2002 and throughout the Class Period. Kriegsman also served as a director from July 2002 to October 15, 2014, and served as the Chairman of the Board of CytRx throughout the Class Period.

43.     Defendant John Y. Caloz ("Caloz") has served as the Company's Chief Financial Officer ("CFO") since January 2009 and throughout the Class Period. Caloz has also served as Chief Accounting Officer and Treasurer since October 2007 and throughout the Class Period.

44.     Together, Defendants Kriegsman and Caloz are sometimes referred to herein as the "Individual Defendants."

45.     Defendants CytRx and the Individual Defendants are collectively referred to herein as the "Defendants."

## IV.     SUBSTANTIVE ALLEGATIONS

### A.     Background of Applicable FDA Procedures and Regulations

46.     The requirement that new drugs show effectiveness is based on a 1962 amendment to the Federal Food, Drug, and Cosmetic Act. This law requires substantial evidence of effectiveness – demonstrated by the satisfactory fulfillment of a clinical objective, or "endpoint" – and specifies that this evidence must be derived from adequate and well-controlled clinical investigations. Common endpoints in oncology include overall survival rates, endpoints based on tumor assessments (*e.g.*, complete response or time to progression), progression-free survival ("PFS") (*i.e.* delayed tumor growth as compared to a control therapy), and other measurable endpoints based on symptom assessments. *See* Guidance for Industry Clinical Trial Endpoints for the Approval of Cancer Drugs and Biologics, at p.4 (May 2007).[8] PFS is defined as the time from randomization until objective tumor progression or death. *Id.* at p. 8-9.

47.     When a clinical trial on a new drug is complete, the drug sponsor will submit an NDA (or New Drug Application) to the FDA for review of, *inter alia*, study design, implementation, endpoint data results, and/or efficacy. As described by Defendants in the Company's 2014 Form 10-K, "[t]o obtain FDA marketing authorization, a company must submit to the FDA the results of the preclinical and clinical testing, together with, among other things, detailed information on the manufacture and composition of the product candidate, in the form of a new drug application, or NDA."

---

[8] *available at* http://www.fda.gov/downloads/Drugs/Guidances/ucm071590.pdf

48.    An NDA is "accepted" when it is taken under review by the FDA and "approved" only upon the FDA's announcement that the drug has been approved for marketing to the public.

49.    A special protocol assessment ("SPA") indicates concurrence by the FDA with the design and size of a clinical trial. *See* Special Protocol Assessment Guidance for Industry, at p. 2 (May 2002).[9] According to the FDA, "If an agreement is reached, the Agency will reduce the agreement to writing and make it part of the administrative record. An agreement may not be changed by the sponsor or FDA after the trial begins, except (1) with the written agreement of the sponsor and FDA, or (2) if the director of the FDA reviewing division determines that 'a substantial scientific issue essential to determining the safety or effectiveness of the drug' was identified after the testing began (section 505(b)(4)(C) of the Act)."[10]

50.    Defendants touted the benefits of the SPA in the Company's 2014 Form 10-K, stating in relevant part:

> The SPA means that the FDA agrees that the design and analyses proposed in the Phase 3 trial protocol are acceptable to support regulatory approval of the product candidate with respect to effectiveness of the indication studied, and will not subsequently change its perspective on these matters, unless previously unrecognized public or animal health concerns were to arise or we were to subsequently modify the protocol.

51.    Defendants substantially repeated this claim regarding the benefits of the SPA in the Company's other SEC filings made throughout the Class Period, as alleged herein in Sec. V, *infra*.

---

[9] *available at*
http://www.fda.gov/downloads/drugs/guidancecomplianceregulatoryinformation/guidances/ucm080571.pdf

[10] *Id.*

### B.   Overview of CytRx and Its Development of Aldoxorubicin to Treat Soft Tissue Sarcoma

52.   CytRx is a biopharmaceutical research and development company specializing in oncology. During the Class Period, CytRx was primarily focused on the clinical development of aldoxorubicin, the Company's only late-stage product candidate for which Defendants were seeking FDA approval during the Class Period. Aldoxorubicin is a modified version of the widely-used chemotherapeutic agent, doxorubicin. Its primary intended use – and the use for which CytRx was preparing an NDA – was as a second-line treatment of soft tissue sarcoma.

53.   A "first-line" therapy is the treatment regimen or regimens that are generally accepted by the medical establishment for initial treatment of a given type and stage of cancer. It is also called primary treatment or primary therapy. "Second-line" therapies are those tried when first-line therapies do not work adequately. The management of a cancer case requires regular evaluation of treatment and adjustment as needed. A break with the primary treatment and an adoption of a new regimen signals "second-line treatment."

54.   Sarcoma is an umbrella term for more than 50 subtypes of cancer that occur in the muscles, fat, blood vessels, tendons and other connective tissues in the body. Bone sarcoma and soft tissue sarcoma, which is a cancer that develops in soft tissues like fat, muscle, nerves, fibrous tissues, blood vessels, or deep skin tissues, are among the most prevalent forms of sarcoma. Patients with metastatic, locally advanced, or unresectable soft tissue sarcomas have an estimated progression-free survival of between 2 and 4.6 months and median overall survival of approximately 9 to 12 months. *See* CytRx press release, "*Oral Presentation of CytRx's Aldoxorubicin Phase 2b Clinical Trial in Soft Tissue Sarcoma Highlighted in The Lancet Oncology*" (Aug. 7, 2014).

55.   Doxorubicin is the current standard of care for treating advanced, metastatic soft tissue sarcoma. However, doxorubicin has significant side effects – most

seriously, cardiotoxicity – that limit its dosage to a level below its maximum anti-tumor capabilities. CytRx therefore modified doxorubicin, creating aldoxorubicin, to bind to albumin in the blood, with the goal of allowing doxorubicin to be delivered to and accumulate preferentially at a tumor site, and reduce toxic side effects to the heart and other healthy tissues.

56.     However, as Defendants also undoubtedly were aware, patients suffering from advanced soft tissue sarcoma, such as those patients participating in the Phase 3 study, were highly prone or susceptible to metabolic acidosis (meaning increased acidity throughout the body, not only in tumor sites, but also in healthy tissues). For example, lactic acidosis, a type of metabolic acidosis, is particularly common in soft tissue sarcoma patients due to the elevation of glycolysis (a side-effect of soft tissue sarcoma), called the Warburg effect, which produces high levels of lactic acid.[11]

57.     Prior to and throughout the Class Period, Defendants stated that the Company would submit an NDA for aldoxorubicin as a second-line treatment for soft-tissue sarcoma by the end of 2016, with market launch projected for 2017.

58.     During the Class Period, the Company was also conducting Phase 2 clinical studies using aldoxorubicin for the treatment of: (i) unresectable glioblastoma multiforme (GBM), a form of brain cancer; (ii) HIV-related Kaposi's sarcoma (KS); and (iii) small-cell lung cancer. However, during the Class Period, Defendants had not yet set a target date for the completion of those studies or for submission of an NDA for either of those indications.

**C.     The SPA and Design of Phase 3 Aldoxorubicin Study**

59.     On April 23, 2013, CytRx announced that it had reached an agreement with the FDA under an SPA for a global pivotal Phase 3 trial with aldoxorubicin as a

---

[11] *See* Xin Wang et al., *Therapeutic Response in Musculoskeletal Soft Tissue Sarcomas: Evaluation by Magnetic Resonance Imaging* (July 2011), *available at* https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3150732/.

treatment for patients with soft tissue sarcomas who had relapsed or were refractory following prior treatment with chemotherapy. Defendant Kriegsman explained that:

> By reaching an agreement on an SPA, the FDA deems that results from the single Phase 3 clinical trial will be acceptable to support the regulatory approval of aldoxorubicin as a second-line treatment for patients with soft tissue sarcoma, with final marketing approval dependent on the results of the trial and other accomplishments… The ability to conduct the clinical trial under an SPA could save significant time compared with a standard regulatory pathway.

60.    The Phase 3 clinical trial protocol set forth in the SPA was amended in January 2014 to allow dosing patients with aldoxorubicin until disease progression. According to the Company's 2014 Form 10-K, filed on March 10, 2015, the FDA's approval "to amend the Phase 3 protocol to continue dosing patients with aldoxorubicin until disease progression (defined as an increase in the size of measurable tumors by 20% or the development of a new tumor lesion), [ ] creat[ed] the potential for substantially improved Phase 3 efficacy results." Thus, Defendants knew that the longer the period of exposure to the drug, the higher the potential for efficacy. By contrast, the shorter the period of exposure to the drug, the lower the potential for efficacy.

61.    Under the SPA, CytRx initiated its global Phase 3 clinical trial in March 2014 to evaluate the efficacy and safety of aldoxorubicin as a second-line treatment for patients with soft tissue sarcoma. These patients had tumors no longer responsive to initial treatment with chemotherapy, including doxorubicin.

62.    According to a May 1, 2014 press release announcing the Company's 1Q 2014 results:

> [t]his multicenter, randomized, open-label Phase 3 clinical study [was] designed to enroll approximately 400 patients with metastatic, locally advanced or unresectable soft tissue sarcomas who have either not responded to, or have progressed following treatment with, on or more systemic regimens of non-adjuvant chemotherapies.

CytRx further explained that, "[t]he primary endpoint of the study [was] progression-free survival ("PFS"), and secondary endpoints [were] overall survival, response rates

and safety." Progression free survival constituted delayed tumor growth as compared to the investigator's choice of comparator drug.

63.     In September 2014, at the European Society for Medical Oncology 2014 Congress, Defendants described the Phase 3 study as follows, in relevant part:

- Estimated median PFS for aldoxorubicin is 5.6 months and 3.5 months for investigator's choice arm.

- Based on the use of a two-side log rank test at the $\alpha = 0.5$ level of significance, *a total of 191 PFS events will be required for 90% power to detect this difference*.

- *Assuming an 18 month accrual period and a 15 month follow-up period after enrollment of the last subject, approximately 400 subjects will be needed to achieve the total of 191 PFS events*.

(emphasis added).

64.     In a May 1, 2014 press release, CytRx reported that it "expect[ed] to complete trial enrollment in 2015."

65.     In a press release that was attached to a Form 8-K filed on August 6, 2014, the Company clarified that it expected to "[c]omplete enrollment in the ongoing pivotal global Phase 3 clinical trial of aldoxorubicin…in the second half of 2015."

66.     On September 12, 2014, at the Aegis Capital Corporate Healthcare & Technology Conference, Defendant Kriegsman stated, with respect to the Phase 3 clinical trial of aldoxorubicin:

We have a Phase 3 pivotal trial going on under an SPA for approval. We expect to launch that product, aldoxorubicin, for second-line soft-tissue sarcoma sometime in 2017.

67.     Also during the Aegus Capital Corporate Healthcare & Technology Conference on September 12, 2014, Defendants expanded upon their timeline for aldoxorubicin. The Company's V.P. of Business Development further explained:

[W]e expect, in terms of the trial timing, to complete enrollment by the end of next year, end of 2015, with the progression-free survival, the primary endpoint, data available mid-2016. Our goal is to rapidly convert that data into an NDA submission and get that as quickly filed thereafter,

towards the end of 2016, with the goal -- again, we believe this trial will read out positive. And again, once we get through the FDA and if the FDA approves, to then launch in 2017.

68.     In a press release attached to a Form 8-K filed on November 4, 2014 , the Company announced its 3Q 2014 results and reiterated that it expected to complete enrollment by "year-end 2015[.]" CytRx continued to maintain that PFS data – *i.e.*, the results of the primary endpoint study – would be "announced in mid-2016." Additionally, Defendants reiterated that "[s]ubject to FDA approval, the Company project[ed] market launch [of aldoxorubicin] in 2017."

**D.     Patient Death and Partial Clinical Trial Hold**

69.     In a press release dated November 18, 2014, CytRx announced that the FDA had placed a partial  hold on the Phase 3 study because a patient taking aldoxorubicin through a compassionate use program offered by the Company had died as a result of the treatment.[12] The press release explained, in relevant part:

> CytRx Corporation (NASDAQ: CYTR), a biopharmaceutical research and development company specializing in oncology, today announced that the Company has received notice from the United States Food and Drug Administration (FDA) that its clinical trials for aldoxorubicin have been placed on partial clinical hold. ***All currently enrolled patients can continue receiving aldoxorubicin treatment, or comparator drugs, as per study protocols, but no new patients can be enrolled until the clinical hold is lifted***.
>
> The FDA has indicated that the partial clinical hold is due to the reported death of a patient with advanced-stage cancer who did not qualify to participate in any of the ongoing aldoxorubicin clinical trials, but had received aldoxorubicin under the Company's expanded access ("compassionate use") program. At the FDA's request, the Company will amend all aldoxorubicin study protocols to include an appropriate inclusion/exclusion criteria, an additional patient screening assessment and an evaluation of serum electrolytes prior to aldoxorubicin

---

[12] The FDA allows expanded access, also referred to as compassionate use, allowing patients who are not otherwise eligible for an ongoing clinical trial to nonetheless access  drugs that have yet to be approved by the FDA.

administration. CytRx is working diligently in collaboration with the FDA to seek the release of the clinical hold and resume enrollment in its clinical studies as expeditiously as possible.

***CytRx currently believes that the partial hold issue will be expeditiously resolved and that enrollment rates and timelines for its ongoing trials will remain materially unchanged…. CytRx remains committed to completing enrollment of its ongoing pivotal global Phase 3 trial in second-line soft tissue sarcoma by the end of 2015***.

(emphasis added.)

70.     On December 3, 2014, Defendants reiterated their November 18, 2014, announcement, explaining that:

the Company has received written notice from the United States Food and Drug Administration (FDA) that its clinical trials for aldoxorubicin have been placed on partial clinical hold. The news supplements and is consistent with the prior verbal communications from the FDA.

As previously announced, ***all currently enrolled patients can continue receiving aldoxorubicin treatment, or comparator drugs, as per study protocols***, but no new patients can be enrolled until the clinical hold is lifted. At the FDA's request, the Company will amend all aldoxorubicin study protocols to include an appropriate inclusion/exclusion criteria, an additional patient screening assessment and an evaluation of serum electrolytes prior to aldoxorubicin administration. CytRx is working diligently in collaboration with the FDA to seek the release of the clinical hold and resume enrollment in its clinical studies.

***CytRx currently believes that the partial hold issue will be expeditiously resolved and that enrollment rates and timelines for its ongoing trials will remain materially unchanged***, subject to FDA timing.

(emphasis added.)

