**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES - GENERAL**

| | |
|---|---|
| Priority | |
| Send | ____ |
| Enter | ____ |
| Closed | ____ |
| JS-5/JS-6 | ____ |
| Scan Only | ____ |

CASE NO.:   **SEE BELOW**                          DATE:  **June 14, 2017**

TITLE:      **CV 16-05519 SJO (SKx):   Nicholas Crihfield  v. CytRx Corporation, et al.**
            **CONSOLIDATED WITH**
            **CV 16-05666 SJO (SKx) Greguy Dorce v. Cytrx Corporation et al**
========================================================================
**PRESENT:  THE HONORABLE S. JAMES OTERO, UNITED STATES DISTRICT JUDGE**

Victor Paul Cruz                              Not Present
Courtroom Clerk                               Court Reporter

**COUNSEL PRESENT FOR LEAD PLAINTIFF:    COUNSEL PRESENT FOR DEFENDANTS:**

Not Present                                   Not Present

========================================================================
**PROCEEDINGS (in chambers):  ORDER GRANTING DEFENDANTS' MOTION TO DISMISS FIRST CONSOLIDATED AMENDED CLASS ACTION COMPLAINT** [Docket No. 57]

This matter is before the Court on Defendants CytRx Corporation ("CytRx"), Steven A Kriegsman ("Kriegsman"), and John Y. Caloz's ("Caloz") ("Individual Defendants") (collectively, "Defendants") Motion to Dismiss First Consolidated Amended Class Action Complaint ("Motion"), filed March 14, 2017.   Lead Plaintiff Nicholas Crihfield ("Crihfield" or "Lead Plaintiff") opposed the Motion ("Opposition") on April 28, 2017, and Defendants replied ("Reply") on May 30, 2017.  The Court found this matter suitable for disposition without oral argument and vacated the hearing set for June 12, 2017.  *See* Fed. R. Civ. P. 78(b).  For the reasons stated below, the Court **GRANTS** Defendants' Motion.

I.      FACTUAL AND PROCEDURAL HISTORY

        A.      Factual Background

Lead Plaintiff brings this putative securities class action against Defendants on behalf of himself and all persons and entities, other than Defendants and their affiliates, who purchased or otherwise acquired CytRx common stock from November 18, 2014 to July 11, 2016, inclusive (the "Class Period").  (*See* First Am. Class Action Compl. ("FAC") ¶ 1, ECF No. 50.)  The gravamen of Lead Plaintiff's case is that CytRx, a company whose primary focus during the Class Period was the clinical development of a cancer drug known as aldoxorubicin, misrepresented and failed to disclose to the public that the stated timelines and ultimate results of a Phase 3 clinical trial of aldoxorubicin were subject to significant risks resulting from the Food and Drug Administration ("FDA") placing a "partial clinical hold" on the trial.  (*See generally* FAC ¶¶ 1-35.)  In support of this theory, Lead Plaintiff alleges the following, with relevant dates and quotations highlighted in bold text.

CytRx is a Delaware corporation with its principal executive offices in Los Angeles, California. (FAC ¶ 41.)  Kriegsman has served as CytRx's CEO since July 2002 and throughout the Class

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES - GENERAL**

**CASE NO.:**  **SEE BELOW**                       **DATE:  June 14, 2017**

Period.  (FAC ¶ 42.) Kriegsman also served as one of CytRx's directors from July 2002 to October 15, 2014, and served as Chairman of the Board of CytRx throughout the Class Period.  (FAC ¶ 42.)  Caloz has served as CytRx's CFO since January 2009, and has also served as Chief Accounting Officer and Treasurer since October 2007.  (FAC ¶ 43.)

      1.   <u>The Trial and the SPA</u>

On **April 23, 2013**, CytRx announced that a Phase 3 clinical trial (the "Trial") of aldoxorubicin as a second-line treatment for soft tissue sarcoma was to be conducted pursuant to a Special Protocol Assessment ("SPA") agreement with the FDA.  (FAC ¶¶ 7, 59; *see also* Req. for Judicial Notice ("RJN"), Ex. 2, ECF No. 58.)[1]  CytRx described the SPA as "a written agreement between the Company, as the trial's sponsor, and the FDA regarding the design, endpoints and planned statistical approach of the Phase 3 clinical trial to be used in support of a potential New Drug Application (NDA) for aldoxorubicin."  (RJN, Ex. 2.)  CytRx also stated that the Trial "will enroll approximately 400 patients" and that "[t]he primary endpoint of the study is progression-free survival ['PFS']," which measures delayed tumor growth as compared to a comparator drug, with "secondary endpoints includ[ing] overall survival and safety."  (FAC ¶¶ 8, 62; RJN, Ex. 2.)  Finally, in this release, Kriegsman stated that "[t]he ability to conduct the clinical trial under an SPA could save significant time compared with a standard regulatory pathway."  (RJN, Ex. 2.)[2]

///

---

[1]  Defendants ask the Court to consider in ruling on its Motion twenty two (22) exhibits attached to two Requests for Judicial Notice ("RJNs").  (*See* RJN; Suppl. RJN, ECF No. 67.)  These exhibits are copies of press releases, SEC filings, and presentations that are referenced in the FAC.  (*See* RJN, Exs. 1-20; Suppl. RJN, Exs. 21-22.)  Defendants have submitted two declarations in which their attorney avers that the parties, after meaningful discussions, have stipulated to the Court taking judicial notice of the above-referenced documents.  (Decl. Michael H. Pearson in Supp. Defs.' RJN ("Pearson RJN Decl.") ¶ 22, ECF No. 59; Suppl. Decl. Michael H. Pearson in Supp. Suppl. RJN ("Suppl. Pearson RJN Decl.") ¶ 24.)  The Court finds consideration of these documents to be proper under Rule 201 of the Federal Rules of Evidence, and therefore **GRANTS** Defendants' RJNs.

[2]  Defendants' press releases each contain a paragraph titled "Forward-Looking Statements" indicating that the publications "contain[ ] forward-looking statements within the meaning of Section 21E of the Securities Exchange Act of 1934, as amended," and that "[s]uch statements involve risks and uncertainties that could cause actual events or results to differ materially from the events or results described in the forward-looking statements, including risks relating to the outcome, timing and results of CytRx's clinical trials . . . ."  (*See, e.g.*, RJN, Ex. 2-8, 13, 15, 17.)  Defendants' SEC filings and publications contain similar statements.  (*See, e.g.*, RJN, Exs. 1, 9-12, 14, 18-20.)

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES - GENERAL**

**CASE NO.:  SEE BELOW**                    **DATE:  June 14, 2017**

In **January 2014**, Defendants announced that the SPA was **amended** to allow dosing patients with aldoxorubicin until disease progression, as opposed to dosing using doxorubicin, a cancer drug currently in use, which was limited due to its toxicity.  (FAC ¶¶ 9, 60.)  According to CytRx's year 2014 Form 10-K, filed on March 10, 2015, the SPA meant that

> the FDA agrees that the design and analyses proposed in the Phase 3 trial protocol are accepted to support regulatory approval of the product candidate with respect to effectiveness of the indication studied, and will not subsequently change its perspective on these matters, unless previously unrecognized public or animal health concerns were to arise or we were to subsequently modify the protocol. Thus, if the study demonstrates an acceptable benefit-risk profile as determined by the FDA, it would suffice as the single pivotal trial to demonstrate effectiveness and would support registration of aldoxorubicin for this indication.

(FAC ¶ 7 n. 1; RJN, Ex. 1 at 2.)

On at least one occasion during the putative class period, Defendants described relevant aspects of the SPA as follows:

- Estimated median PFS for aldoxorubicin is 5.6 months and 3.5 months for investigator's choice arm.
- Based on the use of a two-side log rank test at the α = 0.5 level of significance, a total of **191 PFS events** will be **required** for **90% power** to detect this difference.
- **Assuming** an **18 month accrual period** and a **15 month follow-up period** after enrollment of the last subject, approximately **400 patients** will be needed to achieve the total of 191 PFS events.

(FAC ¶ 63; Suppl. RJN, Ex. 21.)  Defendants explained in their 2014 Form 10-K that this opportunity for longer dosing and patient follow-up "creat[ed] the potential for substantially improved Phase 3 efficacy results[,]" an apparent benefit under the SPA that Defendants would continue to tout throughout the Class Period.  (FAC ¶ 9, n. 2; RJN, Ex. 1 at 5.)  In a **May 1, 2014** press release, CytRx reported that it "expect[ed] to complete trial enrollment in 2015," and clarified in a press release accompanying its **August 6, 2014** Form 8-K that it expected to "[c]omplete enrollment in the ongoing pivotal global Phase 3 clinical trial of aldoxorubicin . . . in the second half of 2015." (FAC ¶¶ 64-65.)