71.     In a December 10, 2014 report "commissioned by" CytRx and titled "*CytRx: Partial clinical hold a minor setback*" (the "December 2014 Edison Report"), Edison Research commented that the partial clinical hold "following the death of a patient with metabolic acidosis" constituted only a "minor setback" on aldoxorubicin's path to FDA approval. The December 2014 Edison Report further reiterated

Defendants' statement that "PFS data from STS Phase III study [was] anticipated in mid-2016."

72.    The December 2014 Edison Report also went much further than Defendants had, however, in describing the details of CytRx's proposed study protocol amendment. In direction contradiction of Defendants' prior assurances regarding dosing of current patients, the Edison Report stated the following regarding the potential impact of the revised protocols on *all* Phase 3 study patients:

> **Study protocol amendment proposed to resolve clinical hold**
>
> *CytRx now intends to require all patients within the ongoing RCTs [randomized clinical trials] (including those who have already received aldoxorubicin) to be tested for acidosis (through a simple blood test measuring electrolyte balance) prior to receiving a treatment cycle. <u>In patients with acidosis, treatment will be deferred until the acid-base balance normalises.</u>* CytRx believes that this amendment should resolve the FDA's concerns about recurrences of similar SAEs to aldoxorubicin. The firm anticipates that the hold could be lifted (enabling patient recruitment resumption) before YE14, in which case the firm would be able to maintain its existing guidance timelines for its ongoing RCTs, including the Phase III STS study.

(emphasis added.)

**E.    After the Approximate 2-Month Hold Is Lifted, Defendants Continue to Insist that the Phase 3 Study Remained On-Track**

73.    On January 20, 2015, Defendants announced the FDA's removal of the partial clinical trial hold. In a press release of the same date, Defendants stated:

> [T]he United States Food and Drug Administration (FDA) has removed the partial clinical hold on the Company's aldoxorubicin clinical trials. Enrollment and dosing of new patients is now permitted after study sites' Institutional Review Boards (IRBs) approve the revised trial protocols.
>
> "CytRx developed modified study parameters intended to avoid potential risks, while allowing the company to evaluate the therapeutic impact of aldoxorubicin for patients with soft tissue sarcoma, glioblastoma, Kaposi's sarcoma, and small cell lung cancer, among other trials," said Steven A. Kriegsman, Chairman and CEO of CytRx. "Our staff worked closely with the FDA Oncology Division to resolve all partial clinical

hold issues as rapidly as possible. We expect enrollment and dosing in the ongoing clinical trials to be back underway soon."

***CytRx currently believes that enrollment rates and timelines for its trials will remain materially unchanged. The Company expects to complete enrollment in its ongoing pivotal global Phase 3 trial in second-line soft tissue sarcoma by the end of 2015 and unblind the clinical data by mid-2016***. Subject to FDA approval, ***CytRx's market launch of aldoxorubicin for second line soft tissue sarcoma is projected to commence in 2017***.

(emphasis added.)

74.     Following this announcement, however, Defendants never fully explained what the final "revised trial protocols" were, how they impacted or changed the SPA, how they potentially impacted the study's underlying assumptions (including enrollment curve, length of dosing, and power assumptions), or the potential effect of the changes upon the aldoxorubicin Phase 3 trial and NDA submission. Indeed, the Company's SEC filings throughout the Class Period failed to even mention that the SPA was amended in January 2015.

75.     Defendants substantially reaffirmed CytRx's stated timelines and contined to present the Phase 3 trial as progressing according to plan throughout the remainder of 2015 and into 2016. For example, in the press release attached to the Company's Form 8-K announcing the release of 1Q 2015 financial results, filed on May 1, 2015, while Defendants slightly revised the enrollment target (from end of 2015 to Q1 2016), they otherwise reaffirmed that Phase 3 data would be available by mid-2016. Defendants stated, in part:

"***CytRx achieved several milestones in the early months of 2015, including the announcement of encouraging data from its clinical trial of aldoxorubicin in patients with soft tissue sarcoma***, …" said Steven A. Kriegsman, Chairman and CEO of CytRx.

Upcoming Milestones

> ***Complete enrollment in the ongoing pivotal global Phase 3 clinical trial of aldoxorubicin as a second-line treatment for STS in the first quarter of 2016, with PFS data announced in second half of 2016***.

(emphasis added.)

76.     In the press release attached to the Company's Form 8-K announcing the release of 2Q 2015 financial results, filed on August 3, 2015, Defendants stated that:

> "The second quarter of 2015 has been very productive for CytRx. ***Enrollment in our ongoing pivotal global Phase 3 clinical trial of aldoxorubicin in soft tissue sarcoma (STS) continues on track*** to be completed in the first quarter of 2016…" said Steven A. Kriegsman, Chairman and CEO of CytRx.

(emphasis added.)

77.     In the press release attached to the Company's Form 8-K announcing the release of 3Q 2015 financial results, filed on November 3, 2015, Defendants again reiterated their timelines for the Phase 3 aldoxorubicin study:

> "***Enrollment in our pivotal global Phase 3 clinical trial of aldoxorubicin in soft tissue sarcoma (STS) continues to progress quite favorably, and is on track to be completed next quarter as planned, with data expected in the second half of 2016***," said Steven A. Kriegsman, Chairman and CEO of CytRx.

(emphasis added.)

78.     In a press release dated December 1, 2015, the Company proudly announced that, despite the partial hold, Phase 3 trial enrollment had actually completed *early* and that data analysis would begin after the 191 event trigger occurred:

> [CytRx] ***has reached its enrollment target of 400 patients for the company's pivotal global Phase 3 clinical trial of aldoxorubicin in patients with previously treated soft tissue sarcoma (STS). Enrollment was originally estimated to be completed in Q1 2016.*** The Phase 3 trial is a randomized, comparative trial being conducted under a Special Protocol Assessment from the FDA at 79 sites in the United States, Canada, Israel, Australia, Western & Eastern Europe and Chile.
>
> "It is a true testament to the dedicated work of our clinical team, the enthusiasm of our participating physicians, and the willingness of

patients to participate in our study that *enrollment in our global pivotal Phase 3 clinical trial was completed ahead of schedule*," said Steven A. Kriegsman, Chairman and CEO of CytRx. "*We now expect to report the primary endpoint of top-line progression-free survival (PFS) in the first half of 2016, and pre-commercial launch activities are underway*."

"As a member of the sarcoma research community, I am very excited to see the overwhelmingly positive response from my colleagues to this pivotal trial," said Sant P. Chawla, M.D., F.R.A.C.P., Principal Investigator and Director of the Sarcoma Oncology Center. This trial is the first to compare a single agent, aldoxorubicin, to five of the most commonly used treatment options for STS patients that have received prior chemotherapy. The *rapid timeframe in which this Phase 3 trial reached its targeted enrollment reflects the desire of practitioners for more efficacious therapies*."

* * *

The primary endpoint of the study is PFS and will be calculated after 191 events occur…. In January 2014, CytRx announced that it received approval from the FDA to amend the Phase 3 protocol to continue dosing patients with aldoxorubicin until disease progression as defined by RECIST 1.1 criteria. *The ability to dose until disease progression creates the potential for substantially improved Phase 3 efficacy results*.

(emphasis added).

79.     In a March 11, 2016, Form 8-K and press release announcing the release of year-end 2015 financial results, Defendants again stated that they would initiate the submission of the NDA by the end of 2016 and "project[ed] aldoxorubicin's market launch in 2017." Defendants also again touted the fact that, despite the partial hold, Phase 3 trial enrollment had completed *early*:

"*2015 was an important year as CytRx achieved several key milestones, including completing the enrollment of our global, pivotal Phase 3 trial with aldoxorubicin one quarter ahead of schedule*," said Steven A. Kriegsman, CytRx's Chairman and CEO.

(emphasis added).

80.     On April 4, 2016, Defendants announced that they had reached the 191 events required to trigger data analysis and again reiterated that the Phase 3 data would be ready by the end of the second quarter 2016. Defendants announced, in relevant part:

> CytRx Corporation (NASDAQ: CYTR), a biopharmaceutical research and development company specializing in oncology, today announced that it has reached the target number of progression events in its pivotal, global phase 3 clinical trial with aldoxorubicin as a treatment for patients with second-line soft tissue sarcomas. In accordance with the statistical analysis plan which is incorporated in the Special Protocol Assessment (SPA) granted by the FDA, 191 events were required to trigger the analysis of the primary endpoint of progression-free survival (PFS). The events were reviewed and verified by an independent, blinded radiology organization contracted by CytRx to analyze all of the scans for the Phase 3 pivotal clinical trial.
>
> "***Reaching the number of events is an important milestone for the aldoxorubicin Phase 3 trial***," said Daniel Levitt, M.D., Ph.D., CytRx's EVP and Chief Medical Officer. "***Now we, along with our contract research organization, are in the process of collecting, verifying and analyzing all of the trial data from the 79 sites around the globe. While this is a large undertaking, we expect to have top-line results at the end of this quarter.***"

(emphasis added.)

81.     Defendants patted themselves on the back again in the Company's May 11, 2016 Form 8-K and press release announcing 1Q 2016 financial results. Reaffirming the timelines yet again a mere month before Phase 3 results were due in, Defendants stated, in relevant part:

> "So far, 2016 has been a very productive year for CytRx," said Steven A. Kriegsman, Chairman and CEO of CytRx. "On the clinical front, ***we reached the 191 progression events in our global, pivotal Phase 3 trial with aldoxorubicin in second-line soft tissue sarcoma to trigger the data verification and analysis. We look forward to announcing top-line results at the end of June 2016.***"

(emphasis added.)

82.     On June 6, 2016, Defendants assured the market that CytRx's aldoxorubicin data looked good, stating, in part, that:

> "*The clinical data presented this year at ASCO [American Society of Clinical Oncology] continues to support the safety and activity of aldoxorubicin* in multiple high unmet need tumor types, including in late-stage and heavily pre-treated patients," commented Daniel Levitt, M.D., Ph.D., CytRx's Executive Vice President and Chief Medical Officer.

(emphasis added.)

83.     On June 7, 2016, Defendants revised the timeline for announcing the Phase 3 study results slightly, stating that they would "update our business information on our pivotal Phase 3 trial of aldoxorubicin as a therapy for patients with soft tissue sarcoma, or STS, whose tumors have progressed following treatment with chemotherapy, as follows: We now expect to report top-line results on progression-free survival, or PFS, the trial's primary endpoint, in July 2016."

**F.     The Truth Emerges: The Revelation of Delays and Materialization of Defendants' Previously Undisclosed Risks Threatening the Phase 3 Study Causes CytRx's Stock Price to Plummet**

84.     Defendants abruptly reversed their previously positive course when, after the close of regular market trading on July 11, 2016, they announced that the long-awaited results of the Phase 3 study had been negatively impacted by delays purportedly caused by the partial clinical hold. Defendants explained, in part:

> CytRx Corporation (NASDAQ: CYTR), a biopharmaceutical research and development company specializing in oncology, today announced the results of an analysis of its global, randomized, Phase 3 clinical trial of aldoxorubicin compared to investigator's choice therapy in patients with relapsed or refractory soft tissue sarcomas (STS).

> In accordance with the FDA-granted special protocol assessment, the current analysis occurred following 191 progression events. *Because enrollment was interrupted by a partial clinical hold in November 2014, this analysis did not provide for sufficient follow-up for the nearly two-thirds of patients who entered the Phase 3 study after the hold was resolved and enrollment resumed. This resulted in nearly half*

*of all patients being censored (excluded) from the current progression free survival (PFS) evaluation. CytRx expects to conduct a second analysis, which will include longer patient follow-up and allow for greater maturation of all endpoints.* The Company expects to announce the results of this evaluation and hold an end-of-Phase 3 meeting with the Food and Drug Administration (FDA) in the fourth quarter of 2016. The partial clinical hold was related to a single patient enrolled in a compassionate use study, which was subsequently resolved successfully.

For the current evaluation, the study did not show a significant difference between aldoxorubicin and investigator's choice therapy for PFS, with a median of 4.17 months and 4.04 months, respectively, for the study's primary endpoint (hazard ratio: 0.91). However, the most immediate indications of therapeutic activity, objective response rate (ORR) and disease control rate (ORR + stable disease $\geq$ 4 months), showed a near doubling in the aldoxorubicin arm compared to investigator's choice, including in patients who previously received treatment with doxorubicin. Disease control rate for aldoxorubicin was significantly greater than investigator's choice therapy in the intent-to-treat population (p=0.048) as well as in patients who received prior doxorubicin (p=0.0415). Patients continue to be followed for overall survival (OS), a secondary endpoint of the trial.

"While results from this current analysis are immature, a near doubling of response rates with aldoxorubicin suggests a highly active therapy which may benefit certain patients with soft tissue sarcoma," said Sant Chawla, M.D., F.R.A.C.P., Principal Investigator and the Director of the Sarcoma Oncology Center in Santa Monica, California. "*Because enrollment was interrupted by a clinical hold, both PFS and response data need to be analyzed at a future date to account for patients enrolled later in the trial*. I look forward to this subsequent analysis providing a more complete understanding of aldoxorubicin's potential in this very challenging disease."

(emphasis added.)

85.    At 5:00 p.m. on July 11, 2016, Defendants held a Business Update conference call and webcast, during which Defendant Kriegsman explained: "As we announced a short while ago, *the unforeseen clinical hold that interrupted this study*

*in 2014 impacted the outcome of the current evaluation, underscoring a need for subsequent analysis.*" (emphasis added.)

86.    Also during the July 11, 2016 call and webcast, Daniel Levitt ("Levitt"), Executive Vice President and Chief Medical Officer, further explained on behalf of the Company:

> Our study is a randomized, controlled Phase 3 trial, which enrolled 433 patients at 79 sites in 15 countries with the majority of patients in (technical difficulty) patients with metastatic, locally advanced or unresectable soft tissue sarcomas who had either not responded to or who had progressed following treatment with one or more systemic regiments of non-adjuvant chemotherapy were randomized one-to-one to be treated with aldoxorubicin or the investigator's choice of an approved chemotherapeutic regimen, including doxorubicin, ifosfamide, dacarbazine, pazopanib, or gemcitabine plus docetaxel.

> The primary endpoint of the study is progression-free survival. Secondary endpoints include overall survival, response rates and safety. Patient characteristics were well-balanced between the treatment and control arms.