///
///
///
///

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES - GENERAL**

**CASE NO.:** **SEE BELOW**　　　　　　　　**DATE:** **June 14, 2017**

2.　　The Partial Clinical Hold

Clinical trials do not always go as planned, however, and on **November 18, 2014**, Defendants issued a press release announcing the FDA had placed a "partial clinical hold" (the "hold") on the Trial following the death of a patient who had received the drug through CytRx's expanded access, or "compassionate use," program. (FAC ¶¶ 10, 69; RJN, Ex. 2.) Defendants did not submit a copy of this press release with, or otherwise disclose the partial clinical hold on, a Form 8-K. (FAC n. 3.) This patient suffered from metabolic acidosis, or increased body tissue acidity, which led to her death. (FAC ¶ 11.) The November 18, 2014 press release stated that, during the pendency of the partial clinical hold, "[a]ll **currently enrolled patients can continue** receiving aldoxorubicin treatment, or comparator drugs, **as per study protocols**, but **no new patients can be enrolled** until the clinical hold is lifted." (FAC ¶¶ 12, 69; RJN, Ex. 2 [emphasis added].) Defendants further expressed their belief that the partial hold issue would be resolved "expeditiously" and stated that "**enrollment rates and timelines** for [CytRx's] ongoing trials [would] **remain materially unchanged**. . . . CytRx remains committed to completing enrollment of its ongoing pivotal global Phase 3 trial in second-line soft tissue sarcoma by the end of 2015." (FAC ¶¶ 12, 69; RJN, Ex. 2 [emphasis added].) The press release also noted, however, that "[a]t the FDA's request, the Company **will amend** all aldoxorubicin study protocols to include an appropriate inclusion/exclusion criteria, an additional patient screening assessment and an **evaluation of serum electrolytes** [for acidosis detection] **prior to aldoxorubicin administration**. CytRx is working diligently in collaboration with the FDA to seek the release of the clinical hold and resume enrollment in its clinical studies as expeditiously as possible." (FAC ¶ 69; RJN, Ex. 2 [emphasis added].) Defendants largely reiterated these announcements on December 3, 2014. (FAC ¶ 70.)

In response to the hold, CytRx "commissioned" a report by Edison Research, which on December 10, 2014 issued a report (the "Edison Report") that "went much further than Defendants had . . . in describing the details of CytRx's proposed study protocol amendment." (FAC ¶¶ 71-72.) In particular, the Edison Report stated:

> CytRx **now intends** to require all patients within the ongoing RCTs [randomized clinical trials] (including those who have already received aldoxorubicin) to be tested for acidosis (through a simple blood test measuring electrolyte balance) prior to receiving a treatment cycle. **In patients with acidosis, treatment will be deferred until the acid-base balance normalises**. CytRx believes that this amendment should resolve the FDA's concerns about recurrences of similar SAEs to aldoxorubicin. The firm anticipates that the hold could be lifted (enabling patient recruitment resumption) before YE14, in which case the firm would be able to maintain its existing guidance timelines for its ongoing RCTs, including the Phase III STS study.

(FAC ¶ 72; RJN, Ex. 16 [emphasis added].) According to Lead Plaintiff, in issuing the November 18 press release, Defendants knew or recklessly disregarded and failed to disclose that the

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES - GENERAL**

CASE NO.:  **SEE BELOW**                              DATE:  **June 14, 2017**

**timeline** for completion of the Trial, and the **results** of the Phase 3 study themselves, faced **significant risks** due to the effect of the partial clinical hold on **both** currently enrolled patients and new patients.  (FAC ¶ 14.)  For example, although the press release stated study protocols would be amended "to include an appropriate inclusion/exclusion criteria, an additional patient screening assessment and an evaluation of serum electrolytes prior to aldoxorubicin administration," Defendants did not disclose the fact that treatment for any currently enrolled patient who failed the "evaluation of serum electrolytes"—an acidosis test—would be deferred until the patient's acid-base level normalized.  (FAC ¶ 16.)  Instead, Defendants misleadingly assured investors that "[a]ll currently enrolled patients can continue receiving aldoxorubicin treatment, or comparator drugs, as per study protocols" and that "enrollment rates and timelines for its ongoing trials will remain materially unchanged."  (FAC ¶ 16.)

>        c.        The Hold Is Lifted

On **January 20, 2015**, Defendants announced the FDA's removal of the hold in a press release, stating, in relevant part,

> [T]he [FDA] has removed the partial clinical hold on the Company's aldoxorubicin clinical trials.  Enrollment and dosing of new patients is now permitted after study sites' Institutional Review Boards (IRBs) approve the **revised protocol**.

> "CytRx developed **modified study parameters intended to avoid potential risks**, while allowing the company to evaluate the therapeutic impact of aldoxorubicin for patients with soft tissue sarcoma, glioblastoma, Kaposi's sarcoma, and small cell lung cancer, among other trials," said [Kriegsman].  "Our staff worked closely with the FDA Oncology Division to resolve all partial clinical hold issues as rapidly as possible.  We expect enrollment and dosing in the ongoing clinical trials to be back underway soon."

> CytRx currently believes that **enrollment rates and timelines** for its trials **will remain materially unchanged**.  The Company expects to **complete enrollment** in its ongoing pivotal global Phase 3 trial in second-line soft tissue sarcoma by the **end of 2015** and **unblind** the clinical data by **mid-2016**.  Subject to FDA approval, CytRx's **market launch** of aldoxorubicin for second line soft tissue sarcoma is projected to commence in **2017**.

(FAC ¶ 73; RJN, Ex. 4.)  In announcing the lifting of the hold, Defendants vaguely referred to "modified study parameters intended to avoid potential risks," but did not explain what the "modified" parameters were or that patients who failed interim acidosis testing would be subject to delayed aldoxorubicin dosing during the course of the Trial.  (FAC ¶¶ 17, 74.)  Indeed, CytRx's SEC filings throughout the Class Period failed to even mention that the SPA was amended in January 2015.  (FAC ¶ 74.)

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES - GENERAL**

CASE NO.:  __SEE BELOW__                    DATE:  __June 14, 2017__

According to Lead Plaintiff, these statements are relevant for several reasons.  First, soft tissue sarcoma patients are predisposed to developing lactic acidosis, a type of metabolic acidosis, thereby presenting a significant risk that the treatment cycles of all patients could be delayed as a result of the study's revised protocols.  (FAC ¶ 18.)  Moreover, both the SPA and Defendants' publicly announced timelines for the Trial and New Drug Application ("NDA") were based upon **specific assumptions** regarding enrollment timing and length of drug exposure and follow-up. (FAC ¶ 19.)  For example, as noted above, the SPA assumed an "18 month accrual period and a 15 month follow-up period after enrollment of the last subject."  (FAC ¶ 19 n. 4.)  Pursuant to these assumptions, the SPA assumed that a total of approximately **400 subjects** would be needed to obtain a total of **191 PFS events** would "power" the study at 90% and produce efficacy results sufficient to support approval of an NDA.  (FAC ¶¶ 19, 63.)  Furthermore, because Defendants knew that longer patient exposure substantially increased efficacy results—indeed, they touted such extended exposure as a benefit of the SPA—they also knew that any delays in enrollment or interruption in patient dosing risked affected the Trial results and ability to submit an NDA according to the stated timelines.  (FAC ¶ 20.)  Finally, during the Class Period, Defendants learned that, as a result of the interruptions caused by the partial hold, enrollment in the Trial became heavily weighted toward the back-end of the enrollment period, with later enrollees necessarily receiving a shorter dosing period by the time of the 191-event trigger of data analysis. (FAC ¶ 21.)

4.    Enrollment Completed on December 3, 2015, "Ahead of Schedule"

Notwithstanding this information, Defendants substantially repeated the representations contained in the November 18, 2014 press release in a press release dated **December 3, 2015**.  (FAC ¶¶ 12, 122; RJN, Ex. 5.)[3] Also in this press release, Defendants continued to reassure the market that the Phase 3 study remained on track, announcing that, despite the temporary interruption posed by the partial hold, the Phase 3 trial had actually **completed enrollment "ahead of schedule."**  (FAC ¶¶ 22, 122; RJN, Ex. 5.)  Defendants additionally stated their expectation that CytRx "expect[ed] to report the primary endpoint of top-line progression free survival (PFS) in the first half of 2016, and pre-commercial launch activities are underway."  (FAC ¶¶ 22, 122; RJN, Ex. 5.)  Defendants reiterated these announcements in (1) CytRx's S-3 Registration Statement, filed on December 30, 2015; (2) CytRx's Form 10-K for year-end 2015, filed on March 11, 2016; and (3) a press release accompanying the filing of this Form 10-K.  (FAC ¶¶ 124, 126, 128; RJN, Exs. 13, 20 at 2-3.)

By this time, however, Defendants knew and failed to disclose that the timing assumptions underlying the SPA could **not** be met while maintaining a mid-2016 data publication and year-end 2016 NDA filing, because in order to yield statistically significant results and fully power the study,

---

3    The Court understands these paragraphs of the FAC to refer to the press release contained in Exhibit 5 to the RJN, notwithstanding the different dates.

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES - GENERAL**

**CASE NO.:  SEE BELOW**                    **DATE:  June 14, 2017**

the SPA assumed a 400-person trial and a 15-month follow-up period after enrollment of the last patient.  (FAC ¶¶ 63, 122, 126.)  "Indeed, by the time Defendants announced the completion of enrollment in December 2015, Defendants knew that enrollment in the study had been **disproportionately weighted toward the end of the enrollment period**, contrary to the SPA's assumptions, thereby posing significant risk to the ability to conduct sufficient dosing and patient follow-up prior to hitting the 191 event trigger."  (FAC ¶ 123.)

    5.    Study Reaches 191 Event Trigger to Commence Data Analysis

On **April 4, 2016**, Defendants published a press release announcing the Phase 3 study had hit the 191 progression events necessary to begin data analysis, and further announcing they expected the results would be available in June 2016.  (FAC ¶¶ 23, 130; RJN, Ex. 6.)  In particular, the release stated that CytRx

> has reached the target number of progression events in its pivotal, global phase 3 clinical trial with aldoxorubicin . . . .  In accordance with the statistical analysis plan which is incorporated in the [SPA] granted by the FDA, 191 events were required to trigger the analysis of the primary endpoint of [PFS].