> In accordance with an FDA-granted Special Protocol Assessment, the current analysis we are reporting on today was triggered by the 191st event of progression. However, *because enrollment was interrupted by a partial clinical hold in November of 2014 and full enrollment did not resume until several months later, this analysis essentially captured a relatively short period of follow-up for anyone enrolled after the hold.*

> *Because nearly two-thirds of patients fall into this category it had a substantial impact on our current analysis with nearly half of all patients (technical difficulty) survival evaluation. In other words, in March at the time of this data analysis cutoff, nearly half of patients were excluded from the analysis of the endpoint.*

> As a reminder, the partial hold was related to an event with a single patient from a compassionate use protocol and was successfully resolved. *We now plan to conduct a second analysis which will include longer patient follow-up and allow for greater maturation of all endpoints later this year. And we expect to announce the outcome of this second analysis sometime in the fourth quarter of 2016.*

***All that being said, from the current evaluations we did not show a significant difference between aldoxorubicin and investigator's choice therapy for progression-free survival, the study's primary point.*** Median PFS by blinded central review was 4.17 months for aldoxorubicin and 4.04 months for investigator's choice, resulting in a hazard ratio of 0.91.

Importantly, however, we saw a clear indication of activity in pre-planned secondary endpoints including objective response rate and disease control rate, defined as objective response rate plus stable disease of greater than four months. These outcomes showed a near doubling in the aldoxorubicin arm compared to investigator's choice including in patients who previously received treatment with doxorubicin.

Disease control rate for aldoxorubicin was significantly greater than investigator's choice therapy in the intent-to- treat population as well as in patients who received prior doxorubicin. Treatment-related adverse events for aldoxorubicin were consistent with those observed in prior studies, and the drug was not associated with clinically significant cardiac, kidney or liver toxicities.

This first-of-its-kind study in soft tissue sarcoma has a comparator arm with multiple regiments, in many ways setting a very high bar for aldoxorubicin to clear by allowing for physicians to tailor the comparator to specific sarcoma subtypes. Despite this requirement under our SPA, aldoxorubicin demonstrated markedly greater activity over investigator's choice therapy in several outcomes.

While we would have preferred a clearer outcome, we are encouraged by a strong level of activity with aldoxorubicin and its manageable toxicity and expect to learn more from the subsequent analyses. We sincerely thank the trial investigators and clinical sites for their hard work and support. More importantly, we are deeply appreciative to the patients and their families for their ongoing participation in this important trial.

(emphasis added.)

87.    Also during the same July 11, 2016 call and webcast, Levitt responded to an analyst's question regarding the censoring of patients:

Robin Davison, New Science Global Healthcare Fund: I'm still trying to understand what you are suggesting with this heavy censoring of the patients. My understanding is you've analyzed all 191 patients that have

progressed, so there's no patients that you know to have progressed that haven't been censored, presumably? There is subsequent confirmation or anything like that is there, here?

Levitt: Not on the patients that have progressed. [B]ut certainly on the large number of patients that have been censored we don't yet know whether they've been censored because they have not progressed at the time of data cutoff, or whether they somehow fell out of the study and are no longer being followed. So there are (multiple speakers) of those patients.

ROBIN DAVISON: Yes, okay. Can I just understand it, is there a specific triggering event for the second analysis, like a number of progressions or an OS [overall survival] event? Or is it just that you have a meeting with the FDA so you will do a second analysis at that point, surely that can't be the triggering event?

DANIEL LEVITT: The triggering event for that, frankly, will occur when we would plan to have -- yes, it would be when we would plan to have a meeting with the FDA, and also in terms of when a number of patients, which I won't go into right now, have left the censoring roles, and where they have had progression. But I won't go into that right now.

88.     On this news and materialization of previously undisclosed risk, CytRx's stock price fell $1.50 per share, or over 59%, to close at $1.01 per share on July 12, 2016, on unusually heavy trading volume. The Company's stock price continued to decline over the next two trading days as investors digested the news, falling an additional 10%, to close at $0.90 per share on July 14, 2016.

**G.      Post-Class Period Events Shed Further Light on Defendants' Fraud**

89.     An article published by *Seeking Alpha* on July 19, 2016 explained the problem, essentially echoing Defendants' stated explanation that extended exposure to aldoxorubicin was required to yield beneficial results. The *Seeking Alpha* article explained the effect of delayed or late enrollment and insufficient dosing and follow-up time for aldoxorubicin patients, in relevant part, as follows:

Say a study has 400 patients, and say it was enrolled over 3 years with a very slow ramp the first year, gradually increasing ramp the second year, reaching its peak accrual rate, and maintaining that peak rate until fully

enrolled. And say half of these patients then "event" sometime after it is fully enrolled. What are you seeing in those data? A pretty good representation of the whole. Because you have a good number of long tail patients who were enrolled those first 2 years especially. So it's a good glimpse of how the whole will do. And 50% of the sample "evented" is about the earliest for a sample of that size enrolled in that amount of time that you could reproduce data reliable enough to petition regulators for approval with (earlier is possible but data would have to be extremely significant).

And although final PFS or OS hazard ratios ("HR") will differ from what they were recognized to be at this earlier junction, it's unlikely to be an appreciable enough difference to matter.

***This implies though that the trial ran according to design that it followed a preplanned accrual time and follow up.*** And it assumes that control group performed about as expected. ***If true, then the trial will be well powered to detect a difference between groups (over 80%). If not, the powering will be lower. How can you "power up" a trial? Just wait for more events. It will gain more "power" very simply this way. In other words, data will more accurately reflect a difference between groups (rejecting the null hypothesis) if such a difference does indeed exist.***

There are many studies that are designed to even "intervene" in effect by incorporating a sample size reestimation ("SSR") procedure part way through the test. Usually after a high percentage of the patients have been enrolled. If accrual time has been much slower than expected, or if control group is eventing slower than expected, more events will be required to derive a well powered result…. However there was no SSR conducted in the aldoxorubicin P3 study. And ***due to the extremely fast back-half of enrollment, had insufficient follow-up time to attain the initially designed powering***.

As an example of why that's an issue, let's say you enrolled 400 patients in one month. All in one month. It's absurd, but it will illustrate the point. Now, let's also say you required 200 events for analysis of the final outcome measure. Call it PFS. What will happen? You will only see data up to the median. You will have no idea how right of median patients perform, and so the hazard ratio will be immature. ***How to solve this? Require more follow up time. Or, de facto, more events***.

*Seeking Alpha*, "*Can Aldoxorubicin Still Pass the Test?*" (July 19, 2016) (emphasis added).

90.     The author of the July 19, 2016 *Seeking Alpha* report further investigated, compiled and analyzed statistics on the enrollment of CytRx's Phase 3 aldoxorubicin study in an attempt to model the study's enrollment curve.  According to the *Seeking Alpha* report:

> The aldoxorubicin P3 study was 1/3 enrolled (about 140 patients) before the clinical hold lifted (mid-Jan 2015). After the hold lifted, it took some time for sites to begin accruing again. Some EU sites took up to 6 months to come back online. From Feb 2015 to July 2015 they randomized a further 70-100 patients (between 200-230 total). So it took from summer 2014 to July 2015 to randomize 200-230 patients, about 40% of whom were randomized in those 5 months after the hold. They then randomized 200-230 more in just 6 months. Then the 191 PFS event trigger was announced April 4th, but likely occurred in the trial sometime in March of 2016.

> So the breakdown of enrollment is as follows:

> -70 patients randomized to either arm by the lifting of the hold, which is about 14-18 months prior to the 191 event trigger.

> -30-45 patients randomized to either arm from the time the hold lifted until mid-2015, which is about 8-12 months before the 191 event trigger.

> -100-115 patients randomized to either arm in six months, which is 3-8 months before the 191 event trigger.

> So 100-115 patients per arm from 8-18 months, with most enrolled around 8-15 months before the 191 event trigger, and the ***remaining 100-115 per arm enrolled from 3-8 months before 191 trigger, with most of these enrolled from 3-5 months before trigger***.

> ***As you can see, there was a preponderance of patients enrolled in under 8 months before the trigger (about half), and 2/3rds in under 12 months. There may even have been about 100 patients (50 per arm) randomized within 3-5 months of the 191 trigger, which is nearly 25% of all patients.***

(emphasis added.)

91.     With these figures, the *Seeking Alpha* article further employed a model to explain how limited dosing, exposure and follow-up negatively impacted the Phase 3 results, and opined that extended dosing and follow up could positively impact results:

> Let's say around 380 PFS events will be included in the final (by data cutoff). In this analysis, there will be few events contributing to left of *current* median (enrollment complete 4 months prior to April 191 event trigger announcement, and 3 months from over-enrollment; current median PFS is about 4 months). And so if there is a more pronounced long tail, or longterm effect with aldox, this final analysis will better reflect it.

(emphasis in original.)

92.     While the *Seeking Alpha* article remained optimistic that the drug would show statistically significant results upon the additional follow-up and re-testing to support an NDA, other industry commentators have not been so kind, noting that the FDA was not likely to ignore the botched Phase 3 results, regardless of whether the failure to show efficacy really was merely a matter of data immaturity. In response to the Company's November 29, 2016, announcement that it had completed the collection of more "events" and would reassess the Phase 3 data, analyst Adam Feuerstein observed on his biotech blog, TheStreet.com:

> CytRx deleted half of the enrolled sarcoma patients and reanalyzed the failed study results. Poof! Aldoxorubicin works, or so the company now claims.
>
> * * *
>
> CytRx now wants investors to forget about the dismal aldoxorubicin study results of July and focus instead on a "new" analysis involving 246 of the 433 sarcoma patients. In this subgroup, aldoxorubicin reduced the risk of progression-free survival by 38% compared to the control arm -- a benefit CytRx claims is statistically significant.
>
> The U.S. Food and Drug Administration isn't likely to ignore the 187 sarcoma patients CytRx deleted just to claim victory from a failed study.
>
> CytRx says it will file a New Drug Application with the FDA in 2017, seeking approval of aldoxorubicin for the treatment of soft-tissue sarcoma. When in 2017 CytRx intends to file to FDA was not disclosed, but don't be surprised if the company works slowly. If history is a reliable guide (and there's no reason to doubt it) the outcome here will be an FDA rejection. For this reason, CytRx isn't going to be in any rush to start the FDA review clock.

93.     In sum, Defendants' own explanation that the apparent failure of the drug is not really a failure of efficacy, but merely a result of immature data, only highlights their culpability in this case.  Defendants knew or recklessly disregarded the risks that, as a result of the late enrollments and delayed dosing caused by the clinical hold and related study amendments, and the effect that it had on the enrollment, exposure, and power assumptions underlying the study design, the 191 event trigger was more likely to occur when the data was immature (*i.e.*, that patients would be exposed to less dosing and shorter follow-up).  Defendants further knew or recklessly disregarded the risks that assessing the immature Phase 3 data would fail to yield efficacy results, but they charged on, not only concealing these risks from the market, but proudly trumpeting all along that the study and the timeline for NDA submission were on-track.

## V.     MATERIALLY FALSE AND MISLEADING CLASS PERIOD STATEMENTS

94.     The Class Period starts on November 18, 2014, when the Company issued a press release entitled, "CytRx Announces Partial Clinical Hold Affecting Aldoxorubicin Clinical Trials." Therein, Defendants stated, in relevant part:

> CytRx Corporation (NASDAQ: CYTR), a biopharmaceutical research and development company specializing in oncology, today announced that the Company has received notice from the United States Food and Drug Administration (FDA) that its clinical trials for aldoxorubicin have been placed on partial clinical hold. ***All currently enrolled patients can continue receiving aldoxorubicin treatment, or comparator drugs, as per study protocols, but no new patients can be enrolled until the clinical hold is lifted.***
>
> The FDA has indicated that the partial clinical hold is due to the reported death of a patient with advanced-stage cancer who did not qualify to participate in any of the ongoing aldoxorubicin clinical trials, but had received aldoxorubicin under the Company's expanded access ("compassionate use") program. At the FDA's request, the Company will amend all aldoxorubicin study protocols to include an appropriate inclusion/exclusion criteria, an additional patient screening assessment and an evaluation of serum electrolytes prior to aldoxorubicin administration. CytRx is working diligently in collaboration with the

FDA to seek the release of the clinical hold and resume enrollment in its clinical studies as expeditiously as possible.

CytRx currently believes that the partial hold issue will be expeditiously resolved and that *enrollment rates and timelines for its ongoing trials will remain materially unchanged*. . . . CytRx remains committed to completing enrollment of its ongoing pivotal global Phase 3 trial in second-line soft tissue sarcoma by the end of 2015.

(emphasis added.)

95.     The above-quoted statements from the November 18, 2014 press release were materially false or misleading and lacked a reasonable basis because they: (i) misrepresented the full scope and effect of the hold; and (ii) misrepresented and failed to disclose that the results and timeline of the Phase 3 clinical trial of aldoxorubicin, including the NDA submission, were put at significant risk as a result of the partial clinical hold and the FDA's requested amended study protocols. Specifically, Defendants falsely or misleadingly represented that currently enrolled patients would continue receiving treatment "per study protocols," when, in fact, the FDA had requested an amendment to the SPA to require current patients be tested for acidosis prior to receiving each treatment cycle of aldoxorubicin or comparator drug, *and that aldoxorubicin dosing for any patient with acidosis would be delayed until the patient's acid-base balance normalized*. As a result, the treatment cycles (and data collection) of currently enrolled patients faced a significant risk of delay throughout the duration of the Phase 3 clinical trial, especially in light of the predisposition of patients with soft tissue sarcoma to also suffer from metabolic acidosis. Moreover, Defendants' statement that timelines would "remain materially unchanged" was materially false and misleading and lacked a reasonable basis when made, whereas Defendants knew or recklessly disregarded and failed to disclose that (i) current patients were subject to delayed dosing throughout the duration of the Phase 3 trial (as described immediately above), (ii) in light of the study's assumed 15 month follow-up period after enrollment of the last subject and that 90% study power was required to yield efficacy results, and

Defendants' knowledge that longer dosing and patient follow-up "creat[ed] the potential for substantially improved Phase 3 efficacy results," the delays occasioned by the hold and revised protocols presented a material risk to the Phase 3 study's timeline and results.