(FAC ¶ 130; RJN, Ex. 6.)  The release characterized this as "an important milestone for the aldoroxubicin Phase 3 trial," and further provided that CytRx "expect[s] to have top-line results at the end of this quarter," that it "plans to discuss with the FDA initiating a rolling [NDA] by the end of 2016, subject to the outcome of the Phase 3 pivotal trial," and that "[p]ursuant to FDA approval, CytRx expects to launch aldoxorubicin . . . in the second half of 2017."  (FAC ¶ 130; RJN, Ex. 6.)  Defendants reiterated that it had reached the 191 progression events and largely maintained their timeline-related goals (1) in CytRx's Q1 2016 Form 10-Q, filed May 10, 2016; (2) in two Form 8-Ks, filed May 11 and June 7, 2016; (3) at a conference held on July 7, 2016; (4) in a subsequent amendment to CytRx's Form S-3 Registration Statement, dated June 8, 2016; and (5) in CytRx's June and July 2016 Corporate Overview presentations.  (FAC ¶¶ 132, 134, 136, 138, 140, 144, 146; RJN, Exs. 14-15, 18-19.)

According to an article published on the investment research website *Seeking Alpha* after the end of the Class Period on July 19, 2016, however, at the time Defendants announced that the study had achieved the requisite 191 events to trigger data analysis, they knew or recklessly disregarded that, as a result of the partial clinical hold, (1) approximately 25% of all patients were randomized within three to five months of data analysis; (2) half of all patients were enrolled within only eight months of data analysis; and (3) nearly two-thirds of all patients were enrolled within one year of data analysis.  (FAC ¶ 24.)  Furthermore, Defendants knew that actual enrollment, drug exposure, and follow-up time periods failed to comport with the SBA's assumed "18 month accrual period and a 15 month follow-up period after enrollment of the last subject" designed to reach 90% power at the time of data analysis.  (FAC ¶ 24.)

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES - GENERAL**

**CASE NO.:  SEE BELOW**                    **DATE:  June 14, 2017**

Defendants had a motivation to minimize, misrepresent, and/or conceal potential problems with the Phase 3 aldoxorubicin study, which becomes clear when one considers CytRx's financial situation during the Class Period.  (FAC ¶ 29.)  Prior to and during the Class Period, CytRx generated *de minimis* revenue and survived almost entirely on serial fundraising, including (1) a $23 million offering in October 2012; (2) a $25.9 million offering in October 2013; (3) an $86 million offering in February 2014; (4) a $28.8 million offering in July 2015; and (5) a $40 million long-term loan facility secured in February 2016.  (FAC ¶ 29.)  Moreover, during 2015 and 2016 alone, the Individual Defendants collectively pocketed almost $6 million, not including stock option grants, in total compensation.  (FAC ¶ 29.)

> 6.     July 11, 2016:  Defendants for the First Time Reveal that Trial Results Had Been Negatively Impacted by Delays Purportedly Caused by the Hold

After the market closed on **July 11, 2016**, the falsity of Defendants' prior assurances was revealed and the risks that Defendants had concealed materialized after Defendants earlier that day announced the Phase 3 trial results, stating that "[f]or the current evaluation, the study did not show a significant difference between aldoxorubicin and investigator's choice therapy for PFS[.]" (FAC ¶¶ 32, 84; RJN, Ex. 7.)  Defendants insisted that the perceived failure of the efficacy of the drug seen in the results was due to a lack of maturity of the study and data, explaining that "[b]ecause **enrollment was interrupted** by a partial clinical hold in November 2014," there had been insufficient **"follow-up"** for the **nearly two-thirds** of patients who entered the Phase 3 study after the hold was resolved an[d] enrollment resumed[,] . . . result[ing] in **nearly half of all patients being" excluded** from the PFS evaluation.  (FAC ¶¶ 32, 84; RJN, Ex. 7.)  Defendants further stated that CytRx would "conduct a second analysis, which will include longer patient follow-up and allow for greater maturation of all endpoints[,]" and that CytRx would announce the results of this additional evaluation and hold an end-of-Phase 3 meeting with the FDA during the fourth quarter of 2016.  (FAC ¶¶ 32, 84.)

On this news, the price of CytRx's stock fell $1.50 per share, or over 59%, to close at $1.01 per share on July 12, 2016 on unusually heavy trading volume.  (FAC ¶ 33.)  Over the next two days, CytRx's stock continued to decline as investors digested the news, falling an additional 10% to close at $0.90 per share on July 14, 2016.  (FAC ¶ 33.)  At the time the filing of the FAC on January 13, 2017, CytRx's share price was hovering around $0.40.  (FAC ¶ 34.)

Armed with these allegations, Plaintiffs assert the following causes of action against Defendants: (1) violation of section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder against all Defendants ("Rule 10b-5 Claim"); and (2) violation of section 20(a) of the Exchange Act against the Individual Defendants ("Section 20 Claim").  (*See* FAC ¶¶ 178-193.)

II.     LEGAL STANDARDS

    A.     Motion to Dismiss

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES - GENERAL**

**CASE NO.:   SEE BELOW**                    **DATE:  June 14, 2017**

A motion to dismiss under Rule 12(b)(6) tests for the legal sufficiency of the claims alleged in the complaint.  *Ileto v. Glock, Inc.*, 349 F.3d 1191, 1199-1200 (9th Cir. 2003).  Rule 12(b)(6), which provides for dismissal of a plaintiff's cause of action for "failure to state a claim on which relief can be granted," *see* Fed. R. Civ. P. 12(b)(6), must be read in conjunction with Federal Rule of Civil Procedure 8(a) ("Rule 8").  *See Ileto v. Glock Inc.*, 349 F.3d 1191, 1199-1200 (9th Cir. 2003).  Rule 8 requires that "[a] pleading that states a claim for relief must contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  Although the pleader is not required to plead "detailed factual allegations" under Rule 8, this standard demands "more than a sheer possibility that a defendant has acted unlawfully."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted).  Pleadings that contain nothing more than legal conclusions or "a formulaic recitation of the elements of a cause of action" are insufficient.  *Id.*  (citation and quotation marks omitted).

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Id.* (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  Where a complaint pleads sufficient facts "to raise a right to relief above the speculative level," a court may not dismiss the complaint under Rule 12(b)(6).  *See Twombly*, 550 U.S. at 545.  In reviewing a motion to dismiss under Rule 12, a court may only consider the complaint, documents incorporated by reference in the complaint, and matters of judicial notice.  *United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003).

>   B.     Particularity Under Rule 9(b) and the PSLRA

"Securities fraud class actions must meet the higher, exacting pleading standards of Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act (PSLRA)."  *Or. Pub. Emps. Ret. Fund v. Apollo Grp. Inc.* ("*OPERF*"), 774 F.3d 598, 604 (9th Cir. 2014).  Rule 9(b) states that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity.  Malice, intent, knowledge, and other condition of mind of a person may be averred generally."  Fed. R. Civ. P. 9(b).

Moreover, "the enactment of the [PSLRA] in 1995 significantly altered pleading requirements in private securities fraud litigation by amending the 1934 Exchange Act to require that a complaint 'plead with particularity both falsity and scienter.'"  *In re Daou Sys., Inc.*, 411 F.3d 1006, 1014 (9th Cir. 2005) (quoting *Gompper v. VISX, Inc.*, 298 F.3d 893, 895 (9th Cir. 2002)).  A securities fraud complaint must now "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed."  *Gompper*, 298 F.3d at 895 (quoting 15 U.S.C. § 78u-4(b)(1)).
The complaint must also "state with particularity facts giving rise to a **strong** inference that the defendant acted with the required state of mind."  *Id.* (emphasis in original) (quoting 15 U.S.C. § 78u-4(b)(2)); *see also In re Silicon Graphics Inc. Sec. Litig.*, 183 F.3d 970, 974 (9th Cir. 1999) (facts must come closer to demonstrating intent as opposed to mere motive and opportunity).

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES - GENERAL**

**CASE NO.:** <u>**SEE BELOW**</u>                **DATE:** <u>**June 14, 2017**</u>

"The stricter standard for pleading scienter naturally results in a stricter standard for pleading falsity, because falsity and scienter in private securities fraud cases are generally strongly inferred from the same set of facts, and the two requirements may be combined into a unitary inquiry under the PSLRA." *In re Daou Sys.*, 411 F.3d at 1015 (citations and internal quotation marks omitted). "Thus, the complaint must allege that the defendants made false or misleading statements either intentionally or with deliberate recklessness." *Id.* (citing *Silicon Graphics*, 183 F.3d at 974).

> C.     <u>Section 10(b) of the Exchange Act and Rule 10b-5</u>

Section 10(b) of the Exchange Act of 1934, 15 U.S.C. § 78j(b), makes it unlawful "for any person . . . [t]o use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe[.]" 15 U.S.C. § 78j(b). SEC Rule 10b-5, promulgated under the authority of section 10(b), in turn, provides:

> It shall be unlawful for any person . . .

> (a)     To employ any device, scheme, or artifice to defraud,
> (b)     To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, or
> (c)     To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5. Section 10(b) and Rule 10b-5 create a private right of action "which resembles, but is not identical to, common-law tort actions for deceit and misrepresentation." *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 341 (2005). "The basic elements of a Rule 10b-5 claim, therefore, are: (1) a material misrepresentation or omission of fact, (2) scienter, (3) a connection with the purchase or sale of a security, (4) transaction and loss causation, and (5) economic loss." *In re Daou Sys.*, 411 F.3d at 1014 (citing *Dura Pharms.*, 544 U.S. at 336).