96.     On December 3, 2014, Defendants issued another press release in which they again announced the partial clinical trial hold and reiterated that it would not materially impact the timeline for the aldoxorubicin Phase 3 study, or the timeline for the submission of the drug's NDA. Defendants explained, in relevant part:

> CytRx Corporation (NASDAQ: CYTR), a biopharmaceutical research and development company specializing in oncology, today announced that the Company has received written notice from the United States Food and Drug Administration (FDA) that its clinical trials for aldoxorubicin have been placed on partial clinical hold. The news supplements and is consistent with the prior verbal communications from the FDA.
>
> As previously announced, ***all currently enrolled patients can continue receiving aldoxorubicin treatment, or comparator drugs, as per study protocols, but no new patients can be enrolled until the clinical hold is lifted.*** At the FDA's request, the Company will amend all aldoxorubicin study protocols to include an appropriate inclusion/exclusion criteria, an additional patient screening assessment and an evaluation of serum electrolytes prior to aldoxorubicin administration. CytRx is working diligently in collaboration with the FDA to seek the release of the clinical hold and resume enrollment in its clinical studies.
>
> CytRx currently believes that the partial hold issue will be expeditiously resolved and that ***enrollment rates and timelines for its ongoing trials will remain materially unchanged***, subject to FDA timing. . . . CytRx remains committed to completing enrollment of its ongoing pivotal global Phase 3 trial in second-line soft tissue sarcoma by the end of 2015.

(emphasis added).

97.     The relevant portions of the above-quoted statements from the December 3, 2014 press release are identical to the statements identified in Defendants' November

18, 2014 press release, and they were materially false and misleading and lacked a reasonable basis when made for the same reasons as set forth in ¶95, *supra*.

98.     On January 20, 2015, Defendants announced in a press release that the FDA had removed the partial hold and that "[e]nrollment and dosing of new patients is now permitted." In the press release, Defendants explained, in relevant part:

> CytRx Corporation (Nasdaq: CYTR), a biopharmaceutical research and development company specializing in oncology, today announced that the United States Food and Drug Administration (FDA) has removed the partial clinical hold on the Company's aldoxorubicin clinical trials. Enrollment and dosing of new patients is now permitted after study sites' Institutional Review Boards (IRBs) approve the revised trial protocols.
>
> "***CytRx developed modified study parameters intended to avoid potential risks***, while allowing the company to evaluate the therapeutic impact of aldoxorubicin for patients with soft tissue sarcoma, glioblastoma, Kaposi's sarcoma, and small cell lung cancer, among other trials," said Steven A. Kriegsman, Chairman and CEO of CytRx. "Our staff worked closely with the FDA Oncology Division to resolve all partial clinical hold issues as rapidly as possible. We expect enrollment and dosing in the ongoing clinical trials to be back underway soon."
>
> ***CytRx currently believes that enrollment rates and timelines for its trials will remain materially unchanged***. The Company expects to complete enrollment in its ongoing pivotal global Phase 3 trial in second-line soft tissue sarcoma by the end of 2015 and unblind the clinical data by mid-2016. Subject to FDA approval, ***CytRx's market launch of aldoxorubicin for second line soft tissue sarcoma is projected to commence in 2017***.

(emphasis added.)

99.     The above-quoted statements from the January 20, 2015 press release were materially false and misleading and lacked a reasonable basis because they: (i) misrepresented the full scope and effect of the hold; and (ii) misrepresented and failed to disclose that the results and timeline of the Phase 3 clinical trial of aldoxorubicin, including the NDA submission, were put at significant risk as a result of the partial clinical hold and the amended study protocols. Specifically, Defendants failed to disclose that under the amended protocols, *aldoxorubicin dosing for any patient who*

*tested positive for acidosis would be delayed until the patient's acid-base balance normalized*. As a result, the treatment cycles (and data collection) of currently enrolled patients faced a significant risk of delay throughout the duration of the Phase 3 clinical trial, especially in light of the predisposition of patients with soft tissue sarcoma to also suffer from metabolic acidosis. Moreover, in light of the study's assumed 15 month follow-up period after enrollment of the last subject and that 90% study power was required to yield efficacy results, and Defendants' knowledge that longer dosing and patient follow-up "creat[ed] the potential for substantially improved Phase 3 efficacy results," Defendants knew or recklessly disregarded and failed to disclose that the delays occasioned by the hold and revised protocols presented a material risk to the Phase 3 study's results and commercialization timeline.

100.   On January 22, 2015, Defendants announced the results of Phase 2b testing on aldoxorubicin's secondary endpoint, overall survival rates of subjects with soft-tissue sarcoma. In a conference call held the same day to discuss those results, Defendant Kreigsman again told investors:

> We expect to ***complete enrollment in the ongoing phase 3 trial by the end of this year***, evaluate the ***clinical trial results by mid-2016***, and subject to FDA approval, ***launch aldoxorubicin commercially in 2017***.

(emphasis added.)

101.   The above-quoted statements from the January 22, 2015 conference call were materially false and misleading and lacked a reasonable basis when made because they misrepresented and failed to disclose that the results and timeline of the Phase 3 clinical trial of aldoxorubicin, including the NDA submission, were put at significant risk as a result of the partial clinical hold and the amended study protocols. Specifically, Defendants failed to disclose that under the amended protocols, *aldoxorubicin dosing for any patient who tested positive for acidosis would be delayed until the patient's acid-base balance normalized*. As a result, the treatment cycles (and data collection) of currently enrolled patients faced a significant risk of delay throughout the duration of

the Phase 3 clinical trial, especially in light of the predisposition of patients with soft tissue sarcoma to also suffer from metabolic acidosis. Moreover, in light of the study's assumed 15 month follow-up period after enrollment of the last subject and that 90% study power was required to yield efficacy results, and Defendants' knowledge that longer dosing and patient follow-up "creat[ed] the potential for substantially improved Phase 3 efficacy results," Defendants knew or recklessly disregarded and failed to disclose that the delays occasioned by the hold and revised protocols presented a material risk to the Phase 3 study's results and commercialization timeline.

102.   The Company announced its 4Q 2014 and year-end 2014 financial results on March 10, 2015. In the Form 10-K of the same date (the "2014 Form 10-K"), signed by Defendants Kriegsman and Caloz, Defendants stated the following regarding the commercialization of aldoxorubicin and the status of the Phase 3 trial, in relevant part:

> In the first quarter of 2014, we initiated a pivotal Phase 3 trial of aldoxorubicin as a therapy for patients with STS whose tumors have progressed following treatment with chemotherapy, and *we have received approval from the FDA to continue dosing patients with aldoxorubicin until disease progression in that clinical trial*. The Phase 3 trial is being conducted under a Special Protocol Assessment, or SPA, granted by the U.S. Food and Drug Administration, or FDA. *The SPA means that the FDA agrees that the design and analyses proposed in the Phase 3 trial protocol are acceptable to support regulatory approval of the product candidate with respect to effectiveness of the indication studied, and will not subsequently change its perspective on these matters, unless previously unrecognized public or animal health concerns were to arise or we were to subsequently modify the protocol. Thus, if the study demonstrates an acceptable benefit-risk profile as determined by the FDA, it would suffice as the single pivotal trial to demonstrate effectiveness and would support registration of aldoxorubicin for this indication*.
>
> * * *
>
> *In January 2014, the Company announced it has received approval from the FDA to amend the Phase 3 protocol to continue dosing patients with aldoxorubicin until disease progression* (defined as an increase in the size of measurable tumors by 20% or the development of a new tumor lesion), *which creates the potential for substantially*

*improved Phase 3 efficacy results*.

(emphasis added.)

103.   The 2014 Form 10-K's description of the SPA was materially false and misleading because it misrepresented and failed to disclose that the SPA *was* "subsequently modif[ied]" at the FDA's insistence in January 2015 following a patient death and the FDA's imposition of the partial clinical hold. Specifically, Defendants knew and yet failed to disclose in the 2014 Form 10-K that: (i) in January 2015, the SPA was amended to require current patients be tested for acidosis prior to receiving each treatment cycle of aldoxorubicin or comparator drug, and that aldoxorubicin dosing for any patient with acidosis would be delayed until their acid-base balance normalized (an undisclosed risk that was only heightened by a patient population prone to metabolic acidosis); (ii) as a result of this amendment to the protocol, the treatment cycles of all patients were at substantial risk of delay throughout the duration of the Phase 3 clinical trial; (iii) the delays occasioned by the hold, both in terms of enrollment and the heightened risk of ongoing disruptions to dosing, put the very enrollment and power assumptions underlying the study's design at substantial risk; and (iv) these undisclosed risks threatened the Phase 3 trial's ability to "demonstrate effectiveness" in accordance with the SPA and to "support registration of aldoxorubicin." Defendants also misleadingly touted the "potential for substantially improved Phase 3 efficacy results" created by the FDA's January 2014 decision to allow extended dosing, while simultaneously omitting material facts regarding the risks posed by the delays and dosing interruptions occasioned by the hold and revised study protocols.

104.   In the Company's Form 10-Q for 1Q 2015, signed by Defendant Caloz and certified by Defendants Kriegsman and Caloz and filed on May 1, 2015, Defendants stated of the Phase 3 aldoxorubicin trial, in relevant part:

> CytRx Corporation ("CytRx" or the "Company") is a biopharmaceutical research and development company specializing in oncology. We currently are focused on the clinical development of aldoxorubicin, our

modified version of the widely-used chemotherapeutic agent, doxorubicin. ***We have initiated under an SPA a pivotal Phase 3 global trial*** with aldoxorubicin as a therapy for patients with soft tissue sarcomas whose tumors have progressed following treatment with chemotherapy, ***and have received approval from the FDA to continue dosing patients with aldoxorubicin until disease progression in that clinical trial***.

(emphasis added.)

105.   The 1Q 2015 Form 10-Q was materially false and misleading because it misrepresented and failed to disclose that the SPA was modified at the FDA's insistence in January 2015 following a patient death and the FDA's imposition of the partial clinical hold. Specifically, Defendants knew and yet failed to disclose in the filing that: (i) in January 2015, the SPA was amended to require current patients be tested for acidosis prior to receiving each treatment cycle of aldoxorubicin or comparator drug, and that aldoxorubicin dosing for any patient with acidosis would be delayed until their acid-base balance normalized (an undisclosed risk that was only heightened by a patient population prone to metabolic acidosis); (ii) as a result of this amendment to the protocol, the treatment cycles of all patients were at substantial risk of delay throughout the duration of the Phase 3 clinical trial; (iii) the delays occasioned by the hold, both in terms of enrollment and the heightened risk of ongoing disruptions to dosing, put the very enrollment and power assumptions underlying the study's design at substantial risk; and (iv) these undisclosed risks threatened the Phase 3 trial's ability to "demonstrate effectiveness" in accordance with the SPA and to "support registration of aldoxorubicin." Moreover, while Defendants were careful to include reference to the one amendment to the SPA that was beneficial to the potential efficacy of the Phase 3 study results, *i.e.* the FDA's approval of extended aldoxorubicin dosing until disease progression, Defendants' simultaneous omission of the hold, the heightened risks of delay to the study caused by the hold, the January 2015 FDA-imposed protocol amendment which required interim testing, and thus even further risk of delay, was

materially false and misleading and created a false impression of the Phase 3 study and the SPA.

106.   In a presentation at the Jefferies & Co. Healthcare Conference in June 2015, under the heading of "Timing," Defendants represented: (1) "enrollment to be completed by Q1 2016;" (2) "PFS data to be available 2H16;" (3) "Projected NDA filing at end of 2016;" and (4) "commercial launch in 2017."

107.   The above-quoted statements from the June 2015 Jefferies & Co. Healthcare Conference were materially false and misleading and lacked a reasonable basis because they misrepresented and failed to disclose that the results and timeline of the Phase 3 clinical trial of aldoxorubicin, including the NDA submission, were put at significant risk as a result of the partial clinical hold and the amended study protocols. Specifically, Defendants failed to disclose that under the amended protocols, *aldoxorubicin dosing for any patient who tested for positive acidosis would be delayed until the patient's acid-base balance normalized*. As a result, the treatment cycles (and data collection) of currently enrolled patients faced a significant risk of delay throughout the duration of the Phase 3 clinical trial, especially in light of the predisposition of patients with soft tissue sarcoma to also suffer from metabolic acidosis. Moreover, in light of the study's assumed 15 month follow-up period after enrollment of the last subject and that 90% study power was required to yield efficacy results, and Defendants' knowledge that longer dosing and patient follow-up "creat[ed] the potential for substantially improved Phase 3 efficacy results," Defendants knew or recklessly disregarded and failed to disclose that the delays occasioned by the hold and revised protocols presented a material risk to the Phase 3 study's results and commercialization timeline. Indeed, by this time in June 2015, while Defendants were projecting enrollment completion by 1Q 2016, Defendants knew or recklessly disregarded the effects of the study hold on relatively "late" enrollments (put another way, Defendants knew or recklessly disregarded that enrollment in the study was being disproportionately weighted toward the end of the enrollment period contrary to the

study's assumptions), thereby posing significant risk to the ability to conduct sufficient dosing and patient follow-up prior to hitting the 191 event trigger.

108.   In the July 22, 2015 Prospectus Supplement (to the Company's December 23, 2013 Prospectus signed by Defendants Caloz and Kriegsman) offering an additional 9.1 million shares, pursuant to which Defendants hoped to raise more than $23 million, Defendants stated of the Phase 3 study and eventual commercialization of aldoxorubicin:

> In the first quarter of 2014, under an SPA agreed to by the FDA, we initiated a pivotal global Phase 3 clinical trial to evaluate the efficacy and safety of aldoxorubicin as a 2nd-line treatment for patients with STS. This multicenter, randomized, open-label Phase 3 clinical trial is designed to enroll approximately 400 patients with metastatic, locally advanced or unresectable STS, who have either not responded to or have progressed following treatment with, one or more systemic regimens of non-adjuvant chemotherapies…. The primary endpoint of the study is PFS, and secondary endpoints include overall survival, response rates and safety. ***In January 2014, the Company announced it has received approval from the FDA to amend the Phase 3 protocol to continue dosing patients with aldoxorubicin until disease progression, which creates the potential for improved Phase 3 efficacy results.***
>
> * * *
>
> In the first quarter of 2014, we initiated a pivotal Phase 3 trial of aldoxorubicin as a therapy for patients with STS whose tumors have progressed following treatment with chemotherapy. The Phase 3 trial is being conducted under a Special Protocol Assessment, or SPA, granted by the FDA. ***The SPA means that the FDA agrees that the design and analyses proposed in the Phase 3 trial protocol are acceptable to support regulatory approval of the product candidate with respect to effectiveness of the indication studied, and will not change its perspective on these matters, except in limited circumstances such as where a sponsor fails to follow a protocol agreed to with the FDA or where previously unrecognized health concerns occur. Thus, if the study demonstrates an acceptable benefit-risk profile as determined by the FDA, it will support registration of aldoxorubicin for this indication. If approved for marketing, our current plan would be to commercially launch aldoxorubicin in late 2017***.

(emphasis added.)