"It is well established that claims brought under Rule 10b-5 and section 10(b) must meet the particularity requirements of Federal Rule of Civil Procedure 9(b)" and the PSLRA. *Id.* (citing *Semegen v. Weidner*, 780 F.2d 727, 729, 734-35 (9th Cir. 1985)); *OPERF*, 774 F.3d at 604 (9th Cir. 2014).

> D.     <u>Section 20(a) of the Exchange Act</u>

Section 20(a) of the 1934 Exchange Act creates liability for "controlling persons," providing:

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES - GENERAL**

**CASE NO.:**  <u>SEE BELOW</u>                    **DATE:**  <u>June 14, 2017</u>

> Every person who, directly or indirectly, controls any person liable under any provision of [chapter 2B] of or any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

15 U.S.C. § 78t(a).  "To establish a cause of action under this provision, a plaintiff must first prove a primary violation of underlying federal securities laws, such as Section 10(b) or Rule 10b-5, and then show that the defendant exercised actual power over the primary violator."  *In re NVIDIA Corp. Sec. Litig.*, 768 F.3d 1046, 1052 (9th Cir. 2014) (citing *Howard v. Everex Sys., Inc.*, 228 F.3d 1057, 1065 (9th Cir. 2000)).

III.    <u>ANALYSIS</u>

Defendants contend that Lead Plaintiff's "speculation" that Defendants knew nearly two years before the Trial results were analyzed that they would be disappointing runs afoul of fact, law, and logic.  According to Defendants, Lead Plaintiff's theory of liability ignores three fundamental facts: (1) that despite the hold in November 2014, CytRx met the timelines for its Trial being conducted under an FDA-approved SPA; (2) that the progress and status of the Trial were blind to Defendants; and (3) that the risks associated with pharmaceutical trials are well-known and were specifically disclosed by CytRx in public filings during the Class Period.  (Mot. 1, ECF No. 57.)  They therefore move to dismiss the FAC in its entirety, arguing first that Lead Plaintiff cannot state a claim against them for violations of Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 promulgated thereunder because he has failed to sufficiently allege they made **false or misleading statements** with adequate **scienter** that were relied upon and subsequently caused any **loss** to shareholders.  (Mot. 3-19.)  Second, they submit that Lead Plaintiff's claims against the Individual Defendants under Section 20(a) of the Securities Exchange Act of 1934 fail because Plaintiff cannot establish the prerequisite violations of the federal securities laws.  (Mot. 20.)  Lead Plaintiff responds to each of these arguments.  (*See generally* Opp'n, ECF No. 65.)

A.    <u>Whether Lead Plaintiff Adequately Alleges Falsity and Scienter</u>

Defendants principally argue that Lead Plaintiff fails to allege an actionable misstatement or omission, submitting that because the FAC lacks a single particularized fact showing Defendants knew or must have known the Trial results would be disappointing due to the hold, this case "presents the archetypal 'fraud by hindsight' theory that the federal securities laws are designed to foreclose."  (Mot. 1.)  They also contend that Lead Plaintiff's claim that CytRx did not adequately disclose the SPA amendment following the hold "is demonstrably wrong, as shown by the [FAC] itself," submitting that Lead Plaintiff's "critique of CytRx's word choices when making such disclosures is not actionable and 'more quibble than material.'"  (Mot. 1.)

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES - GENERAL**


**CASE NO.:**  **SEE BELOW**                          **DATE:**  **June 14, 2017**


"[F]alsity and scienter are generally inferred from the same set of facts."  *In re Read-Rite Corp.*, 335 F.3d 843, 845 (9th Cir. 2003).  Thus, Ninth Circuit precedent provides that "these two requirements may be combined into a unitary inquiry under the PSLRA."  *Ronconi v. Larkin*, 253 F.3d 423, 429 (9th Cir. 2001) ("Because falsity and scienter in private securities fraud cases are generally strongly inferred from the same set of facts, we have incorporated the dual pleading requirements of 15 U.S.C. §§ 78u-4(b)(1) and (b)(2) into a single inquiry.").  To adequately plead falsity, Lead Plaintiff must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed."  15 U.S.C. § 78u-4(b)(1).

Lead Plaintiff confirms in his Opposition that he believes the following categories of statements made by Defendants during the putative class period contain actionable misrepresentations and/or omissions:  (1) those "assuring" investors that existing patients were not impacted by the hold; (2) those "assuring" investors that the Trial timelines would be unaffected by the hold and the amended SPA; and (3) those misrepresenting Defendants' compliance with the assumptions underlying the SPA.  (*See* Opp'n 5-10.)  The Court examines these three categories of allegedly misleading statements and omissions.

> 1.   Post-Hold Statements that "All Currently Enrolled Patients Can Continue Receiving Aldoxorubicin Treatment . . . as Per Study Protocols"

Lead Plaintiff first critiques Defendants' November 18, 2014 announcement of the hold and December 3, 2014 follow-up press release that "assured" investors that "[a]ll currently enrolled patients **can continue receiving** aldoxorubicin, **as per study protocols**, but no new patients can be enrolled until the clinical hold is lifted."  (Opp'n 5-6; FAC ¶¶ 94, 96 [emphasis added].)  Lead Plaintiff argues this "assurance" that current enrollees in the Trial would not be affected by the hold was misleading, as Defendants knew that under amended protocols requested by the FDA—revealed in the Edison Report published a few weeks later—dosing for any patient who tested positive for acidosis would be delayed until the patient's acid-base balance normalized.  (FAC ¶ 72.)

Defendants respond by arguing that this theory of liability-by-omission "fails as a matter of law for a simple reason:  **CytRx disclosed th[e] very fact**" that it was amending the SPA to require current patients be tested for acidosis prior to receiving each treatment cycle of aldoroxorubicin. (Mot. 11 [emphasis in original].)  The Court disagrees.  Although it is true that the November 18, 2014 press release announcing the hold states that "[a]t the FDA's request, the Company will amend all aldoxorubicin study protocols to include an appropriate inclusion/exclusion criteria, an additional patient screening assessment and an evaluation of serum electrolytes prior to aldoxorubicin administration," Lead Plaintiff alleges that the release fails to describe the risk that undertaking such screening and evaluation measures would result in a significant number of current enrollees to delay continued dosing until their acid-base balance normalized, possibly

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES - GENERAL**

CASE NO.:   __SEE BELOW__                          DATE:  __June 14, 2017__

jeopardizing the Trial's timeline and results.  (FAC ¶¶ 94-95.)  Accepting as true Lead Plaintiff's allegations regarding the existence of these risks, the Court concludes that CytRx's failure to disclose these risks to investors can make the statements contained in these press releases misleading.  Indeed, this theory of liability is similar in key respects to that asserted in *In re CV Therapeutics, Inc. Securities Litigation* ("*CV Therapeutics*"), a case in which plaintiffs, among other things, accused defendant CV Therapeutics, a pharmaceutical company, of fraudulently and misleadingly failing "to reveal the depth of the FDA's concerns" with one of its unapproved drugs, Raxena.  No. C 03-03709 SI, 2004 WL 1753251, at *8 (N.D. Cal. Aug. 5, 2004).  The district court denied the defendants' motion to dismiss in part because the complaint alleged that CV Therapeutics disclosed to investors both that it had received an "Approvable Letter" from the FDA and that the letter stated that "additional clinical information is needed prior to approval" of Raxena, but failed to mention that the Approvable Letter requested "substantial additional clinical data" and noted "three specific safety concerns that will need to be addressed prior to approval." *Id.*  Although Lead Plaintiff does not claim that Defendants failed to disclose to investors the content of particular communications with the FDA, the Court nevertheless agrees with the court in *CV Therapeutics* that statements regarding regulatory concerns can be misleading where they do not adequately describe the risks involved.  The Court declines to hold Defendants' failure to describe the risk that acidosis testing might have on the Trial not actionable as a matter of law at this early stage in the litigation.  *See In re Sanofi Sec. Litig.*, 87 F. Supp. 3d 510, 528 (S.D.N.Y. 2015) ("[B]ecause of the fact-intensive nature of the materiality inquiry, the Court may not dismiss a complaint 'on the ground that the alleged misstatements or omissions are not material unless they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance.'" (citing *Carpenters Pension Trust Fund of St. Louis v. Barclays PLC*, 750 F.3d 227, 235 (2d Cir. 2014));

Whether the FAC adequately alleges that Defendants published these statements with **scienter**, however, presents a closer question, which the Court is compelled to answer in the negative.  "A defendant who makes misrepresentations or omissions 'either intentionally or with deliberate recklessness' acts with scienter."  *OPERF*, 774 F.3d at 607 (citing *In re Daou Sys.*, 411 F.3d at 1015).  "[I]n determining whether the pleaded facts give rise to a 'strong' inference of scienter, the court must take into account plausible opposing inferences."  *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 310, 127 S. Ct. 2499 (2007).  A complaint will survive a motion to dismiss "only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged."  *Id.* at 324.

According to Lead Plaintiff, the Court should infer from the allegations in the FAC that Defendants more likely than not knew that testing currently enrolled patients for acidosis would delay aldoxorubicin administration to such a degree that the Trial's projected timeline and results would be negatively impacted because of findings contained in the Edison Report.  (*See* Opp'n 13 [citing FAC ¶ 72].)  Lead Plaintiff does not argue that any other allegations in the FAC support a finding of scienter with respect to this statement.  (*See generally* Opp'n.)