109.   The July 22, 2015 Prospectus Supplement's description of the SPA was materially false and misleading because it misrepresented and failed to disclose that the SPA was amended at the FDA's insistence in January 2015 following a patient death and the FDA's imposition of the partial clinical hold. Specifically, Defendants knew and yet failed to disclose in the filing that: (i) in January 2015, the SPA was amended to require current patients be tested for acidosis prior to receiving each treatment cycle of aldoxorubicin or comparator drug, and that aldoxorubicin dosing for any patient with acidosis would be delayed until their acid-base balance normalized (an undisclosed risk that was only heightened by a patient population prone to metabolic acidosis); (ii) as a result of this amendment to the protocol, the treatment cycles of all patients were at substantial risk of delay throughout the duration of the Phase 3 clinical trial; (iii) the delays occasioned by the hold, both in terms of enrollment and the heightened risk of ongoing disruptions to dosing, put the very enrollment and power assumptions underlying the study's design at substantial risk; and (iv) these undisclosed risks threatened the Phase 3 trial's ability to "demonstrate effectiveness" in accordance with the SPA and to "support registration of aldoxorubicin." Moreover, while Defendants were careful to include reference to the one amendment to the SPA they perceived as beneficial, *i.e.* the FDA's approval of extended aldoxorubicin dosing until disease progression and its "potential for substantially improved Phase 3 efficacy results," Defendants' simultaneous omission of the hold, the heightened risks of delay to the study caused by the hold, and the January 2015 FDA-imposed protocol amendment which required interim testing, and thus even further risk of delay, was materially false and misleading and created a false impression of the Phase 3 study and the SPA.

110.   The Company announced its 2Q 2015 financial results on August 3, 2015. In the Form 10-Q of the same date, signed by Defendant Caloz and certified by Defendants Caloz and Kriegsman, Defendants substantially repeated the same statements regarding the Phase 3 study and eventual commercialization of aldoxorubicin, stating in relevant part:

In the first quarter of 2014, the Company initiated a pivotal Phase 3 trial of aldoxorubicin as a therapy for patients with STS whose tumors have progressed following treatment with chemotherapy. The Phase 3 trial is being conducted under a Special Protocol Assessment, or SPA, granted by the FDA. ***The SPA means that the FDA agrees that the design and analyses proposed in the Phase 3 trial protocol are acceptable to support regulatory approval of the product candidate with respect to effectiveness of the indication studied, and will not change its perspective on these matters, except in limited circumstances such as where a sponsor fails to follow a protocol agreed to with the FDA or where previously unrecognized health concerns occur. Thus, if the study demonstrates an acceptable benefit-risk profile as determined by the FDA, it will support registration of aldoxorubicin for this indication. If approved for marketing, the Company's current plan would be to commercially launch aldoxorubicin in late 2017.***

(emphasis added.)

111.   The 2Q 2015 Form 10-Q was materially false and misleading because it misrepresented and failed to disclose that the SPA was amended at the FDA's insistence in January 2015 following a patient death and the FDA's imposition of the partial clinical hold. Specifically, Defendants knew and yet failed to disclose in the filing that: (i) in January 2015, the SPA was amended to require current patients be tested for acidosis prior to receiving each treatment cycle of aldoxorubicin or comparator drug, and that aldoxorubicin dosing for any patient with acidosis would be delayed until their acid-base balance normalized (an undisclosed risk that was only heightened by a patient population prone to metabolic acidosis); (ii) as a result of this amendment to the protocol, the treatment cycles of all patients were at substantial risk of delay throughout the duration of the Phase 3 clinical trial; (iii) the delays occasioned by the hold, both in terms of enrollment and the heightened risk of ongoing disruptions to dosing, put the very enrollment and power assumptions underlying the study's design at substantial risk; and (iv) these undisclosed risks threatened the Phase 3 trial's ability to "demonstrate effectiveness" in accordance with the SPA and to "support registration of aldoxorubicin." The projected 2017 commercial launch was materially false and misleading and lacked a reasonable basis because Defendants misrepresented and failed

to disclose that the results and timeline of the Phase 3 clinical trial of aldoxorubicin, including the NDA submission, were put at significant risk as a result of the partial clinical hold and the amended study protocols.

112. In the press release attached to the Company's Form 8-K announcing the release of 2Q 2015 financial results, filed on August 3, 2015, Defendants stated that:

> "The second quarter of 2015 has been very productive for CytRx. **Enrollment in our ongoing pivotal global Phase 3 clinical trial of aldoxorubicin in soft tissue sarcoma (STS) continues on track** to be completed in the first quarter of 2016."

(emphasis added.)

113. Defendants' statement that enrollment was "on track" was materially false and misleading when made because Defendants knew or recklessly disregarded that the clinical hold presented a material risk to the study's underlying enrollment and power assumptions. Indeed, in light of the study's assumed 15 month follow-up period after enrollment of the last subject and that 90% study power was required to yield efficacy results, and Defendants' knowledge that longer dosing and patient follow-up "creat[ed] the potential for substantially improved Phase 3 efficacy results" (such that, conversely, delays to or interruptions in dosing posed a risk to efficacy results), Defendants knew or recklessly disregarded and failed to disclose that the delays occasioned by the hold and revised protocols presented a material risk to the Phase 3 study's results and commercialization timeline *even if* enrollment were to be completed on-time.

114. In a corporate overview presentation in August 2015, Defendants again represented that: (1) "enrollment to be completed by Q1 2016;" (2) "PFS data to be available 2H16;" (3) "Projected NDA filing at end of 2016;" and (4) "commercial launch in 2017."

115. The above-quoted statements from the August 2015 Company presentation are identical to the Company's June 2015 presentation, and were materially false and misleading and lacked a reasonable basis for the same reasons as set forth in ¶107, *supra*. Indeed, by this time in August 2015, while Defendants were projecting

enrollment completion by 1Q 2016, Defendants knew or recklessly disregarded the effects of the study hold on relatively "late" enrollments (put another way, Defendants knew that enrollment in the study was being disproportionately weighted toward the end of the enrollment period contrary to the study's assumptions), thereby posing significant risk to the ability to conduct sufficient dosing and patient follow-up prior to hitting the 191 event trigger.

116.    The Company announced its 3Q 2015 financial results on November 3, 2015. In the Form 10-Q of the same date, signed by Defendant Caloz and certified by Defendants Caloz and Kriegsman, Defendants substantially repeated the same statements regarding the Phase 3 study and eventual commercialization of aldoxorubicin, stating in relevant part:

> In the first quarter of 2014, the Company initiated a pivotal Phase 3 trial of aldoxorubicin as a therapy for patients with STS whose tumors have progressed following treatment with chemotherapy. The Phase 3 trial is being conducted under a Special Protocol Assessment, or SPA, granted by the FDA. ***The SPA means that the FDA agrees that the design and analyses proposed in the Phase 3 trial protocol are acceptable to support regulatory approval of the product candidate with respect to effectiveness of the indication studied, and will not change its perspective on these matters, except in limited circumstances such as where a sponsor fails to follow a protocol agreed to with the FDA or where previously unrecognized health concerns occur. Thus, if the Phase 3 study demonstrates an acceptable benefit-risk profile as determined by the FDA, it will support registration of aldoxorubicin for this indication. If approved for marketing, the Company's current plan would be to commercially launch aldoxorubicin in late 2017***.

(emphasis added.)

117.    The above-quoted statements from Form 10-Q for the 3Q 2015 are identical to the Company's 2Q 2015 and were false and misleading and lacked a reasonable basis when made for the same reasons as set forth in ¶111, *supra*.

118.    Also on November 3, 2015, Defendants continued to maintain the study timelines. In a press release of the same date, attached to a Form 8-K signed by

Defendant Caloz, announcing the Company's 3Q 2015 financial results, Defendants stated, in part:

> "***Enrollment in our pivotal global Phase 3 clinical trial of aldoxorubicin in soft tissue sarcoma (STS) continues to progress quite favorably, and is on track to be completed next quarter as planned, with data expected in the second half of 2016***," said Steven A. Kriegsman, Chairman and CEO of CytRx.

(emphasis added.)

119.   The above-quoted statements from the November 3, 2015 press release were materially false and misleading and lacked a reasonable basis when made because they misrepresented and failed to disclose that the results and timeline of the Phase 3 clinical trial of aldoxorubicin, including the NDA submission, were put at significant risk as a result of the partial clinical hold and the amended study protocols. Specifically, Defendants failed to disclose that under the amended protocols, *aldoxorubicin dosing for any patient who tested positive for acidosis would be delayed until the patient's acid-base balance normalized*. As a result, the treatment cycles (and data collection) of currently enrolled patients faced a significant risk of delay throughout the duration of the Phase 3 clinical trial, especially in light of the predisposition of patients with soft tissue sarcoma to also suffer from metabolic acidosis. Moreover, Defendants' statement that enrollment in the study "continues to progress quite favorably" was false and misleading in light of the study's assumed 15 month follow-up period after enrollment of the last subject and that 90% study power was required to yield efficacy results, and Defendants' knowledge that longer dosing and patient follow-up "creat[ed] the potential for substantially improved Phase 3 efficacy results." Under these circumstances, Defendants knew or recklessly disregarded and failed to disclose that the delays occasioned by the hold and revised protocols presented a material risk to the Phase 3 study's results and commercialization timeline. Indeed, by this time in November 2015, while Defendants were projecting enrollment completion by early 2016, Defendants knew or recklessly disregarded the effects of the study hold on

relatively "late" enrollments (put another way, Defendants knew that enrollment in the study was being disproportionately weighted toward the end of the enrollment period contrary to the study's assumptions), thereby posing significant risk to the ability to conduct sufficient dosing and patient follow-up prior to hitting the 191 event trigger.

120.   In a corporate overview presentation in November 2015, Defendants again represented that: (1) "enrollment to be completed by Q1 2016;" (2) "PFS data to be available 2H16;" (3) "Projected NDA filing at end of 2016;" and (4) "commercial launch in 2017."

121.   The above-quoted statements from the corporate overview presentation in November 2015 are identical to the Company's June 2015 and August 2015 presentations and were materially false and misleading and lacked a reasonable basis when made for the same reasons as set forth in ¶¶107 and 115, *supra*. Moreover, by this time in November 2015, while Defendants were projecting enrollment completion by early 2016, Defendants knew or recklessly disregarded the effects of the study hold on relatively "late" enrollments (put another way, Defendants knew that enrollment in the study was being disproportionately weighted toward the end of the enrollment period contrary to the study's assumptions), thereby posing significant risk to the ability to conduct sufficient dosing and patient follow-up prior to hitting the 191 event trigger.

122.   On December 1, 2015, Defendants again maintained the study timelines and announced the completion of patient enrollment, ahead of schedule. Specifically, in a press release of the same date, the Company announced:

> [*The Company*] *has reached its enrollment target of 400 patients for the company's pivotal global Phase 3 clinical trial of aldoxorubicin* in patients with previously treated soft tissue sarcoma (STS). Enrollment was originally estimated to be completed in Q1 2016.
>
> * * *
>
> "It is a true testament to the dedicated work of our clinical team, the enthusiasm of our participating physicians, and the willingness of patients to participate in our study that *enrollment in our global pivotal Phase 3 clinical trial was completed ahead of schedule*," said Steven A.

Kriegsman, Chairman and CEO of CytRx. "*We now expect to report the primary endpoint of top-line progression-free survival (PFS) in the first half of 2016, and pre-commercial launch activities are underway*." (emphasis added.)

123.   The above-quoted statements from the December 1, 2015 press release were materially false and misleading and lacked a reasonable basis when made because they misrepresented and failed to disclose that the results and timeline of the Phase 3 clinical trial of aldoxorubicin, including the NDA submission, were put at significant risk as a result of the partial clinical hold and the amended study protocols. Specifically, Defendants failed to disclose that under the amended protocols, *aldoxorubicin dosing for any patient who tested positive for acidosis would be delayed until the patient's acid-base balance normalized*. As a result, the treatment cycles (and data collection) of currently enrolled patients faced a significant risk of delay throughout the duration of the Phase 3 clinical trial, especially in light of the predisposition of patients with soft tissue sarcoma to also suffer from metabolic acidosis. Moreover, in light of the study's assumed 15 month follow-up period after enrollment of the last subject and that 90% study power was required to yield efficacy results, and Defendants' knowledge that longer dosing and patient follow-up "creat[ed] the potential for substantially improved Phase 3 efficacy results," Defendants knew or recklessly disregarded and failed to disclose that the delays occasioned by the hold and revised protocols presented a material risk to the Phase 3 study's results and commercialization timeline. Indeed, by the time Defendants announced the completion of enrollment in December 2015, Defendants knew that enrollment in the study had been disproportionately weighted toward the end of the enrollment period, contrary to the study's assumptions, thereby posing significant risk to the ability to conduct sufficient dosing and patient follow-up prior to hitting the 191 event trigger.

124.   In the Company's Form S-3 Registration Statement filed on December 30, 2015 and signed by Defendants Caloz and Kriegsman, Defendants substantially

repeated the same statements regarding the Phase 3 study and commercialization of aldoxorubicin, stating in relevant part:

> In the first quarter of 2014, we initiated a pivotal global Phase 3 clinical trial to evaluate the efficacy and safety of aldoxorubicin as a second-line treatment for patients with soft tissue sarcoma (STS) under a Special Protocol Assessment with the FDA. This multicenter, randomized, open-label Phase 3 clinical trial is designed to enroll approximately 400 patients with metastatic, locally advanced or unresectable soft tissue sarcomas who have either not responded to, or have progressed following treatment with, one or more systemic regimens of non-adjuvant chemotherapies … The primary endpoint of the study is progression-free survival (PFS), and secondary endpoints include overall survival, response rates and safety. ***In January 2014, the Company announced it has received approval from the FDA to amend the Phase 3 protocol to continue dosing patients with aldoxorubicin until disease progression*** (defined as an increase in the size of measurable tumors by 20% or the development of a new tumor lesion), ***which creates the potential for substantially improved Phase 3 efficacy results***.
>
> * * *
>
> ***The SPA means that the FDA agrees that the design and analyses proposed in the Phase 3 trial protocol are acceptable to support regulatory approval of the product candidate with respect to effectiveness of the indication studied, and will not subsequently change its perspective on these matters, unless previously unrecognized public or animal health concerns were to arise or we were to subsequently modify the protocol. Thus, if the study demonstrates an acceptable benefit-risk profile as determined by the FDA, it would suffice as the single pivotal trial to demonstrate effectiveness and would support registration of aldoxorubicin for this indication***.

(emphasis added.)