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES - GENERAL**

**CASE NO.:** <u>SEE BELOW</u>          **DATE:** <u>June 14, 2017</u>

The Court is unable to make out a strong inference of scienter based on the allegations pled. First, the Edison Report was published on December 10, 2014, several weeks **after** Defendants announced the hold on November 18, 2014.  (FAC ¶¶ 71-72.)  Given this temporal discrepancy, the Court finds it implausible to infer that Defendants knew when they announced the hold that conducting acidosis testing on current Trial patients would have a negative effect on the outcome of the Trial.  Rather, the Court finds it more likely that Defendants first learned of such a possibility after the Edison Report was published, particularly given the statement in the November 18, 2014 press release that pursuant to "the FDA's request, the Company **will amend**" its SPA to include certain testing protocols, suggesting Defendants had not, at that point in time, confirmed that acidosis testing would be necessary for all current enrollees.  (FAC ¶ 94.)  The Court finds this to be the far more likely scenario given the Edison Report provides that "CytRx **now intends** to require all patients within the ongoing trials to be tested for acidosis prior to receiving treatment," and further states that although "the hold could be lifted promptly . . . if the hold persists well into 2015, CytRx may need to revise its guidance of top-line data in 2016 for the [Trial]."  (FAC ¶ 72; Pearson RJN Decl., Ex. 16 at 1.)

Moreover, the mere fact that the Edison Report clarifies—several weeks after CytRx announced the hold and in light of CytRx's statement in that announcement that it was "working diligently in collaboration with the FDA to seek the release of the clinical hold and resume enrollment in its clinical studies," (FAC ¶ 70)—that currently enrolled patients would be screened for acidosis does not strongly imply that CytRx **knew** such screening would materially risk jeopardizing the Trial's projected timeline or its results.  Indeed, nowhere in the FAC does Lead Plaintiff allege that a **single** patient receiving aldoroxorubicin at the time the hold was announced had their treatment either delayed or discontinued as a result of testing positive for acidosis.  Thus, even after considering the contents of the Edison Report, there is insufficient information to demonstrate Defendants knew that requiring acidosis testing would unduly risk jeopardizing the Trial.

In sum, the Court does not find that a reasonable person would deem the inference of scienter to be either cogent or at least as compelling as any opposing inference once could draw from the facts alleged, *Tellabs*, 551 U.S. at 324, and it accordingly **DISMISSES** Lead Plaintiff's securities fraud claims based on the allegedly misleading statement in CytRx's November 18 and December 3, 2014 press releases that "[a]ll currently enrolled patients can continue receiving aldoxorubicin treatment . . . as per study protocols, but no new patients can be enrolled until the clinical hold is lifted."

///
///
///

          2.     <u>Statements Concerning Defendants' Compliance with the Amended SPA</u>

Lead Plaintiff next argues the FAC adequately alleges Defendants knowingly misrepresented their compliance with the SPA on several occasions.  (Opp'n 8-10.)  For example, Lead Plaintiff points

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES - GENERAL

CASE NO.:  **SEE BELOW**                    DATE:  June 14, 2017

to CytRx's 2015 Form 10-K, filed March 11, 2015, and its Q1 2016 Form 10-Q, filed May 10, 2016, in which Defendants stated that

> The Phase 3 trial is **being conducted under** a Special Protocol Assessment, or SPA, . . . .  The SPA means that the **FDA agrees that the design and analyses proposed in the Phase 3 trial protocol are acceptable to support regulatory approval** . . ., and will not subsequently change its perspective on these matters, . . . .  Thus, if the study demonstrates an acceptable benefit-risk profile as determined by the FDA, it would suffice as the single pivotal trial to demonstrate effectiveness and would support registration of aldoxorubicin. . . .

(FAC ¶¶ 127, 132.)  Lead Plaintiff argues that Defendants knowingly misstated their compliance with the SPA based on two allegations in the FAC.  First, they argue that by December 1, 2015, Defendants knew their timing assumptions underlying the SPA could not be met because the follow-up period would have needed to extend until at least March 1, 2017.  (Opp'n 8 [citing FAC ¶¶ 63, 122, 126].)  And second, they argue that "Defendants later admitted [that] in March 2016 they knew that 'nearly half of patients were excluded from the analysis of the endpoint' due to insufficient follow-up data."  (Opp'n 9 [citing FAC ¶ 86].)

The problem underlying this argument is that Defendants, in describing the SPA, estimated that "approximately 400 subjects w[ould] be needed to achieve the [required] 191 PFS events" by "**[a]ssuming** an 18 month accrual period and a 15 month follow-up period after enrollment of the last subject."  (FAC ¶ 63.)  There is no indication in the FAC, however, that the SPA **obligated** Defendants to adhere to the 18-month accrual and 15-month follow-up periods.  Indeed, such an understanding would appear to run contrary to cases that have described an SPA as "an agreement between the FDA and the drug developing entity (the 'sponsor') that, if the sponsor follows the procedure agreed upon in the protocol and the drug proves efficacious, then it will be approved."  *In re Cell Therapeutics, Inc. Class Action Litig.*, No. 2:10-CV-00414-MJP, 2011 WL 444676, at *1 (W.D. Wash. Feb. 4, 2011); *see also* Cancer Clinical Trials: Proactive Strategies 99-100 (Stanley P.L. Leong, ed.) (2007).

Lead Plaintiff points to no authority holding that a company's failure to comply with all assumptions underlying an SPA or a similar agreement with a regulatory body renders the company not in compliance with the agreement.  Nor does he point to any authority indicating, much less suggesting, that a company misleads its investors by announcing its clinical trial is being "conducted under an SPA" or similar agreement when the company fails to follow all scientific assumptions underlying that agreement.  For example, it would be one thing if CytRx had announced to investors that it was "in compliance with all aspects of the SPA" or that it was "following all assumptions stated in the SPA."  This is not, however, what CytRx did.  Instead, it announced "[t]he Phase 3 trial is being conducted under a Special Protocol Assessment, or SPA" such that "if the study demonstrates an acceptable benefit-risk profile as determined by the FDA, it would suffice as the single pivotal trial to demonstrate effectiveness and would support

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES - GENERAL**

**CASE NO.:**  __SEE BELOW__                        **DATE:**  __June 14, 2017__

registration of aldoxorubicin. . . ."  (FAC ¶¶ 127, 132.)  A reasonable investor would not find Defendants' statements concerning the SPA to be materially misleading.

To the extent Lead Plaintiff impliedly argues that some scientific or statistical principle dictates that a 15-month follow-up period were needed in order to obtain 191 PFS events using a sample of 400 subjects, the Court would find such a theory implausible in light of evidence submitted by Defendants in their Reply that on November 29, 2016—months before the expiration of the 15-month follow-up "deadline" of March 1, 2017, (*see* Opp'n 8)—CytRx "announced positive updated results from its pivotal Phase 3 clinical trial . . . . which enrolled 433 patients . . . ."  (Suppl. Pearson RJN Decl., Ex. 22.)[4]  Given this reality, a reasonable investor could not find CytRx's failure to disclose its non-compliance with the assumed 15 month follow-up period material.  *See, e.g.*, *In re Bayer AG Sec. Litig.*, No. 03 Civ.1546 WHP, 2004 WL 2190357, at *2-*4 (S.D.N.Y. Sept. 30, 2004) (concluding that adverse event reports were not material giving rise to a duty to disclose until a consensus emerged regarding the data on the drug).  The Court rejects Lead Plaintiff's effort to "sidestep the heightened pleading requirements for fraud by simply mischaracterizing" CytRx's statements, *GIA-GMI, LLC v. Michener*, No. C 06-7949 SBA, 2007 WL 2070280, at *9 (N.D. Cal. July 16, 2007), and concludes that Defendants did not make "an untrue statement of material fact" or "omit[ ] to state a material fact necessary in order to make the statements made, in light of the circumstances in which they were made, not misleading," 15 U.S.C. § 78u-4(b)(1).

Even if the Court were to assume that Defendants failed to comply with material aspects of the SPA, it would nevertheless conclude that Lead Plaintiff has failed to plead a strong inference of scienter.  Based on the allegations in the FAC, the Court finds that the stronger inference is that Defendants believed one of two things:  either (1) once enrollment was completed and once 191 progression events were logged—both of which were timely accomplished in accordance with Defendants' longstanding estimates—they were permitted to unblind and analyze the underlying data to determine if it yielded statistically significant PFS results; or (2) they could achieve a sufficiently powered Trial with a follow-up period shorter than 15 months (i.e., the SPA's "assumptions" were assumptions, not requirements).  Indeed, Lead Plaintiff's allegations concerning "the potential for substantially improved Phase 3 efficacy results" do not appear to bear any direct nexus to the 15-month follow-up period, but instead refers to the FDA's decision to permit Defendants "to continue dosing patients with aldoxorubicin until disease progression (defined as an increase in the size of measurable tumors by 20% or the development of a new tumor lesion) . . . ."  (FAC ¶¶ 9, 124; RJN, Ex. 1 at 5.)  The FAC does not contain any allegations that the 15-month follow-up period was necessary in order to achieve statistically significant results, much less allegations that Defendants knew a 15-month follow-up period was required. *Cf. Zak v. Chelsea Therapeutics Int'l, Ltd.*, 780 F.3d 597, 610 (4th Cir. 2015) (finding inference of scienter stronger than other inferences where pharmaceutical company "fail[ed] to disclose critical

---

[4]  The Court takes judicial notice of this document under the doctrine of incorporation by reference as this announcement is referenced in paragraph 92 of the FAC.