125.   The December 30, 2015 Form S-3's description of the SPA was materially false and misleading because it misrepresented and failed to disclose that the SPA was amended at the FDA's insistence in January 2015 following a patient death and the FDA's imposition of the partial clinical hold. Specifically, Defendants knew and yet failed to disclose in the filing that: (i) in January 2015, the SPA was amended to require current patients be tested for acidosis prior to receiving each treatment cycle of

aldoxorubicin or comparator drug, and that aldoxorubicin dosing for any patient with acidosis would be delayed until their acid-base balance normalized (an undisclosed risk that was only heightened by a patient population prone to metabolic acidosis); (ii) as a result of this amendment to the protocol, the treatment cycles of all patients were at substantial risk of delay throughout the duration of the Phase 3 clinical trial; (iii) the delays occasioned by the hold, both in terms of enrollment and the heightened risk of ongoing disruptions to dosing, put the very enrollment and power assumptions underlying the study's design at substantial risk; and (iv) these undisclosed risks threatened the Phase 3 trial's ability to "demonstrate effectiveness" in accordance with the SPA and to "support registration of aldoxorubicin." Defendants also misleadingly touted the "potential for substantially improved Phase 3 efficacy results" created by the FDA's January 2014 decision to allow extended dosing, while simultaneously omitting any reference to the hold or to the January 2015 FDA-imposed protocol amendment which required interim testing and the risks of delay attendant to it.

126.   As late as the Company's Form 10-K for year-end 2015, filed on March 11, 2016 (the "2015 Form 10-K") and signed by Defendants Kriegsman and Caloz, Defendants again misrepresented the SPA and continued to maintain the study timelines, stating in relevant part:

> In the first quarter of 2014, we initiated a pivotal Phase 3 trial of aldoxorubicin as a therapy for patients with STS whose tumors have progressed following treatment with chemotherapy, and we have received approval from the FDA to continue dosing patients with aldoxorubicin until disease progression in that clinical trial. ***The Phase 3 trial is being conducted under a Special Protocol Assessment, or SPA, granted by the U.S. Food and Drug Administration, or FDA. The SPA means that the FDA agrees that the design and analyses proposed in the Phase 3 trial protocol are acceptable to support regulatory approval of the product candidate with respect to effectiveness of the indication studied, and will not subsequently change its perspective on these matters, unless previously unrecognized public or animal health concerns were to arise or we were to subsequently modify the protocol. Thus, if the study demonstrates an acceptable benefit-risk profile as***

> ***determined by the FDA, it would suffice as the single pivotal trial to demonstrate effectiveness and would support registration of aldoxorubicin for this indication.*** The clinical trial has completed its target enrollment of 400 patients at approximately 79 clinical sites in the U.S., Europe, Canada, Latin America and Australia. ***We expect to report the top-line results on PFS the trial's primary endpoint, in the first half of 2016.***
>
> * * *
>
> ***In January 2014, the Company announced it has received approval from the FDA to amend the Phase 3 protocol to continue dosing patients with aldoxorubicin until disease progression*** (defined as an increase in the size of measurable tumors by 20% or the development of a new tumor lesion), ***which creates the potential for substantially improved Phase 3 efficacy results***.

(emphasis added.)

127.   The above-quoted statements regarding the SPA are identical to Defendants' descriptions of the SPA in previous SEC filing and were false and misleading for the same reasons as set forth in ¶¶103, 109, 111, 117, and 125, *supra*. Indeed, by this time in March 2016, over three months since Defendants announced that enrollment in the Phase 3 study was completed, Defendants knew that enrollment in the study was being disproportionately weighted toward the end of the enrollment period (contrary to the study's assumptions), thereby posing significant risk to the ability to conduct sufficient dosing and patient follow-up prior to hitting the 191 event trigger.

128.   In a press release also dated March 11, 2016, attached to a Form 8-K signed by Defendant Caloz, announcing the release of the year-end 2015 financial results, Defendants stated, in relevant part:

> "2015 was an important year as CytRx achieved several key milestones, ***including completing the enrollment of our global, pivotal Phase 3 trial with aldoxorubicin one quarter ahead of schedule***," said Steven A. Kriegsman, CytRx's Chairman and CEO.
>
> **Upcoming Milestones**
>
> * * *

Announce top-line data from the global, pivotal Phase 3 clinical trial of aldoxorubicin as second-line treatment in patients with soft tissue sarcomas in the next quarter ending June 30, 2016. Subject to FDA approval, the Company projects aldoxorubicin's market launch in 2017.

(emphasis added.)

129.   The above-quoted statements from the March 11, 2016 press release were materially false and misleading because they failed to disclose that, despite completing enrollment "ahead of schedule," enrollment was heavily weighted toward the back half of the enrollment period. Moreover, Defendants' statements were materially false and misleading and lacked a reasonable basis when made because they misrepresented and failed to disclose that the results and timeline of the Phase 3 clinical trial of aldoxorubicin, including the NDA submission, were put at significant risk as a result of the partial clinical hold and the amended study protocols. Specifically, Defendants failed to disclose that under the amended protocols, *aldoxorubicin dosing for any patient who tested positive for acidosis would be delayed until the patient's acid-base balance normalized*. As a result, the treatment cycles (and data collection) of currently enrolled patients faced a significant risk of delay throughout the duration of the Phase 3 clinical trial, especially in light of the predisposition of patients with soft tissue sarcoma to also suffer from metabolic acidosis. Moreover, in light of the study's assumed 15 month follow-up period after enrollment of the last subject and that 90% study power was required to yield efficacy results, and Defendants' knowledge that longer dosing and patient follow-up "creat[ed] the potential for substantially improved Phase 3 efficacy results," Defendants knew or recklessly disregarded and failed to disclose that the delays occasioned by the hold and revised protocols presented a material risk to the Phase 3 study's results and commercialization timeline. Indeed, by this time in March 2016, over three months since Defendants announced that enrollment in the Phase 3 study was completed, Defendants knew that enrollment in the study was being disproportionately weighted toward the end of the enrollment period (contrary to the

study's assumptions), thereby posing significant risk to the ability to conduct sufficient dosing and patient follow-up prior to hitting the 191 event trigger.

130.   In a press release dated April 4, 2016, Defendants announced that the study had reached the 191 event trigger to commence data analysis, explaining, in relevant part:

> CytRx Corporation (NASDAQ: CYTR), a biopharmaceutical research and development company specializing in oncology, today announced that **it has reached the target number of progression events in its pivotal, global phase 3 clinical trial with aldoxorubicin as a treatment for patients with second-line soft tissue sarcomas. In accordance with the statistical analysis plan which is incorporated in the Special Protocol Assessment (SPA) granted by the FDA, 191 events were required to trigger the analysis of the primary endpoint of progression-free survival (PFS)**. The events were reviewed and verified by an independent, blinded radiology organization contracted by CytRx to analyze all of the scans for the Phase 3 pivotal clinical trial.

> "Reaching the number of events is an important milestone for the aldoxorubicin Phase 3 trial," said Daniel Levitt, M.D., Ph.D., CytRx's EVP and Chief Medical Officer. "Now we, along with our contract research organization, are in the process of collecting, verifying and analyzing all of the trial data from the 79 sites around the globe. **While this is a large undertaking, we expect to have top-line results at the end of this quarter**. We are continuing to actively treat and follow patients who have not progressed and are analyzing data to determine the overall survival and safety."

> * * *

> CytRx plans to discuss with the FDA initiating a rolling **New Drug Application by the end of 2016**, subject to the outcome of the Phase 3 pivotal trial. Pursuant to FDA approval, **CytRx expects to launch aldoxorubicin in the United States as a treatment for patients with second-line soft tissue sarcoma in the second half of 2017**.

(emphasis added.)

131.   The foregoing statements were materially false and misleading and lacked a reasonable basis when made because they misrepresented and failed to disclose that the results and timeline of the Phase 3 clinical trial of aldoxorubicin, including the

NDA submission, were put at significant risk as a result of the partial clinical hold and the amended study protocols. Specifically, Defendants failed to disclose that under the amended protocols, *aldoxorubicin dosing for any patient who tested positive for acidosis would be delayed until the patient's acid-base balance normalized*. As a result, the treatment cycles (and data collection) of currently enrolled patients faced a significant risk of delay throughout the duration of the Phase 3 clinical trial, especially in light of the predisposition of patients with soft tissue sarcoma to also suffer from metabolic acidosis. Moreover, in light of the study's assumed 15 month follow-up period after enrollment of the last subject and that 90% study power was required to yield efficacy results, and Defendants' knowledge that longer dosing and patient follow-up "creat[ed] the potential for substantially improved Phase 3 efficacy results," Defendants knew or recklessly disregarded and failed to disclose that the delays occasioned by the hold and revised protocols presented a material risk to the Phase 3 study's results and commercialization timeline. Indeed, by the time Defendants announced the event trigger in April 2016, Defendants knew that enrollment in the study had been disproportionately weighted toward the end of the enrollment period (contrary to the study's assumptions), thereby posing significant risk to the ability to conduct sufficient dosing and patient follow-up prior to hitting the 191 event trigger. More specifically, at the time the event trigger occurred, Defendants knew precisely how many patients had enrolled in the late months and weeks leading up to data analysis in contravention of the study's enrollment and power assumptions.

132.   In the Company's Q1 2016 Form 10-Q, filed on May 10, 2016 and signed by Defendant Caloz and certified by Defendants Caloz and Kriegsman, Defendants stated, in relevant part:

> In the first quarter of 2014, we initiated a pivotal Phase 3 trial of aldoxorubicin as a therapy for patients with STS whose tumors have progressed following treatment with chemotherapy, and we have received approval from the FDA to continue dosing patients with aldoxorubicin until disease progression in that clinical trial. ***The Phase 3***

***trial is being conducted under a Special Protocol Assessment, or SPA, granted by the U.S. Food and Drug Administration, or FDA. The SPA means that the FDA agrees that the design and analyses proposed in the Phase 3 trial protocol are acceptable to support regulatory approval of the product candidate with respect to effectiveness of the indication studied, and will not subsequently change its perspective on these matters, unless previously unrecognized public or animal health concerns were to arise or we were to subsequently modify the protocol. Thus, if the study demonstrates an acceptable benefit-risk profile as determined by the FDA, it would suffice as the single pivotal trial to demonstrate effectiveness and would support registration of aldoxorubicin for this indication.*** The clinical trial has enrolled 433 patients at approximately 79 clinical sites in the U.S., Europe, Canada, Latin America and Australia. ***We expect to report the top-line results on progression-free survival, the trial's primary endpoint, towards the end of the second quarter of 2016***.

(emphasis added.)

133.   The above-quoted statements from the Q1 2016 Form 10-Q were materially false and misleading because they misrepresented and failed to disclose that the SPA was amended at the FDA's insistence in January 2015 following a patient death and the FDA's imposition of the partial clinical hold. Specifically, Defendants knew and yet failed to disclose in the filing that: (i) in January 2015, the SPA was amended to require current patients be tested for acidosis prior to receiving each treatment cycle of aldoxorubicin or comparator drug, and that aldoxorubicin dosing for any patient with acidosis would be delayed until their acid-base balance normalized (an undisclosed risk that was only heightened by a patient population prone to metabolic acidosis); (ii) as a result of this amendment to the protocol, the treatment cycles of all patients were at substantial risk of delay throughout the duration of the Phase 3 clinical trial; (iii) the delays occasioned by the hold, both in terms of enrollment and the heightened risk of ongoing disruptions to dosing, put the very enrollment and power assumptions underlying the study's design at substantial risk; and (iv) these undisclosed risks threatened the Phase 3 trial's ability to "demonstrate effectiveness" in accordance

with the SPA and to "support registration of aldoxorubicin." Indeed, by the time Defendants announced the event trigger in April 2016, Defendants knew that enrollment in the study had been disproportionately weighted toward the end of the enrollment period (contrary to the study's assumptions), thereby posing significant risk to the ability to conduct sufficient dosing and patient follow-up prior to hitting the 191 event trigger. More specifically, at the time the event trigger occurred and thereafter, Defendants knew precisely how many patients had enrolled in the late months and weeks leading up to data analysis in contravention of the study's enrollment and power assumptions.

134.    In a press release attached to a Form 8-K filed on May 11, 2016 and signed by Defendant Caloz, announcing the 1Q 2015 results, Defendants stated, in relevant part:

> "So far, 2016 has been a very productive year for CytRx," said Steven A. Kriegsman, Chairman and CEO of CytRx. "***On the clinical front, we reached the 191 progression events in our global, pivotal Phase 3 trial with aldoxorubicin in second-line soft tissue sarcoma to trigger the data verification and analysis. We look forward to announcing top-line results at the end of June 2016***….."
>
> * * *
>
> **First Quarter 2016 and Recent Highlights**
>
> * * *
>
> **Reached the Target Number of Events in the Global Pivotal Phase 3 Trial.** In April 2016, CytRx achieved the target number of progression events in the aldoxorubicin global, pivotal Phase 3 trial in patients with second-line soft tissue sarcomas. Our contract research organization started the collection and verification of the trial data from all 433 patients enrolled at 79 sites around the globe. ***CytRx expects to report top-line results following the analysis of the data in June 2016***.

(emphasis added.)

135.    The foregoing statements were materially false and misleading and lacked a reasonable basis when made because they misrepresented and failed to disclose that the results and timeline of the Phase 3 clinical trial of aldoxorubicin, including the

NDA submission, were put at significant risk as a result of the partial clinical hold and the amended study protocols. Specifically, Defendants failed to disclose that under the amended protocols, *aldoxorubicin dosing for any patient who tested positive for acidosis would be delayed until the patient's acid-base balance normalized*. As a result, the treatment cycles (and data collection) of currently enrolled patients faced a significant risk of delay throughout the duration of the Phase 3 clinical trial, especially in light of the predisposition of patients with soft tissue sarcoma to also suffer from metabolic acidosis. Moreover, in light of the study's assumed 15 month follow-up period after enrollment of the last subject and that 90% study power was required to yield efficacy results, and Defendants' knowledge that longer dosing and patient follow-up "creat[ed] the potential for substantially improved Phase 3 efficacy results," Defendants knew or recklessly disregarded and failed to disclose that the delays occasioned by the hold and revised protocols presented a material risk to the Phase 3 study's results and commercialization timeline. Indeed, by the time Defendants announced the event trigger in April 2016, Defendants knew that enrollment in the study had been disproportionately weighted toward the end of the enrollment period (contrary to the study's assumptions), thereby posing significant risk to the ability to conduct sufficient dosing and patient follow-up prior to hitting the 191 event trigger. More specifically, at the time the event trigger occurred and thereafter, Defendants knew precisely how many patients had enrolled in the late months and weeks leading up to data analysis in contravention of the study's enrollment and power assumptions.