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES - GENERAL**

**CASE NO.:** <u>SEE BELOW</u>                    **DATE:** <u>June 14, 2017</u>

information received from the FDA during the new drug application process, while releasing less damaging information that they knew was incomplete").

For the foregoing reasons, the Court **DISMISSES** Lead Plaintiff's securities fraud claims to the extent they are based on a theory that Defendants misled investors as to whether they complied with the terms of the SPA.

3.      Statements Concerning the Trial's Projected Timeline

Finally, Lead Plaintiff criticizes Defendants for publishing a number of statements concerning the Trial's **projected timeline** without "disclos[ing] the **material risk** that interruptions caused by the hold and amended SPA posed to the SPA's follow-up assumptions—*i.e.*, the length of time patients needed to be exposed to aldoxorubicin to sufficiently power the study to achieve statistically significant results." (Opp'n 7.)[5]   In particular, Lead Plaintiff attacks Defendants' announcements on November 18 and December 3, 2014 that "timelines for its ongoing trials will remain materially unchanged" notwithstanding the imposition of the hold and the accompanying amendment to the SPA requiring acidosis screening.   (FAC ¶¶ 94, 96.)   He also challenges Defendants' repeated "promises" (1) that Trial data would be released in mid-2016; (2) that an NDA for aldoxororubicin would be submitted by year-end 2016; and (3) that aldoxorubicin would be commercialized in 2017, some of which were made after the Trial data was unblinded.   (FAC ¶¶ 98, 100, 108, 110, 114, 116, 118.) As will be made clear, these timeline-related challenges are based on certain "assumptions" underlying the SPA; namely, that clinical data would be analyzed after 191 PFS events were observed, requiring the enrollment of approximately 400 patients, assuming the existence of both an 18-month accrual period and a 15-month follow-up period after enrollment was completed.   (FAC ¶ 63.)

Defendants argue these statements are not actionable for two reasons.   First, they contend that such forward-looking statements are insulated from liability under the PSLRA's safe-harbor provision, codified at 15 U.S.C. § 78u-5 ("Section 78u-5").   (Mot. 5-8.)   Second, they argue that Lead Plaintiff fails to adequately allege scienter.   (Mot. 8-11, 14.)   The Court considers these arguments below.

a.      Applicability of the PSLRA's Safe Harbor

Defendants first contend that statements projecting the Trial's timeline are protected under the PSLRA's safe-harbor provision.   (*See* Mot. 5-11.)   Section 78u-5 provides that, in general, "in any private action arising under this chapter that is based on an untrue statement of a material fact or

---

[5]  Lead Plaintiff confirms in his Opposition that he is **not** arguing either that Defendants should have designed the trial differently or that they should have predicted that the efficacy results would be negative.   (Opp'n 9 n. 12.)

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES - GENERAL**

**CASE NO.:**  **SEE BELOW**                    **DATE:**  **June 14, 2017**

omission of a material fact necessary to make the statement not misleading, a person . . . shall not be liable with respect to any forward-looking statement, whether written or oral, if and to the extent that" **either** (1) the forward-looking statement is identified as forward-looking and "accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement;" or (2) the plaintiff "fails to prove" the projections were made with "actual knowledge" that they were false and misleading.  15 U.S.C. § 78u-5(c).[6]  The PSLRA defines a forward-looking statement to include "a statement of the plans and objectives of future operations, including plans or objectives relating to the products or services of the issuer."  15 U.S.C. § 78u-5(i)(1)(B).  Under the first method, the "state of mind of the individual making the statement is irrelevant, and the statement is not actionable regardless of the plaintiff's showing of scienter."  *In re Cutera Sec. Litig*, 610 F.3d 1103, 1112 (9th Cir. 2010).

Defendants argue that the following statements concerning the Trial's timeline constitute "forward-looking statements" that are protected by the PSLRA's safe-harbor provision:  (1) those concerning CytRx's expectation that it would **complete enrollment** in the Trial by the end of 2015; (2) those indicating they would **un-blind and disclose** the clinical data by mid-2016; (3) those discussing **submitting an NDA** with the FDA by the end of 2016; and (4) those indicating that, "subject to FDA approval," aldoxorubicin would **launch commercially** in 2017.  (Mot. 6 [citing FAC ¶¶ 96, 98, 100, 106, 108, 110, 112, 114, 116, 120, 126, 128, 130,132, 134, 136, 138, 140, 142, 144, 146].)  Defendants submit that each of these statements was accompanied by appropriate cautionary language, and also contend that the FAC does not allege any facts showing they had "actual knowledge" that CytRx would miss the Trial's timeline projections.

Lead Plaintiff responds by arguing that the safe harbor does not apply because (1) it does not apply to material omissions; (2) certain of these statements are not "forward-looking;" (3) that the statements that are forward-looking were not accompanied by meaningful cautionary language; and (4) Defendants had actual knowledge that their statements were false or misleading.  (*See* Opp'n 10-14.)  Lead Plaintiff also submits that the FAC raises a strong inference of scienter.  (Opp'n 14-19.)

Lead Plaintiff's arguments do not persuade.  First, to the extent he argues that "Defendants' statements in December 2014 that existing patients were not impacted by the hold . . . and their statements after December 2015 that the study was conducted in accordance with the SPA . . . were not forward-looking, and thus do not qualify for safe harbor protection," (Opp'n 10-11), the Court ruled in Sections III(A)(1) and (2) that these statements are not actionable based on the allegations in the FAC.  Similarly, to the extent Lead Plaintiff claims that "[w]hen Defendants

---

[6]  Defendants are also entitled to the protection of the PSLRA's safe harbor if the forward-looking statement is "immaterial," which Defendants do not content to be the case.  15 U.S.C. § 78u-5(c)(1)(A)(ii).

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES - GENERAL**


**CASE NO.:**  **SEE BELOW**                    **DATE:**  **June 14, 2017**


announced the completion of enrollment in the Phase 3 trial in December 2015, they omitted the material fact that the dataset, if reported at the end of June 2016 (as promised), could **not** comply with the SPA's 15-month follow-up assumption," (Opp'n 10), the Court ruled in Section III(A)(2) that the FAC both fails to allege how or why this assumption is material and fails to adequately allege scienter.  These statements are not actionable.

Second, the Court concludes that Defendants' statements concerning their expectations that they would submit an NDA in 2016 and bring aldoxorubicin to market in 2017 are protected under the PSLRA's safe harbor.  Lead Plaintiff does not argue that these statements do not constitute "forward-looking statements," nor does he submit that these statements were not made expressly contingent on the Trial results being positive.  (*See generally* Opp'n.)  Instead, he argues the statements were not accompanied by "meaningful" cautionary language either because the disclosures are "generic" or because Defendants "knew" that the study failed to comply with the SPA's follow-up assumptions."  (Opp'n 11-12.)

Neither argument withstands scrutiny.  The statements contained in press releases were each accompanied by the following cautionary language:

> [The forward-looking] statements involve risks and uncertainties that could cause actual events or results to differ materially from the events or results described in the forward-looking statements, including **risks relating to the outcome, timing and results of CytRx's clinical trials** . . . .

(*See* RJN, Ex. 2-8, 13, 15, 17 [emphasis added].)  Moreover, CytRx's 2014 and 2015 Form 10-Ks included the following disclosure:

> We **may experience delays** in clinical trials of our product candidates.  We do not know whether ongoing clinical trials will be completed on schedule or at all . . . Clinical trials can be delayed  for a variety of reasons, including delays related to . . . **recruiting** suitable patients to participate in a trial . . . [or] **having patients complete a trial**.

(RJN, Ex. 1 at 14; Ex. 20 at 17 [emphasis added].)  These statements "relate directly to that to which [Lead Plaintiff] claim[s] to have been misled."  *In re Energy Recovery Inc. Sec. Litig.*, No. 15-cv-00265-EMC, 2016 WL 324150, at *17 (N.D. Cal. Jan. 27, 2016) (quoting *In re Worlds of Wonder Sec. Litig.*, 35 F.3d 1407, 1415 (9th Cir. 1994)).  Indeed, here, as in *Police Retirement Systems v. Intuitive Surgical, Inc.*, Defendants "identif[ied] important factors that could cause actual results to differ materially from those in the forward-looking statement"—i.e., the risk that Defendants would either not be able to obtain a sufficient number of suitable Trial participants to meet their timeline projections or that the timeline would be delayed because participants might not complete the Trial.  759 F.3d 1051, 1058 (9th Cir. 2014).  Moreover, the FAC does not allege with particularity how Defendants' statements regarding its expectations that it would submit an

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES - GENERAL**


**CASE NO.:  SEE BELOW**                    **DATE:  June 14, 2017**


NDA and bring aldoxorubicin to market according to a particular timeline were made with "actual knowledge . . . that [the statements were] false or misleading."  15 U.S.C. § 78u-5(c)(1)(B).  For these reasons, the Court concludes that Defendants' statements concerning their expectations that they would submit an NDA in 2016 and bring aldoxorubicin to market in 2017 are not actionable.  *See, e.g.*, *Gillis v. QRX Pharma Ltd.*, 197 F. Supp. 3d 557, 596 (S.D.N.Y. 2016) (defendant's "projection that '[a]ssuming approval, [QRX] anticipate[s] product launch . . . before the end of [the] calendar year' to be both inactionable because "[n]o reasonable investor would interpret it as a 'guarantee,' or even as suggesting a high likelihood, of FDA approval," and because it is protected by the PSLRA safe harbor as a forward-looking statement that is not alleged to have been made with "actual knowledge . . . that [it was] false or misleading").