136.   At the Jefferies Health Care Conference on June 7, 2016, the Company reaffirmed its previous statements regarding aldoxorubicin approval in 2017. On behalf of the Company, Olivia Ware, Chief Commercial Officer, stated: "[Aldoxorubicin is] in Phase 3 studies and data is expected now in July of 2016 and we expect to have approval at the end of 2017." Similarly, David J. Haen ("Haen"), Vice President of Business Development, stated: "The goal is we hope to have a positive Phase 3 and subsequent [NDA] filing, and then to get this drug approved some time in 2017." Haen

further explained: "We've been doing the pre-commercial activities now…. The Phase 3 is really what is the quickest path to market and that's where we are going…."

137.   The foregoing statements were materially false and misleading and lacked a reasonable basis when made because they misrepresented and failed to disclose that the results and timeline of the Phase 3 clinical trial of aldoxorubicin, including the NDA submission, were put at significant risk as a result of the partial clinical hold and the amended study protocols. Specifically, Defendants failed to disclose that under the amended protocols, *aldoxorubicin dosing for any patient who tested positive for acidosis would be delayed until the patient's acid-base balance normalized*. As a result, the treatment cycles (and data collection) of currently enrolled patients faced a significant risk of delay throughout the duration of the Phase 3 clinical trial, especially in light of the predisposition of patients with soft tissue sarcoma to also suffer from metabolic acidosis. Moreover, in light of the study's assumed 15 month follow-up period after enrollment of the last subject and that 90% study power was required to yield efficacy results, and Defendants' knowledge that longer dosing and patient follow-up "creat[ed] the potential for substantially improved Phase 3 efficacy results," Defendants knew or recklessly disregarded and failed to disclose that the delays occasioned by the hold and revised protocols presented a material risk to the Phase 3 study's results and commercialization timeline. Indeed, by the time Defendants announced the event trigger in April 2016, Defendants knew that enrollment in the study had been disproportionately weighted toward the end of the enrollment period (contrary to the study's assumptions), thereby posing significant risk to the ability to conduct sufficient dosing and patient follow-up prior to hitting the 191 event trigger. More specifically, at the time the event trigger occurred and thereafter, Defendants knew precisely how many patients had enrolled in the late months and weeks leading up to data analysis in contravention of the study's enrollment and power assumptions.

138.   In a Form 8-K dated June 7, 2016, and signed by Defendant Caloz, Defendants stated that they "*expect[ed] to report top-line results on progression-free survival, or PFS, the trial's primary endpoint, in July 2016*." (emphasis added.)

139.   The foregoing statement was materially false and misleading and lacked a reasonable basis when made because it misrepresented and failed to disclose that the results and timeline of the Phase 3 clinical trial of aldoxorubicin, including the NDA submission, were put at significant risk as a result of the partial clinical hold and the amended study protocols. Specifically, Defendants failed to disclose that under the amended protocols, *aldoxorubicin dosing for any patient who tested positive for acidosis would be delayed until the patient's acid-base balance normalized*. As a result, the treatment cycles (and data collection) of currently enrolled patients faced a significant risk of delay throughout the duration of the Phase 3 clinical trial, especially in light of the predisposition of patients with soft tissue sarcoma to also suffer from metabolic acidosis. Moreover, in light of the study's assumed 15 month follow-up period after enrollment of the last subject and that 90% study power was required to yield efficacy results, and Defendants' knowledge that longer dosing and patient follow-up "creat[ed] the potential for substantially improved Phase 3 efficacy results," Defendants knew or recklessly disregarded and failed to disclose that the delays occasioned by the hold and revised protocols presented a material risk to the Phase 3 study's results and commercialization timeline. Indeed, by the time Defendants announced the event trigger in April 2016, Defendants knew that enrollment in the study had been disproportionately weighted toward the end of the enrollment period (contrary to the study's assumptions), thereby posing significant risk to the ability to conduct sufficient dosing and patient follow-up prior to hitting the 191 event trigger. More specifically, at the time the event trigger occurred and thereafter, Defendants knew precisely how many patients had enrolled in the late months and weeks leading up to data analysis in contravention of the study's enrollment and power assumptions.

140.   In a subsequent amendment to the Company's Form S-3 Registration Statement, dated June 8, 2016, signed by Defendants Kriegsman and Caloz, Defendants stated that they "expect[ed] to report the top-line results on PFS the trial's primary endpoint, **[by mid-July]** 2016." While substantially repeating their previous statements regarding the Phase 3 study and the aldoxorubicin SPA, Defendants slightly revised the timeline for reporting PFS results, stating: "[w]e expect to report the top-line results on PFS the trial's primary endpoint, in July 2016."

141.   The foregoing statements were materially false and misleading and lacked a reasonable basis when made because they misrepresented and failed to disclose that the results and timeline of the Phase 3 clinical trial of aldoxorubicin, including the NDA submission, were put at significant risk as a result of the partial clinical hold and the amended study protocols. Specifically, Defendants failed to disclose that under the amended protocols, *aldoxorubicin dosing for any patient who tested positive for acidosis would be delayed until the patient's acid-base balance normalized*. As a result, the treatment cycles (and data collection) of currently enrolled patients faced a significant risk of delay throughout the duration of the Phase 3 clinical trial, especially in light of the predisposition of patients with soft tissue sarcoma to also suffer from metabolic acidosis. Moreover, in light of the study's assumed 15 month follow-up period after enrollment of the last subject and that 90% study power was required to yield efficacy results, and Defendants' knowledge that longer dosing and patient follow-up "creat[ed] the potential for substantially improved Phase 3 efficacy results," Defendants knew or recklessly disregarded and failed to disclose that the delays occasioned by the hold and revised protocols presented a material risk to the Phase 3 study's results and commercialization timeline. Indeed, by the time Defendants announced the event trigger in April 2016, Defendants knew that enrollment in the study had been disproportionately weighted toward the end of the enrollment period (contrary to the study's assumptions), thereby posing significant risk to the ability to conduct sufficient dosing and patient follow-up prior to hitting the 191 event trigger.

More specifically, at the time the event trigger occurred and thereafter, Defendants knew precisely how many patients had enrolled in the late months and weeks leading up to data analysis in contravention of the study's enrollment and power assumptions.

142. A CytRx press release dated June 6, 2016, Defendants assured the market that CytRx's aldoxorubicin data looked good, stating, in part, that:

> "***The clinical data presented this year at ASCO [American Society of Clinical Oncology] continues to support the safety and activity of aldoxorubicin*** in multiple high unmet need tumor types, including in late-stage and heavily pre-treated patients," commented Daniel Levitt, M.D., Ph.D., CytRx's Executive Vice President and Chief Medical Officer.

(emphasis added.)

143. The foregoing statement that the Company's aldoxorubicin data "continues to support the safety and activity of aldoxorubicin" was false or misleading when made because Defendants knew or recklessly disregarded that the clinical hold presented a material risk to the study's underlying enrollment and power assumptions. Indeed, by this time in June 2016 – over 3 months since the data review was triggered and the very month results were due – Defendants were acutely aware of the actual enrollment curve and the actual amount of time Phase 3 patients had been receiving the drug. Defendants also knew that these facts ran afoul of the study's assumed 15 month follow-up period after enrollment of the last subject and that 90% study power was required to yield efficacy results. Moreover, in light of Defendants' knowledge that longer dosing and patient follow-up "creat[ed] the potential for substantially improved Phase 3 efficacy results" (such that, conversely, delays to or interruptions in dosing posed a risk to efficacy results), Defendants knew or recklessly disregarded and failed to disclose that the delays occasioned by the hold and revised protocols presented a material risk to the Phase 3 study's results and commercialization timeline.

144. In the Company's June 2016 Corporate Overview presentation, under the heading "Timing" the Company reported: (1) "Achieved 191 events in April 2016[,]

triggering the data analysis of the primary endpoint of PFS;" (2) "Enrollment completed ahead of schedule in Q415;" (3) "PFS data expected to be available July 2016;" (4) "Projected NDA filing at end of 2016;" and (5) "Commercial launch in 2017."

145.   The foregoing statements were materially false and misleading and lacked a reasonable basis when made because they misrepresented and failed to disclose that the results and timeline of the Phase 3 clinical trial of aldoxorubicin, including the NDA submission, were put at significant risk as a result of the partial clinical hold and the amended study protocols. Specifically, Defendants failed to disclose that under the amended protocols, *aldoxorubicin dosing for any patient who tested positive for acidosis would be delayed until the patient's acid-base balance normalized*. As a result, the treatment cycles (and data collection) of currently enrolled patients faced a significant risk of delay throughout the duration of the Phase 3 clinical trial, especially in light of the predisposition of patients with soft tissue sarcoma to also suffer from metabolic acidosis. Moreover, in light of the study's assumed 15 month follow-up period after enrollment of the last subject and that 90% study power was required to yield efficacy results, and Defendants' knowledge that longer dosing and patient follow-up "creat[ed] the potential for substantially improved Phase 3 efficacy results," Defendants knew or recklessly disregarded and failed to disclose that the delays occasioned by the hold and revised protocols presented a material risk to the Phase 3 study's results and commercialization timeline. Indeed, by the time Defendants announced the event trigger in April 2016, Defendants knew that enrollment in the study had been disproportionately weighted toward the end of the enrollment period (contrary to the study's assumptions), thereby posing significant risk to the ability to conduct sufficient dosing and patient follow-up prior to hitting the 191 event trigger. More specifically, at the time the event trigger occurred and thereafter, Defendants knew precisely how many patients had enrolled in the late months and weeks leading up to data analysis in contravention of the study's enrollment and power assumptions.

146.   Finally, in the Company's July 2016 Corporate Overview presentation – just days before the end of the Class Period – Defendants *still* repeated the same baseless timelines for aldoxorubicin. Under the heading "Timing" the Company again reported: (1) "Achieved 191 events in April 2016[,] triggering the data analysis of the primary endpoint of PFS;" (2) "Enrollment completed ahead of schedule in Q415;" (3) "PFS data expected to be available July 2016;" (4) "Projected NDA filing at end of 2016;" and (5) "Commercial launch in 2017."

147.   The above-quoted statements from the corporate overview presentation in July 2016 – *i.e.* immediately prior to the July 11, 2016 revelation of delays and materialization of Defendants' previously undisclosed risks – were materially false and misleading because they again misrepresented and failed to disclose that the timeline for the Phase 3 clinical trial of aldoxorubicin risked being  delayed by the residual effects of the partial clinical hold, as discussed above.

## VI.   ADDITIONAL SCIENTER ALLEGATIONS

### A.   The Company Did Not Generate Meaningful Revenue and Was Dependent Upon the Continued Development of Aldoxorubicin for Its Survival

148.   During the Class Period, other than $100,000 annually in licensing revenue, the Company generated *no* revenue. Instead, CytRx funded its operations through a combination of public offerings of securities and debt.

149.   For the four years incorporating 2012 to 2015, CytRx held four public offerings to fund "general corporate purposes" and various stages of commercialization of aldoxorubicin:

- October 2012: CytRx raised approximately $23 million with the sale of 9,200,000 shares of common stock at $2.50 per share, to be used to "fund the clinical development of its drug candidate[] aldoxorubicin … and for general corporate purposes, [] include[ing] pre-commercialization activities relating to aldoxorubicin, working capital, capital expenditures, research and development and other commercial expenditures."

- October 2013: CytRx raised approximately $25.9 million with the sale of 11.5 million shares of common stock at a price of $2.25 per share.

- February 2014: CytRx raised approximately $86 million through the sale of 13,225,000 shares of common stock at $6.50 per share, to be used for "clinical trials of its drug candidate aldoxorubicin" and "general corporate purposes."

- July 2015: CytRx raised approximately $28.8 million with the sale of 10,465,000 shares valued at $2.75 per share, to be used to "fund clinical trials of its candidate aldoxorubicin," "pre-commercialization activities relating to aldoxorubicin," and other "general corporate purposes."

150.   In addition to public offerings of common stock, CytRx also relied upon debt. At the end of Q1 2016, the Company had approximately $70 million cash and cash equivalents, an amount that analysts believed was insufficient to get the Company through the 2H of 2017. *See* Seeking Alpha, *CytRx: Ok Science, Bad Past, Unknown Future* (April 25, 2016).

151.   To prolong the life of the Company, on February 5, 2016, CytRx secured a $40 million long-term loan, of which $25 million was received on February 8, 2016 and a "***second tranche of up to $15 million [would] become available on or before December 31, 2016 if CytRx announce[d] positive data from its global pivotal Phase 3 clinical trial of aldoxorubicin for the treatment of soft tissue sarcoma***" and initiated a clinical trial of a new drug candidate. The loan had a 48-month term and an interest "rate of 9.5% per annum, subject to the variability of the prime interest rate." Under the terms of the loan, the first year was an "interest-only period," which could be extended an additional six months "[i]f the regulatory milestone relating to data from the aldoxorubicin Phase 3 trial [was] positive" and "another six months" if the second tranche of $15 million was funded. Desperate for working capital and hoping to extend the length of the interest-only period, Defendants were incentivized to announce the

Phase 3 clinical trial results by the end of 2016, despite setbacks caused by the partial clinical delay.

152.   While a more "legitimate practice of securing capital" than their prior pump and dump schemes, analysts were quick to note that "the lack of partnerships was glaring." *See* Seeking Alpha, *CytRx: Ok Science, Bad Past, Unknown Future* (April 25, 2016).

### B.   Defendants Have Historically Employed Pump and Dump Schemes to Raise Much Needed Capital

153.   The October 2013 public offering, which raised approximately $25.9 million with the sale of 11.5 million shares of common stock at a price of $2.25 per share, and the February 2014 public offering, which raised approximately $86 million through the sale of 13,225,000 shares of common stock at $6.50 per share, became the subject of litigation. Between September 2013 and February 2014, CytRx retained a third-party, Dream Team, to publish promotional articles aimed at inflating the value of the Company's common stock immediately prior to (i) lucrative secondary offerings and (ii) the award of massive amounts of "perfectly-timed stock option grants" to members of the Board of Directors and Individual Defendants Kriegsman and Caloz. *In re CytRx Corp. Sec. Litig.*, No. 2:14-CV-01956-GHK (PJWx) (C.D. Cal.) (Dkt. No. 60 at ¶¶ 6-17). The Company paid Dream Team $65,000 and did not disclose to investors its relationship with Dream Team. *Seeking Alpha*, *Behind the Scenes with Dream Team, CytRx and Galena* (Mar. 13, 2014).