> b.   Materiality and Scienter

With respect to the remaining challenged statements, the Court finds dismissal to be proper because the FAC fails to adequately allege either or both materiality and scienter.  For example, the Court agrees with Defendants that their statement on November 3, 2015 that enrollment remained "on track" despite the hold, "with data expected in the second half of 2016" cannot form the basis for a securities violation, but not because these statements (1) are forward-looking; (2) constitute "non-actionable puffery;" or (3) "were in fact realized."  (*Cf.* Mot. 11 n. 7; Opp'n 11; Reply 3 n. 5, ECF No. 66.)  Rather, the Court finds that these statements are not actionable because the allegations in the FAC do not more likely than not suggest Defendants knew these statements were misleading in light of either the hold or the 15-month follow-up assumption.

*Rihn v. Acadia Pharmaceuticals Inc.*, a case cited by Lead Plaintiff, is inapposite.  In that case, defendants, less than a week after issuing press releases stating they "remain[ed] on track to submit [their] NDA this quarter," cancelled various scheduled appearances and announced it was delaying its NDA submission, notwithstanding that the complaint alleged defendants "needed to be prepared for a pre-approval inspection by the FDA of its manufacturing facilities" and "demonstrate that its manufacturing and quality assurance systems and those of its third-party contract manufacturers and suppliers complied with CGMPs."  No. 15cv00575 BTM(DHB), 2016 WL 5076147, at *5 (S.D. Cal. Sept. 19, 2016).  The district court found defendants' promises of being "on track" to be materially misleading because they did not engage in the "significant undertaking" required to be approved for an NDA, and therefore they "lacked information regarding whether the necessary infrastructure for commercial-scale operations was in place."  *Id.*  Here, by contrast, the FAC contains no allegations that Defendants were not blind to the underlying data in November 2015.  Given this fact and given the Court's conclusion in Section III(A)(2), *supra*, that the FAC does not allege how strict compliance with the SPA's assumptions is material, the Court concludes that Defendants' statements regarding their progress are not actionable.

Lead Plaintiff also argues that Defendants violated the securities laws because "they knew" in March 2016 "that 'nearly half of patients were excluded from the analysis of the endpoint' due to insufficient follow-up data," citing to paragraph 86 of the FAC in support of this argument.  (Opp'n

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES - GENERAL**

**CASE NO.:**  <u>SEE BELOW</u>                    **DATE:**  <u>June 14, 2017</u>

9.)  This is a drastic mischaracterization of paragraph 86, which cites to the following language from Defendants' July 11, 2016 call with investors:

> Because nearly two-thirds of patients fall into this category it had a substantial impact on our current analysis with nearly half of all patients (technical difficulty) survival evaluation.  In other words, in March at the time of this data analysis cutoff, nearly half of patients were excluded from the analysis of the endpoint.

(FAC ¶ 86.)  There are no allegations in the FAC explaining how or why Defendants **knew** in March 2016 that "nearly half of patients were excluded from the analysis of the endpoint," and the Court is unable to infer such knowledge based on the remaining allegations, particularly given the Trial was a double-blind study conducted by a contract research organization ("CRO").  As best the Court can surmise, Lead Plaintiff reaches this conclusion based on the July 19, 2016 *Seeking Alpha* report's conclusion that "the 191 PFS event trigger was announced April 4th, but likely occurred in the trial sometime in March of 2016."  (FAC ¶ 90.)  Lead Plaintiff does not explain, however, how the Court can plausibly infer Defendants knew that nearly half of the study participants would be excluded by March of 2016.  The FAC does not allege when the underlying data was released to Defendants for their evaluation, but Defendants consistently stated CytRx "expects to unblind the clinical data by mid-2016."  (*See* FAC ¶ 73.)  Moreover, in a May 11, 2016 press release, CytRx announced that in April of that year, its CRO "started the collection and verification of the trial data from all 433 patients enrolled at 79 sites around the globe" and therefore CytRx "expect[ed] to report top-line results following the analysis of the data in June 2016."  (RJN, Ex. 15.)  The Court infers from this statement that Defendants did not receive and review the underlying data until at least May 11, 2016 (and likely not until June 2016) such that the far stronger inference is that Defendants did not know a substantial number of study participants would be excluded from the analysis in March of that year.  Even if Lead Plaintiff had alleged in his FAC that Defendants had unblinded the data in March 2016, the FAC does not allege Defendants had reviewed and verified the unblinded data such that there would be a strong inference of scienter. *See Anderson v. Peregrine Pharms., Inc.*, No. SACV 12-1647 PSG (FMOx), 2013 WL 4780059, at \*10-\*11 (C.D. Cal. Aug. 23, 2013) ("Based on the law discussed above—both controlling and persuasive authority—failure to verify the results of a scientific study is not securities fraud. Rather, a claim for securities fraud based on inaccurate statements regarding data from a clinical trial or scientific study on a product requires that the defendant actually knew that the data was inaccurate or the statements made were false at the time they were made.").  Accordingly, the Court finds that the inference of scienter is outweighed by the opposing inference that Defendants did not know until they received and reviewed the underlying data that a material number of study participants were at risk of being excluded.

      4.    <u>Concluding Thoughts Regarding Scienter</u>

In the seminal *In re AstraZeneca Securities Litigation* decision, the district court observed that "[a] number of cases have dealt with the situation of a pharmaceutical company attempting to develop

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES - GENERAL**

**CASE NO.:  SEE BELOW**                    **DATE:  June 14, 2017**

a drug which ultimately cannot be placed on the market or is taken off the market."  559 F. Supp. 2d 453, 470 (S.D.N.Y. 2008).  "The key" in these cases "is the honest belief of the management in the truth of information issued to the public."  *Id.*  "If the management knows that certain facts will necessarily prevent the regulatory approval or the marketing of the drug and conceals these facts from the investing public, then there is scienter. There is also scienter if the management is reckless in dealing with such adverse facts."  *Id.* (citations omitted).

The cases cited by both sides demonstrate why the FAC does not allege a strong inference of scienter.  Of these, *Tran v. XBiotech Inc.* is perhaps the most illuminating.  In that case, the trial court considered the plaintiffs' theory that pharmaceutical company XBiotech misled its investors regarding its stated Phase III clinical trial timelines for its sole important drug, Xilonix.  *See* No. A-15-CA-01083-SS, 2016 WL 5408382, at *1-*2, *9 (W.D. Tex. Sept. 23, 2016).  XBiotech began its Phase III clinical trial in Europe in July 2014, hoping to recruit at least 276 patients across 40 clinical trial sites in Europe and complete the entire trial in 2015.  *Id.* at *2.  Plaintiffs alleged that "[b]etween Phase III Trial's commencement in July 2014 and March 3, 2015, approximately 122 patients were enrolled across the study sites," but XBiotech's CRO, KCR, "encountered several difficulties enrolling its desired 276 patients," including sick patients who were not physically healthy enough to continue with the study after initial screening and due to certain countries' vacation policies.  *Id.*  Yet XBiotech maintained its stated timelines, notwithstanding being advised by employees that "the goals for enrollment and completion of the study were unrealistic without additional study sites."  *Id.* at *3.  In its SEC filings, however, XBiotech noted that it "may experience delays in enrolling subjects in our trials and may not be able to enroll sufficient subjects to complete the trials."  *Id.* at *4.  It also stated that "[a]s of March 3, 2015 about 122 patients had been enrolled," and also that "the addition of sites in Russia is expected soon."  *Id.*

To support their claim that XBiotech acted with scienter in maintaining its timeline, plaintiffs pointed to XBiotech's "disregard of enrollment data and warnings provided by senior company employees, the importance of Xilonix to XBiotech, the small size of XBiotech, and the motive to inflate the value of stock for the IPO . . . ."  *Id.* at *9.  The Court nevertheless found "the inference of scienter [to be] outweighed by opposing inferences."  *Id.*  First, the court stated that "motive to raise capital in the normal course of business provides a weak, if any, inference of scienter."  *Id.*  It then considered plaintiffs' argument that XBiotech "either knew or should have been aware of the danger of misleading investors about the timeline for the Phase III Trial in light of the enrollment data and the nature of XBiotech's business."  *Id.*  The court noted plaintiffs failed to point to a "specific report or data available at the time of the alleged misstatements that contradicted those statements," and then found that XBiotech's "transparency [regarding enrollment numbers and problems with a second clinical trial] cuts against the inference of scienter."  *Id.* at *9-*10.  The court stated that "[a]dditional characteristics" of XBiotech's SEC filings "further negate the inference of scienter," including that it "use[d] words emphasizing uncertainty" in connection with its projected timelines.  *Id.* at *10.

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES - GENERAL**

**CASE NO.:**  **SEE BELOW**                    **DATE:**  **June 14, 2017**

The inference of scienter in this case is even weaker than that in *XBiotech*.  Here, there are no allegations that Defendants were made aware that enrollment was impermissibly "weighted toward the back end" such that they could not achieve sufficiently powered results by July 2016.  (*Cf.* Opp'n 11 n. 14.)  Indeed, unlike XBiotech, Defendants were blind to the underlying data until at least May 2016, and there is no indication that any individuals or entities expressed their belief to Defendants that their Trial timeline projections were not realistic or feasible.  Moreover, Defendants' Trial timeline projections, which were accompanied by disclosures regarding risks pertaining to "the timing or FDA approval of projected commercial sales of aldoxorubicin," each "use[d] words emphasizing uncertainty," such as "plans," "expects," "currently believes," and "subject to the outcome."  (*See* RJN, Exs. 4, 6.)  Lead Plaintiff's allegations that Defendants had a motive to conceal adverse information about their potential blockbuster drug do not make the inference of scienter stronger than the opposing inference that Defendants were not aware that the clinical hold and amended SPA risked jeopardizing their projected Trial timelines.