154.   As a result of the promotional articles paid for by CytRx and published by Dream Team, CytRx's stock price rose "from around $2.00 in November to around $8.00 in January." *Id.*

155.   Individual Defendants Kriegsman and Caloz profited immensely from this scheme. Defendant Kriegsman was awarded 925,000 stock options at an exercise price of $2.39 on December 10, 2013, which "generated over $3 million for Defendant Kriegsman in one day." *In re CytRx Corp. Sec. Litig.*, No. 2:14-CV-01956-GHK

(PJWx) (C.D. Cal.) (Dkt. No. 60 at ¶ 86). Additionally, Kriegsman "hauled in $2.1 million for himself by selling" shares of Galena Biopharma – a former subsidiary of CytRx that similarly retained Dream Team to promote its stock – at inflated prices. *Id.* at ¶ 67 & *Seeking Alpha*, *Behind the Scenes with Dream Team, CytRx and Galena* (Mar. 13, 2014) ("CytRx CEO Steven Kriegsman is also a director of Galena and recently took in nearly $3 million from selling Galena stock in January [2014], before the recent plunge.").

156. In turn, Defendant Caloz was granted 150,000 stock options on December 10, 2013 at an exercise price of $2.39. *In re CytRx Corp. Sec. Litig.*, No. 2:14-CV-01956-GHK (PJWx) (C.D. Cal.) (Dkt. No. 60 at ¶ 86).

## C.   Both Individual Defendants Enjoyed Generous Stock Option Grants During the Class Period

157. While Class Period investors have suffered tens of millions of dollars in damages as a result of Defendants' actions, the Individual Defendants have prospered greatly from developing what at least some industry analysts have observed to be an ineffective drug. As Adam Feuerstein, a noted biotech analyst writing for TheStreet.com, concluded: "If you're looking for a reason to explain why CytRx would seek FDA approval for a drug based on a failed clinical trial, just follow the money. It flows directly from shareholders into Kriegsman's bank account." *See* Adam Fuerstein, *CytRx CEO Pockets Millions of Dollars as Failed Sarcoma Drug Moves to FDA* (Nov. 29, 2016).

158. For the three years encompassing 2014 to 2016, Defendant Kriegsman earned approximately $6.8 million in total compensation (not including the December 13, 2016 stock option grant of 1,250,000 shares at $0.43 per share that has yet to be valued), of which approximately $4.2 million was earned during the Class Period:

- 2014: (i) base salary of $825,000 (of which, on a pro-rated basis, approximately $97,000 was earned during the Class Period); (ii) retention bonus of $300,000 awarded in March 2014, before the start of the Class Period; (iii) $150,000 cash bonus awarded

during the Class Period in December , 2014; and (iv) stock option grants valued at $903,000, also awarded in December 2014.

- 2015: (i) base salary of $850,000; (ii) $150,000 cash bonus awarded in December 2015; and (iii) stock option grants valued at $1,593,000, also awarded in December 2015.

- 2016: (i) base salary of $850,000 (of which, on a pro-rated basis, approximately $449,000 was earned during the Class Period); (ii) $150,000 cash bonus awarded in December 2016 after the Class Period ended; (iii) $1,000,000 of restricted shares of common stock also awarded in December 2016; and (iv) stock option to purchase 1,250,000 shares of CytRx common stock at the December 13, 2016 exercise price of $0.43 per share.

159. Similarly, for the three years encompassing 2014 to 2016, Defendant Caloz earned approximately $2.1 million in total compensation (not including the December 13, 2016 stock option grant of 350,000 shares at $0.43 per share that has yet to be valued), of which approximately $1.6 million was earned during the Class Period:

- 2014: (i) base salary of $350,000 (of which, on a pro-rated basis, approximately $41,000 was earned during the Class Period); (ii) $100,000 cash bonus awarded during the Class Period in December 2014; and (iii) stock option grants valued at $301,000, also awarded in December 2014.

- 2015: (i) base salary of $375,000; (ii) cash bonus of $135,000 awarded in December 2015; and (iii) stock option grants valued at $477,900, also awarded in December 2015.

- 2016: (i) base salary of $400,000 (of which, on a pro-rated basis, approximately $212,000 was earned during the Class Period); and (ii) stock option to purchase 350,000 shares of CytRx common stock at the December 13, 2016 exercise price of $0.43 per share.

160. In sum, the Individual Defendants have reaped enormous financial gains despite the precarious financial position of their Company and the potential that aldoxoribucin is an ineffective drug. *See, e.g.*, Adam Feuerstein, *CytRx CEO Pockets Millions of Dollars as Failed Sarcoma Drug Moves to FDA* (Nov. 29, 2016) (characterizing CytRx's plan to market aldoxorubicin as "based more on hocus-pocus than credible study results.").

## VII.   LOSS CAUSATION

161.   Plaintiff repeats and realleges each and every allegation set forth above as if fully set forth within.

162.   Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiff and other Class members. During the Class Period, Plaintiff and other Class members purchased or acquired CytRx securities at artificially inflated prices in reliance on Defendants' material misrepresentations and/or omissions. The price of those securities declined significantly when information was disclosed to the market for the first time during the Class Period, thereby revealing those material misrepresentations and/or omissions.

163.   Prior to July 11, 2016, Defendants had concealed material risks and misled investors regarding the timeline for the Company's ongoing Phase 3 clinical trial and projected commercialization of aldoxorubicin. These concealed risks materialized and investors learned the truth about enrollment and data collection problems in the Phase 3 trial, when, on July 11, 2016, Defendants issued a press release announcing that the partial clinical hold placed on the aldoxorubicin trials in November 2014 had led to insufficient follow-up with patients, resulting in patients being censored ("excluded") from the data evaluation, and necessitating a second analysis. In reaction to this news, the price of CytRx's stock fell $1.50 per share, or over 59%, to close at $1.01 per share on July 12, 2016, on unusually heavy trading volume. The Company's stock price continued to decline over the next two trading days, falling an additional 10%, to close at $0.90 per share on July 14, 2016.

## VIII.   PRESUMPTION OF RELIANCE

164.   At all relevant times, the market for CytRx's securities was efficient for the following reasons, among others:

a.   CytRx's stock met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

b.   As a regular issuer, CytRx filed periodic reports with the SEC and NASDAQ;

c.  CytRx regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

d.  CytRx was followed by securities analysts employed by brokerage firms who wrote reports that were publicly available and distributed to those brokerage firms' sales forces and certain customers.

165.    As a result of the foregoing, the market for CytRx stock promptly digested current information regarding the Company from all publicly available sources and reflected such information in its stock price. Under these circumstances, all purchasers of CytRx securities during the Class Period suffered similar injury through their purchase of such securities at artificially inflated prices, and a presumption of reliance applies.

166.    In addition, Plaintiff is entitled to a presumption of reliance under *Affiliated Ute Citizens of Utah v. United States*, 496 U.S. 128 (1972), because the claims asserted herein are predicated in part on material omissions of fact that Defendants had a duty to disclose.

## IX.    INAPPLICABILITY OF THE STATUTORY SAFE HARBOR AND BESPEAKS CAUTION DOCTRINE

167.    The statutory safe harbor and/or bespeaks caution doctrine applicable to forward-looking statements under certain circumstances do not apply to the false or misleading statements pleaded in this Complaint.

168.    Many of the statements complained of herein were not forward-looking statements, nor were they identified as such when made. Rather, the statements at issue herein – including statements purporting to describe the SPA and statements describing enrollment in the Company's Phase 3 clinical trial of aldoxorubicin – were statements of historical fact or statements of purportedly current facts and conditions at the time the statements were made.

169.    To the extent that any of the false and misleading statements alleged herein

can be construed as forward-looking, those statements were not accompanied by meaningful cautionary language identifying important factors that could cause actual results to differ materially from those in the statements. Such factors include, among others, the significant risk posed to the timeline for and results of the Phase 3 clinical trial of aldoxorubicin due to the effects of the partial clinical hold on both existing and new patients, as well as the continued potential delay as a result of the FDA-requested protocol amendment which required acidosis testing prior to drug administration and a deferral of treatment for any patient who failed the screening until such time as the patient's acid levels normalized (a particularly acute risk given that the patient population was highly prone to metabolic acidosis). Given these then-existing facts, which were not adequately disclosed, any generalized risk disclosures were insufficient to insulate Defendants from liability for their materially false and misleading statements.

170. Alternatively, Defendants are also liable for any forward-looking statements because the speaker knew or recklessly disregarded that the statements were false or misleading when made, or the statement was approved by an Individual Defendant who knew or recklessly disregarded that the statement was false when made.

## X.   PLAINTIFF'S CLASS ACTION ALLEGATIONS

171. Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired CytRx common stock during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosures. Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

172. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, CytRx common stock was actively traded

on the NASDAQ. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by CytRx or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

173. Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

174. Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

175. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of CytRx;

- whether the Individual Defendants caused CytRx to issue false and misleading financial statements during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- whether the prices of CytRx common stock during the Class Period were artificially inflated because of Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

176.   A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.

177.   There will be no difficulty in the management of this action as a class action.

## XI.   CAUSES OF ACTION

### COUNT I

### Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Against All Defendants

178.   Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

179.   This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

180.   During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of common stock. Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of CytRx common stock; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire CytRx common stock at artificially inflated

prices. In furtherance of this unlawful scheme, plan and course of conduct, each Defendant took the actions set forth herein.

181.   Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for CytRx common stock. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about CytRx's finances and business prospects.

182.   By virtue of their positions at CytRx, Individual Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, Individual Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to them. Said acts and omissions of Individual Defendants were committed willfully or with reckless disregard for the truth. In addition, Individual Defendants knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

183.   Information showing that Individual Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control. As the senior managers and/or directors of CytRx, Individual Defendants had knowledge of the details of CytRx's internal affairs.

184.   The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of CytRx. As officers and/or directors of a publicly-held company, the

Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to CytRx's businesses, operations, future financial condition and future prospects. As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of CytRx common stock was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning CytRx's business and financial condition, which were concealed by Defendants, Plaintiff and the other members of the Class purchased or otherwise acquired CytRx common stock at artificially inflated prices and relied upon the price of the common stock, the integrity of the market for the common stock and/or upon statements disseminated by Defendants, and were damaged thereby.

185.   During the Class Period, CytRx common stock were traded on an active and efficient market. Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of CytRx common stock at prices artificially inflated by Defendants' wrongful conduct. Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said common stock, or would not have purchased or otherwise acquired them at the inflated prices that were paid. At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of CytRx common stock was substantially lower than the prices paid by Plaintiff and the other members of the Class. The market price of CytRx common stock declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

186.   By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

187.   As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their

respective purchases, acquisitions and sales of the Company's common stock during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

## COUNT II

### Violations of Section 20(a) of the Exchange Act Against the Individual Defendants

188.   Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

189.   During the Class Period, the Individual Defendants participated in the operation and management of CytRx and conducted and participated, directly and indirectly, in the conduct of CytRx's business affairs. Because of their senior positions, they knew the adverse nonpublic information about CytRx's current financial position and future business prospects.

190.   As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to CytRx's business practices, and to correct promptly any public statements issued by CytRx which had become materially false or misleading.

191.   Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which CytRx disseminated in the marketplace during the Class Period concerning the Company's business, operational and accounting policies. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause CytRx to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of CytRx within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of CytRx common stock.

192.   Each of the Individual Defendants, therefore, acted as a controlling person

of CytRx. By reason of their senior management positions and/or being directors of CytRx, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, CytRx to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of CytRx and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

193.   By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by CytRx.

## XII.   PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment against Defendants as follows:

A.   Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B.   Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.   Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as his reasonable attorneys' fees, expert fees and other costs; and

D.   Awarding such other and further relief as this Court may deem just and proper.

## XIII.  DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

1   DATED:  January 13, 2017          GLANCY PRONGAY & MURRAY LLP

2

3

4                                      By:  _s/ Kara M. Wolke_____
                                       Robert V. Prongay
5                                      Kara M. Wolke
                                       Alexa J. Mullarky
6                                      1925 Century Park East, Suite 2100
                                       Los Angeles, California 90067
7                                      Telephone:  (310) 201-9150
                                       Facsimile:  (310) 201-9160
8                                      Email:  info@glancylaw.com

9

10                                     *Attorneys for Lead Plaintiff Gregory Callendar*
                                       *and the Proposed Plaintiff Class*
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**<u>PROOF OF SERVICE BY ELECTRONIC POSTING</u>**

I, the undersigned say:

I am not a party to the above case, and am over eighteen years old.  On January 13, 2017, I served true and correct copies of the foregoing document, by posting the document electronically to the ECF website of the United States District Court for the Central District of California, for receipt electronically by the parties listed on the Court's Service List.

I affirm under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on January 13, 2017, at Los Angeles, California.


*s/ Kara M. Wolke*
Kara M. Wolke

# Mailing Information for a Case 2:16-cv-05519-SJO-SK Nicholas Crihfield v. CytRx Corporation et al

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Patrick V Dahlstrom**
  pdahlstrom@pomlaw.com

- **Lionel Zevi Glancy**
  lglancy@glancylaw.com

- **J Alexander Hood**
  ahood@pomlaw.com,abarbosa@pomlaw.com

- **Jeremy A Lieberman**
  jalieberman@pomlaw.com,disaacson@pomlaw.com

- **Charles Henry Linehan**
  clinehan@glancylaw.com

- **Adam C McCall**
  amccall@zlk.com

- **Alexa Mullarky**
  amullarky@glancylaw.com

- **Jennifer Pafiti**
  jpafiti@pomlaw.com,ahood@pomlaw.com,kmsaletto@pomlaw.com,disaacson@pomlaw.com,abarbosa@pomlaw.com

- **Clifford H Pearson**
  cpearson@pswlaw.com,mpearson@pswlaw.com,mwilliams@pswlaw.com,egrant@pswlaw.com

- **Michael Harrison Pearson**
  mpearson@pswlaw.com

- **Lesley F Portnoy**
  LPortnoy@glancylaw.com

- **Robert Vincent Prongay**
  rprongay@glancylaw.com,CLinehan@glancylaw.com,info@glancylaw.com,echang@glancylaw.com,bmurray@glancylaw.com

- **Laurence M Rosen**
  lrosen@rosenlegal.com

- **George S Trevor**
  gtrevor@pswlaw.com,yberry@pswplaw.com

- **Kara M Wolke**
  kwolke@glancylaw.com,info@glancylaw.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)