Other legal principles bolster the Court's conclusion that the FAC fails to adequately allege scienter.  For example, the FAC does not identify any "inconsistent contemporaneous statements or information (such as internal reports) made by or available to the defendants" with respect to their purported noncompliance with the SPA.  *Yourish v. Cal. Amplifier*, 191 F.3d 983, 993 (9th Cir. 1999) (quoting *In re GlenFed Sec. Lit.*, 42 F.3d 1541, 1549 (9th Cir. 1991) (*en banc*)); *see also Sapir v. Averback*, Civ. Action No. 14-7331 (JLL) (JAD), 2016 WL 554581, at *10 (D.N.J. Feb. 10, 2016) ("[T]he Court notes that Amended Complaint fails to cite a single document or witness that corroborates allegations of scienter.  Although, admittedly not necessary to state a claim, the Court is cognizant that 'omissions and ambiguities count against inferring scienter' under the PSLRA's particularity requirements.").  Nor does it contain allegations from an inside source indicating that Defendants were made aware that the hold or the amended SPA would materially alter their Trial timeline projections.  *See, e.g.*, *XBiotech*, 2016 WL 5408382 at *2 (granting motion to dismiss for lack of scienter even though plaintiffs had alleged that confidential sources informed XBiotech that its stated timelines could not be met); *Energy Recovery*, 2016 WL 324150 at *8 (denying motion to dismiss in part because plaintiffs alleged that certain of defendant Energy Recovery's statements were false because a confidential witness reported that Energy Recovery did not in fact have a contract with Pemex).

Overall, the Court agrees with Defendants that, considering the allegations in the FAC holistically, the far more compelling inference is that Defendants (1) reasonably believed the Trial data would be sufficiently complete and favorably support an NDA; (2) were so optimistic that they conditioned a loan—which Plaintiff alleges was necessary "[t]o prolong the life of the Company,"(FAC ¶ 151)—on the Trial producing timely and positive results; (3) were so optimistic that they declined to sell any stock and instead bet on the success of the Trial; (4) "designed the Phase 3 Studies with input from the FDA in a manner they thought was appropriate;" (5) "kept the market abreast of the studies' progress through press releases and other filings;" and (6) "revealed the disappointing results of the Phase 3 Studies when they became available."  *Sapir*, 2016 WL 554581 at *10.

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES - GENERAL**

**CASE NO.:** __SEE BELOW__                    **DATE:** __June 14, 2017__

Lead Plaintiff's cases are inapposite.  Lead Plaintiff cites to *In re Immune Response Securities Litigation* for the unchallenged proposition that statements, while not "objectively false[,]" can be "misleading because they omitted crucial material information" concerning "significant issues [that] posed a threat," including the statistical significance of trial results.  (Opp'n 7 [quoting *Immune Response*, 375 F. Supp. 2d 983, 1019 (S.D. Cal. 2005)].)  The trial court in that case found that the complaint adequately pled scienter because it particularly alleged why Defendants "had knowledge of the circumstances concerning [the drug's] ineffectiveness on treatment of HIV and/or secondary markers" by pointing to "meetings and articles where such problems were discussed" and by "alleg[ing] the existence of contemporaneous documentary or testimonial evidence corroborating their allegations of what Defendants knew."  *Immune Response*, 375 F. Supp. 2d at 1022.  No similar evidence is alleged to exist in this case.

Lead Plaintiff's reliance on *Schueneman v. Arena Pharmaceuticals, Inc.* is similarly unavailing.  (Opp'n 8, 14-16.)  In that case, the Ninth Circuit held that the complaint adequately pled scienter where defendants "touted the safety and likely approval of lorcaserin" by "referr[ing] to the animal studies supporting the FDA application" but failed "to disclose the [adverse] Rat Study's existence to the market" even though they "told investors about their confidence in lorcaserin's approval being based on 'the preclinical studies that [were] done, [and] **all the animal studies that have been completed**.'"  840 F.3d 698, 704, 707 (9th Cir. 2016) (emphasis in original).  The court's conclusion followed from the allegations that Defendants knew the Rat Study existed and "that the FDA's request for bi-monthly reports and follow-up studies was 'highly unusual' and 'out-of-process.'"  *Id.* at 707.  Here, Defendants did not affirmatively and misleadingly represent, for example, that they were in full compliance with all assumptions underlying the SPA.  Had they done so, they might have run afoul of the proposition that "once defendants chose to tout [their compliance with the terms of the SPA], they were bound to do so in a manner that wouldn't mislead investors as to [potentially negative information within their possession]."  *Id.* at 707-08 (quoting *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 987 (9th Cir. 2008)).

This case is also far afield from *Siracusano v. Matrixx Initiatives, Inc.*, a case in which the Supreme Court found the plaintiffs' allegations of scienter in the clinical approval context passed muster under the PSLRA.  In *Matrixx*, the Supreme Court rejected defendant Matrixx's argument that it was not required to divulge evidence indicating that the use of its drug, Zicam, could cause loss of smell "because the information was not strong enough to raise alarm bells" because "there was a strong inference of deliberate recklessness based on Matrixx's "(1) telling Dr. Linschoten that it was having an outside consultant review the matter; (2) getting a panel of physicians and scientists to review Dr. Jafek's presentation; (3) demanding that Dr. Jafek remove Zicam's name from the presentation; and (4) suggesting that studies had been done that had not been done."  563 U.S. at 31-34, 49.  In particular, the Court held that Matrixx was obligated to disclose the issue given its positive statements to the market and the fact that it had "received information that plausibly indicated a reliable causal link between Zicam and [loss of smell]."  *Id.* at 45.  Again, the FAC does not adequately explain how or why Defendants were deliberately reckless to the risks that the hold or amended SPA posed to their stated Trial timeline projections.

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES - GENERAL**

**CASE NO.:   SEE BELOW**                      **DATE:  June 14, 2017**

*In re MannKind Securities Action*, a case cited by Lead Plaintiff on the issue of scienter, is likewise distinguishable on its facts.  In that case, the court found that "Defendants made a series of statements in which they described the FDA's 'vetting' of, 'blessing' of, 'approval' of, and 'agreement' with their bioequivalence studies."  835 F. Supp. 2d 797, 809-10 (C.D. Cal. 2011).  The court found that "[b]ased on the FDA's subsequent ordering of further studies, . . . that the most plausible inference to draw is that Defendants' showing of bioequivalence had failed, and that no 'agreement' or 'blessing' had ever been secured."  *Id.*  Here, Defendants made no affirmative representations regarding the FDA's "blessing" of their Trial timeline projections.

*Todd v. STAAR Surgical Co.*, another case cited by Lead Plaintiff on the issue of scienter, is also readily distinguishable.  In that case, defendant STAAR, seeking to sell its implantable lenses in the United States, had "experienced difficulties in obtaining FDA approval of its devices ever since its first attempt at penetrating the U.S. market."  No. CV-14-05263-MWF-RZ, 2016 WL 6699284, at *2 (C.D. Cal. Apr. 12, 2016).  In particular, the FDA noted deficiencies in its California manufacturing facility.  *Id.*  Between 2007 and 2013, STAAR kept its investors abreast of its compliance with FDA regulations, but when the company decided to consolidate its manufacturing operations into one facility in California in 2013, "[t]he consolidation process significantly exacerbated the pre-existing deficiencies in STAAR's quality assurance practices."  *Id.* at *3.  On March 23, 2014, an FDA inspector presented STAAR with a Form 483 identifying myriad violations to a senior regulatory compliance person.  *Id.*  But STAAR made" representations [that] created an impression that the California manufacturing facility was in compliance with FDA rules such that there would be no disruption in the supply of STAAR's products and no hiccups in the approval process for the TICL" after "the FDA observed numerous violations of its regulations . . . ."  *Id.* at *6.  Here, by contrast, the FAC does not allege that Defendants made affirmative representations regarding the Trial's compliance with every assumption underlying the SPA.

For these reasons, the Court concludes the FAC fails to allege that any statement recited therein was made with scienter.  The Court therefore **GRANTS** Defendants' Motion and **DISMISSES** Lead Plaintiff's Section 10(b) of the Exchange Act and Rule 10b-5 claim.

      B.     Loss Causation and the Asserted Section 20(a) Violation

Because the Court concludes that the FAC fails to allege that any statement recited therein was made with scienter, it need not consider Defendants' additional argument that the FAC fails to adequately plead loss causation.  (Mot. 19-20.)  For this same reason, the Court concludes that the FAC fails to state a claim under Section 20(a) of the Exchange Act, which requires that a plaintiff adequately allege "a primary violation by the controlled person."  *Carpenter Pension Trust Fund*, 750 F.3d at 236 (quoting *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 108 (2d Cir. 2007)).  Because Lead Plaintiff has not done so, his Section 20(a) claim is **DISMISSED**.

III.    RULING

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES - GENERAL**

**CASE NO.:**  <u>**SEE BELOW**</u>          **DATE:**  <u>**June 14, 2017**</u>

For the foregoing reasons, the Court **GRANTS** Defendants CytRx Corporation, Steven A Kriegsman, and John Y. Caloz's Motion to Dismiss First Consolidated Amended Class Action Complaint.  Lead Plaintiff has **fifteen (15) days** from the date of this Order to file and serve on Defendants his Second Consolidated Amended Class Action Complaint.  Defendants have **fifteen (15) days** thereafter to respond.

IT IS SO ORDERED.