GLANCY PRONGAY & MURRAY LLP
Kara M. Wolke (#241521)
Jonathan M. Rotter (#234137)
Alexa J. Mullarky (#307932)
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone: (310) 201-9150
Facsimile:  (310) 201-9160
Email:  info@glancylaw.com

*Attorneys for Lead Plaintiff Gregory Callender
and the Proposed Plaintiff Class*

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| In Re CytRx Corporation Securities Litigation | Case No.: 2:16-CV-05519-SJO-SK |
| ———————————————— NICHOLAS CRIHFIELD, Individually and on Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br> v. <br><br> CYTRX CORPORATION, STEVEN A. KRIEGSMAN, and JOHN Y. CALOZ, <br><br> Defendants. | **SECOND CONSOLIDATED AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS** <br><br> <u>**JURY TRIAL DEMANDED**</u> |

1

## **<u>TABLE OF CONTENTS</u>**

2

3   I.      OVERVIEW OF THE ACTION....................................................................1

4   II.     JURISDICTION AND VENUE.................................................................12

5

6   III.    PARTIES ...................................................................................................12

7   IV.     SUBSTANTIVE ALLEGATIONS...........................................................13

8
        A.      Background of Applicable FDA Procedures and Regulations .............13
9

10      B.      The Significance of an SPA and the Importance of Adhering to its
                Elements and Assumptions ...................................................................14
11

12      C.      The Critical Interdependence of Sample Size, Power, and Follow-Up
                Time ......................................................................................................17
13

14      D.      Overview of CytRx and Its Development of Aldoxorubicin to Treat Soft
                Tissue Sarcoma ....................................................................................18
15

16      F.      Prior to the Imposition of the Partial Clinical Hold, Defendants Set Strong
                Expectations for Aldoxorubicin's Development Timelines .................23
17

18      G.      Patient Death and Partial Clinical Trial Hold .......................................24

19      H.      After the Approximate 2-Month Hold Is Lifted, Defendants  Continue to
                Insist that the Phase 3 Study Enrollment Rates and Timelines Remained
20              On-Track ...............................................................................................25

21

22      I.      The Truth Emerges: The Revelation of Delays and Materialization of
                Defendants' Previously Undisclosed Risks Threatening the Phase 3 Study
23              Causes CytRx's Stock Price to Plummet ..............................................30

24
        J.      Post-Class Period Events Shed Further Light on Defendants' Fraud...34
25

26  V.      MATERIALLY FALSE AND MISLEADING CLASS PERIOD STATEMENTS ..38

27  VI.     ADDITIONAL SCIENTER ALLEGATIONS ...........................................58

28

A.      The Company Did Not Generate Meaningful Revenue and Was Dependent Upon the Continued Development of Aldoxorubicin for Its Survival ...................................................................................... 58

B.      Defendants Faced Stiff Competition In Racing To Bring Aldoxorubicin to Market ............................................................................................... 61

C.      Defendants Have Historically Employed Pump and Dump Schemes to Raise Much Needed Capital ............................................................... 62

D.      Both Individual Defendants Enjoyed Generous Stock Option Grants During the Class Period ...................................................................... 63

VII.    LOSS CAUSATION ........................................................................ 65

VIII.   PRESUMPTION OF RELIANCE ................................................... 66

IX.     INAPPLICABILITY OF THE STATUTORY SAFE HARBOR AND BESPEAKS CAUTION DOCTRINE ............................................... 67

X.      PLAINTIFF'S CLASS ACTION ALLEGATIONS ......................... 68

XI.     CAUSES OF ACTION ..................................................................... 69

XII.    PRAYER FOR RELIEF .................................................................. 73

XIII.   DEMAND FOR TRIAL BY JURY ................................................. 74

Lead Plaintiff Gregory Callender ("Plaintiff" or "Lead Plaintiff"), by and through his undersigned attorneys, individually and on behalf of all other persons similarly situated, alleges the following based upon personal knowledge as to Plaintiff's own acts, and on information and belief as to all other matters. The within allegations are based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review and analysis of: (i) CytRx Corporation ("CytRx" or the "Company")'s public filings with the Securities and Exchange Commission ("SEC"); (ii) company press releases and presentations; (iii) public reports and news articles; (iv) research reports by securities and financial analysts; (v) economic analyses of securities movement and pricing data; (vi) transcripts of CytRx's investor calls; (vii) discussions with a U.S. Food and Drug Administration ("FDA") regulatory and drug development expert familiar with the relevant facts herein; and (viii) other publicly available material and data defined herein. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

# I.   OVERVIEW OF THE ACTION

1.   This is a federal securities class action brought on behalf of a class consisting of all persons or entities, other than CytRx, Steven A. Kriegsman, and John Y. Caloz (together, "Defendants") and their affiliates, who purchased or otherwise acquired CytRx common stock from September 12, 2014 to July 11, 2016, inclusive, (the "Class Period"), seeking to recover compensable damages caused by Defendants' violations of federal securities laws (the "Class").

2.   CytRx's primary focus during the Class Period was the clinical development of a cancer treatment drug, known as aldoxorubicin, intended for the treatment of soft tissue sarcoma ("STS"). CytRx owns no other marketable drugs, and aldoxorubicin was the Company's only late-stage product candidate for which Defendants were seeking approval from the FDA during the Class Period.

3.   This action concerns Defendants' materially misleading statements and

omissions made to investors regarding CytRx's pivotal Phase 3 clinical trial of aldoxorubicin as a second-line treatment for STS (the "Phase 3 trial") during the Class Period. The Phase 3 trial results would form the basis of the New Drug Application ("NDA") that CytRx planned to submit to the FDA to seek marketing approval for aldoxorubicin.

4.     A drug known as doxorubicin is the current standard of care for treating STS. However, doxorubicin has significant side effects – most seriously, cardiotoxicity – that limit its dosage to a level below its maximum anti-tumor capabilities. CytRx created aldoxorubicin in an attempt to reduce cardiotoxicity. A modified form of doxorubicin, aldoxorubicin is intended to bind doxorubicin to albumin in the blood, with the goal of enabling the drug to be delivered to and accumulate preferentially at a tumor site, thereby reducing toxic side effects to the heart and other healthy tissues.

5.     As announced by CytRx on April 23, 2013, the Phase 3 trial would be conducted pursuant to a Special Protocol Assessment ("SPA") agreement with the FDA. According to Defendants, the SPA meant that "the FDA agrees that the design and analyses proposed in the Phase 3 trial protocol are acceptable to support regulatory approval of the product candidate with respect to effectiveness of the indication studied…."[1]

6.     The FDA's decision to agree to an SPA is based upon the "underlying data, assumptions, [and other] information described by the sponsor," as well as "relevant Agency policies and guidance documents." According to the FDA, "any change in the underlying data, assumptions, and information [provided by the sponsor] could affect the assessment of the protocol."[2]

---

[1] *See* CytRx 2014 Form 10-K, filed on March 10, 2015 (the "2014 Form 10-K").

[2] *See* Special Protocol Assessment Guidance for Industry, at p. 7 (May 2002) (hereinafter, "FDA Industry Guidance for SPAs"), *available at* http://www.fda.gov/downloads/drugs/guidancecomplianceregulatoryinformation/guidances/ucm080571.pdf.

7.     The SPA was a binding agreement that governed the design, clinical endpoints, and statistical analyses for CytRx's Phase 3 study of aldoxorubicin. If the "design, execution, or analyses" of CytRx's Phase 3 trial were not implemented in accordance with the SPA, the SPA would "no longer [be] binding" on the agency's review of the drug.[3] In other words, having reached the SPA and announced to investors that the Phase 3 trial was being conducted pursuant to an SPA, CytRx was bound to conduct the Phase 3 trial and analyze the data collected in accordance with the SPA, including the assumptions upon which the trial design approved in the SPA was based, or to disclose any deviations from the SPA and their expected impact.

8.     Pursuant to CytRx's SPA, the primary endpoint of the Phase 3 trial was progression free survival ("PFS"), which is delayed tumor growth as compared to a comparator drug. Under the SPA, the estimated PFS endpoint for aldoxorubicin was a median 5.6 months, and 3.5 months for the investigator's choice arm of five different common sarcoma treatments (*i.e.*, the comparator group).

9.     The Phase 3 trial was an "open-label" study blinded only as to observer *confirmation* of the endpoint data. The Phase 3 study was *not blinded* as to enrollment timing, what drug was being administered to each patient (*i.e.*, the treatment group of each patient), or when patients experienced an "event" – either patient death or tumor growth.

10.     In January 2014, the SPA was amended to allow dosing patients with aldoxorubicin until disease progression, which differed from the protocol for dosing doxorubicin, which was limited to six cycles, administered once every three weeks,[4] due to its toxicity. Defendants explained that this opportunity for longer dosing and patient follow-up "creat[ed] the potential for substantially improved Phase 3 efficacy

---

[3] *Id.* at p. 9.

[4] *See* Aegis Capital Corp. Healthcare & Technology Conference (September 12, 2014) ("Doxorubicin, you can only do six cycles of dox. We can do 23 cycles of [aldoxorubicin] *or more.*") (emphasis added).

results[,]"[5] an apparent benefit under the SPA that Defendants would continue to tout throughout the Class Period.

11.    According to Defendants, the design of the Phase 3 trial assumed an "18 month accrual [or enrollment] period and a 15 month follow-up period after enrollment of the last subject."[6] Pursuant to these timing assumptions, the Phase 3 study design further assumed that a total of 400 patients and 191 PFS events would "power" the study at 90%, and thus be capable of producing statistically significant efficacy results at a .05 confidence level[7] and sufficient to support an NDA.[8] The accrual and follow-up assumptions – *i.e.*, elements of the trial design intended to assure the study would be appropriately powered to detect the estimated 2.1 month difference at a .05 confidence – were not publicly disclosed in CytRx's SEC filings during the Class Period.

12.    Sample size and power calculations, including the length of accrual and follow-up treatment period assumptions – are considered critical design elements of an SPA. *See* FDA Industry Guidance for SPAs, at pp. 6-7; *see also* Sec. IV.B, *infra*.

13.    With the final SPA in place, Defendants issued a May 1, 2014 press release stating that "[i]n March 2014, CytRx announced the initiation of its pivotal

---

[5] 2014 Form 10-K.

[6] The SPA itself is currently unavailable to Plaintiff because, although Defendants have commented on and characterized certain aspects of its contents, they have not released the document itself. However, the timing assumptions critical to the study design are revealed in a presentation at a conference for the European Society of Medical Oncology in September 2014. According to a September 22, 2014 CytRx press release, the presentation was to be posted to the Company's website on or about September 29, 2014. Plaintiff does not know whether the poster was ever posted on the Company's website or, if it was, how long it was available. While a copy of the poster is not currently available on CytRx's website, a copy was located in the course of Lead Counsel's investigation in this case, available at: www.poster-submission.com/cdrom/download_poster/37/27972/461TiP

[7] A confidence level of .05 means that the finding has only a 5% chance of not being true.

[8] *Id.*

global Phase 3 clinical trial to evaluate the efficacy and safety of aldoxorubicin as a second-line treatment for patients with soft tissue sarcoma (STS) under a Special Protocol Assessment with the FDA." Defendants further stated on May 1, 2014 that "[t]he Company expects to complete trial enrollment in 2015." This statement comported with the Phase 3 trial's 18-month accrual period, which have would put the enrollment completion date in September 2015. Accordingly, the 15-month follow-up period would have been reached in December 2016.

14.     Despite the foregoing timeline, during the Class Period, Defendants regularly assured the investing public that CytRx expected to complete patient enrollment in the Phase 3 trial by the end of 2015, and to release Phase 3 efficacy results in the first half of 2016 – long before the 15-month follow-up period could have been reached in December 2016. The submission of an NDA based on the Phase 3 results was promised to follow by the end of 2016, with FDA approval and market launch projected for 2017.

15.     The Class Period begins on September 12, 2014, when Defendants announced, during the Aegis Capital Corporation Healthcare & Technology Conference, that CytRx expected "to complete enrollment by the end of next year, end of 2015, with the progression-free survival, the primary endpoint, ***data available mid-2016*** … [and commercial] launch in 2017." At this time, although Defendants may have *hoped* that they would be able to provide statistically significant efficacy results despite running afoul of the SPA and the follow-up and power assumptions contained therein, they knew or recklessly disregarded the risk posed by ending the follow-up period a mere six months after the end of the enrollment period, rather than the fifteen-month follow-up period assumed by the SPA.

16.     This risk was heightened when, on November 18, 2014, Defendants issued a press release announcing that the FDA had placed a partial clinical hold on the Phase 3 clinical trial of aldoxorubicin following the death of a patient who had received the

drug through the Company's expanded access, or "compassionate use," program.[9] Defendants may have previously *hoped* that they could report statistically significant efficacy results while running afoul of the SPA by enrolling a large number of patients early in the enrollment period (*i.e.*, front-loading the study), thereby allowing the follow-up on earlier-enrolled patients to essentially run concurrently during the 18-month enrollment period. But that was not the SPA design and Defendants would have needed to disclose the risk posed by the deviation. Further, the partial clinical hold limited CytRx's ability to front-load the study and heightened the risk that any results obtained less than fifteen months after the end of the enrollment period would not be statistically significant.

17.     The patient who died as a result of aldoxorubicin treatment suffered from metabolic acidosis, which is increased body tissue acidity. Because aldoxorubicin is designed to release concentrated amounts of doxorubicin preferentially to acidic environments, such as tumor sites, and this particular patient had increased acidity throughout the body (*i.e.*, increased acidity *not* limited to tumor sites), doxorubicin was released into non-cancerous tissues, leading to toxicity and, ultimately, death.

18.     In CytRx's November 18, 2014 press release, Defendants stated that, despite the hold, "enrollment rates and timelines for [the Company's] ongoing trials will remain materially unchanged[,]" *i.e.*, data would be available in mid-2016. Defendants further stated that during the pendency of the partial clinical hold, "[a]ll currently enrolled patients can continue receiving aldoxorubicin treatment, or comparator drugs, as per study protocols, but no new patients can be enrolled until the clinical hold is lifted." Defendants substantially repeated these representations in a press release dated December 3, 2014.

---

[9] Defendants did not submit a copy of this press release with, or otherwise disclose the partial clinical hold on, a Form 8-K, "the 'current report' companies must file with the SEC to announce major events that shareholders should know about." *See* https://www.sec.gov/answers/form8k.htm

19.     Approximately two months after the hold was first announced, in a press release dated January 20, 2015, Defendants announced that they had developed modified study parameters intended to avoid potential risks, that the FDA had removed the partial clinical hold, and that CytRx "expect[ed] enrollment and dosing in the ongoing clinical trials to be back underway soon."

20.     With the hold lifted and enrollment apparently back underway, Defendants again assured investors on January 20, 2015, that that "enrollment rates and timelines for its trials will remain materially unchanged," and that market launch of aldoxorubicin was still "projected to commence in 2017."

21.     While assuring investors that enrollment rates and stated development timelines would remain unchanged, however, Defendants did not disclose that the study design set forth in the SPA was based upon an 18-month enrollment period and a 15-month follow-up period, timeframes necessary to power the study at 90% and detect the targeted 2.1 month difference between the treatment group and the comparator group at .05 confidence. Specifically, Defendants knew or recklessly disregarded and failed to disclose that with enrollment nowhere near completion in January 2015 and projected to complete by the *end of* 2015, reporting data from the Phase 3 study in the first half of 2016 would run afoul of the SPA's 15-month follow-up timing assumption from the enrollment of the last patient, thus jeopardizing the study's power calculations as set forth in the SPA.

22.     Moreover, because Defendants knew that the FDA's decision to allow extended aldoxorubicin dosing until disease progression substantially increased efficacy —they in fact touted such extended exposure as a benefit of the SPA—they also knew that any delays in enrollment, which necessarily limited patient exposure to aldoxorubicin, conversely risked affecting the Phase 3 results and ability to submit an NDA on the stated timelines.

23.     As the Class Period progressed, Defendants saw that, as a result of the interruptions caused by the hold, enrollment in the Phase 3 study became heavily

weighted toward the back-end of the enrollment period in late 2015, with later enrollees necessarily receiving a *substantially* shorter dosing period than the SPA's assumed 15-month follow-up period if results were to be reported in June 2016. Despite the foregoing undisclosed risks, Defendants reassured the market that the Phase 3 study and CytRx's development of aldoxorubicin remained "on track" throughout the Class Period.

24.     On December 1, 2015, Defendants announced that, despite the temporary interruption caused by the hold, the Phase 3 trial had purportedly completed enrollment "ahead of schedule" and that CytRx would "report the primary endpoint of top-line progression free survival (PFS) in the first half of 2016, and pre-commercial launch activities are underway." However, when Defendants announced in December 2015 that Phase 3 enrollment was completed "ahead of schedule," and that results would be reported in the first half of 2016, they knew but did not disclose that reporting results in the first half of 2016 would *necessarily* mean running afoul of the SPA's 15-month follow-up period (and, in fact, cutting the follow-up period by more than half). At this time Defendants should have either: (i) disclosed the risk that reporting results so far in advance of the completion of the follow-up period of the SPA put the data at risk of not showing a statistically significant treatment effect; or (ii) announced that, because of the delays in enrollment caused by the hold, Defendants would have insufficient follow-up data to report the PFS results by mid-2016.

25.     Then, on April 4, 2016, Defendants announced that the Phase 3 study had reached 191 events, and that confirmed results from the blinded reviewer analysis would be available in June 2016. The press release proclaimed: "Reaching the number of events is an important milestone for the aldoxorubicin Phase 3 trial[.]" On April 20, 2016, Defendants again stated that PFS results would be available in June 2016. However, when Defendants reaffirmed in April 2016 that PFS data results would be available in June 2016, they *knew* the actual extent to which the length of treatment follow-up for study participants at the time of 191 events fell woefully short of the

SPA's assumed 15-month follow-up period (an aspect of the study's design which was intended to power the study at 90% in an attempt to ensure that the study would produce statistically significant results). Defendants had this knowledge because the study was "open-label," meaning "that the investigators and clinical trial monitors knew when patients were enrolled and which patients were taking which drug," as well as "when patients had an investigator determined progression event." Declaration of Rosina B. Dixon, M.D. ("Dixon Decl.") ¶ 16. Still, Defendants made no mention that actual enrollment timing and length of follow-up treatment had run so far afoul of the SPA's assumptions, putting the PFS results at risk.

26.     Defendants were not *required* by the SPA to publish the Phase 3 study's PFS data upon the occurrence of the 191st event. Rather, according to Defendants' own description of the SPA, the agreement provided that the Phase 3 study could be expected to generate statistically significant evidence of a treatment effect after the occurrence of 191 events, ***assuming the related assumptions of study size, accrual period, and follow-up period were met***. As noted in the accompanying Declaration of Rosina B. Dixon, M.D., "by the time enrollment was completed in December 2015, the Company knew that the event rate was at least 2.5 times faster than assumed because they announced that the data would be available in the first half of 2016 (6 months or less) rather than in 15 months." *Id.* at ¶ 14. Accordingly, it was reckless for Defendants not to disclose that the study was showing less efficacy than assumed in December 2015, while assuring investors that the study was on track, and even more reckless to continue to omit this information at the time Defendants announced that the study had accumulated 191 events. *See id.* at ¶¶ 14-15.

27.     Where Defendants touted the benefits of the SPA and told investors that the Phase 3 study was being conducted pursuant to an SPA – *i.e.*, the FDA's agreement that the trial design and proposed analyses, if followed, was sufficient to support approval – and further touted that the Phase 3 study had completed enrollment "ahead of schedule," Defendants had a duty to disclose that actual enrollment rates and length

of follow-up treatment for enrolled patients ran afoul of the SPA's assumptions and power calculations. Indeed, throughout the Class Period, Defendants recklessly disregarded the material risks raised by the hold and/or had no reasonable basis to believe that the Phase 3 study would produce statistically significant efficacy results sufficient to support an NDA on the represented timelines, where those timelines ran afoul of the SPA's enrollment and/or length of follow-up treatment assumptions that were specifically designed to power the study at 90%. *See* Dixon Decl. at ¶ 12 ("If the progression events occur sooner (less efficacy) than assumed the duration of follow up is less . . . . If either the test drug or the control drug shows efficacy different from what was assumed in the power calculation, then the number of events needed to show a significant difference may change.").

28.    As detailed herein, contrary to Defendants' benign descriptions of the clinical hold and their assurances throughout the Class Period that the hold did not materially impact the aldoxorubicin study and timelines, the delays in enrollment and follow-up occasioned by the hold increased the risk that reporting PFS results in mid-2016 would mean reporting before a sufficient number of patients had received aldoxorubicin for long enough to fully power the study. Of course, this was the very risk that materialized when, on July 11, 2016, Defendants announced that the Phase 3 study had failed to generate positive results, and blamed the hold and lack of data maturity for the failure.

29.    After the market closed on July 11, 2016, the falsity of Defendants' prior assurances was revealed and the risks that Defendants had concealed materialized, when Defendants announced the aldoxorubicin Phase 3 trial results, stating that "[f]or the current evaluation, the study did not show a significant difference between aldoxorubicin and investigator's choice therapy for PFS[.]" Defendants claimed that the perceived failure was due to a lack of maturity of the Phase 3 study and data, explaining that "[b]ecause enrollment was interrupted by a partial clinical hold in November 2014," there had been insufficient "follow-up for the nearly two-thirds of patients who

entered the Phase 3 study after the hold was resolved an enrollment resumed[,] [] result[ing] in nearly half of all patients being" excluded from the PFS evaluation. Defendants further stated that CytRx would "conduct a second analysis, which will include longer patient follow-up and allow for greater maturation of all endpoints[,]" and that the Company would announce the results of this additional evaluation and hold an end-of-Phase 3 meeting with the FDA in the fourth quarter of 2016.

30.     On the news of the materialization of the risk—that the study failed, in the Defendants' own explanation, because of the enrollment hold and need for longer follow-up—the price of CytRx's stock tumbled $1.50 per share, or over 59%, to close at $1.01 per share on July 12, 2016, on unusually heavy trading volume. The Company's stock price continued to decline over the next two trading days as investors digested the news, falling an additional 10%, to close at $0.90 per share on July 14, 2016.

31.     On November 29, 2016, after the end of the Class Period, CytRx announced "updated results" for its Phase 3 trial of aldoxorubicin that demonstrated a statistically significant improvement in PFS in a subset of study patients with leiomyosarcoma and liposarcoma (246 of the 433 patients enrolled), and/or who were treated in North America (312 of the 433 patients enrolled). Notably, these results purporting to show a statistically significant treatment effect only did so in the modified study subgroups, as opposed to the entire study population. But "[f]or approval of a new drug the FDA usually requires that the prespecified primary endpoint, in this case Progression Free Survival, have a p-value of ≤0.05 in the intent-to-treat group, i.e. all patients enrolled in the study." Dixon Decl. ¶ 13.

32.     On June 8, 2017, Defendants published a press release reporting that "CytRx's previously approved special protocol assessment is no longer applicable" and that Defendants were in the process of preparing a rolling NDA that "is not reliant solely on the recently completed Phase 3 clinical trial in STS." To the best of Plaintiff's knowledge, as of the date of this filing an NDA *still* has not been submitted to the FDA.

Instead, Defendants reported on April 19, 2017 and June 8, 2017, that "[t]he Company plans to submit a rolling NDA[,]" which, as of April 19, 2017, the Company expected to do "in the last quarter of 2017."

## II.    JURISDICTION AND VENUE

33.    The claims asserted herein arise under and pursuant to §§ 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act", 15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5).

34.    This Court has jurisdiction over the subject matter of this action pursuant to § 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331.

35.    Venue is proper in this District pursuant to § 27 of the Exchange Act (15 U.S.C. § 78aa and 28 U.S.C. § 1391(b)), as a substantial part of the conduct complained of herein occurred in the District, the Company maintains its principal executive offices within the District, and the Company conducts business in this District.

36.    In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## III.    PARTIES

37.    Lead Plaintiff Gregory Callender, as set forth in the Certification previously filed and incorporated herein by reference, acquired CytRx common stock at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

38.    Defendant CytRx is a Delaware corporation with its principal executive offices in Los Angeles, California. Throughout the Class Period, CytRx common stock was actively traded on the NASDAQ Global Select Market ("NASDAQ") under the symbol CYTR.

39.    Defendant Steven A. Kriegsman ("Kriegsman") has served as the Company's Chief Executive Officer ("CEO") since July 2002 and throughout the Class

Period. Kriegsman also served as a director from July 2002 to October 15, 2014, and served as the Chairman of the Board of CytRx throughout the Class Period.

40.   Defendant John Y. Caloz ("Caloz") has served as the Company's Chief Financial Officer ("CFO") since January 2009 and throughout the Class Period. Caloz has also served as Chief Accounting Officer and Treasurer since October 2007 and throughout the Class Period.

41.   Together, Defendants Kriegsman and Caloz are sometimes referred to herein as the "Individual Defendants."

42.   Defendants CytRx and the Individual Defendants are collectively referred to herein as the "Defendants."

## IV.   SUBSTANTIVE ALLEGATIONS

### A.   Background of Applicable FDA Procedures and Regulations

43.   The requirement that new drugs show effectiveness is based on a 1962 amendment to the Federal Food, Drug, and Cosmetic Act. This law requires substantial evidence of effectiveness—demonstrated by the satisfactory fulfillment of a clinical objective, or "endpoint"—and specifies that this evidence must be derived from adequate and well-controlled clinical investigations. Common endpoints in oncology include overall survival rates, endpoints based on tumor assessments (*e.g.*, complete response or time to progression), progression-free survival ("PFS") (*i.e.* delayed tumor growth as compared to a control therapy), and other measurable endpoints based on symptom assessments. *See* Guidance for Industry Clinical Trial Endpoints for the Approval of Cancer Drugs and Biologics, at p.4 (May 2007).[10] PFS is defined as the time from randomization until objective tumor progression or death. *Id.* at p. 8-9.

44.   When a clinical trial on a new drug is complete, the drug sponsor will submit an NDA (or New Drug Application) to the FDA for review of, *inter alia*, study design, implementation, endpoint data results, and/or efficacy. As described by

---

[10] *Available at* http://www.fda.gov/downloads/Drugs/Guidances/ucm071590.pdf

Defendants in the Company's 2014 Form 10-K, "[t]o obtain FDA marketing authorization, a company must submit to the FDA the results of the preclinical and clinical testing, together with, among other things, detailed information on the manufacture and composition of the product candidate, in the form of a new drug application, or NDA."

45.    An NDA is "accepted" when it is taken under review by the FDA and "approved" only upon the FDA's announcement that the drug has been approved for marketing to the public.

**B.    The Significance of an SPA and the Importance of Adhering to its Elements and Assumptions**

46.    An SPA indicates concurrence by the FDA with the drug sponsor's proposed design and size of a clinical trial. *See* FDA Industry Guidance for SPAs, at p. 2.[11] According to the FDA, "[i]f an agreement is reached, the Agency will reduce the agreement to writing and make it part of the administrative record. ***An agreement may not be changed by the sponsor or FDA after the trial begins***, except (1) with the written agreement of the sponsor and FDA, or (2) if the director of the FDA reviewing division determines that 'a substantial scientific issue essential to determining the safety or effectiveness of the drug' was identified after the testing began (section 505(b)(4)(C) of the Act)."[12]

47.    The FDA Industry Guidance for SPAs further advised, in relevant part, under the heading "Content of a Request" for an SPA:

> ***In the request for special protocol assessment***, the sponsor should pose focused questions concerning specific issues regarding the protocol, ***protocol design (including proposed size)***, study conduct, study goals, and/or ***data analysis for the proposed investigation***. Although the questions should be specific to the protocol and should not address overall development strategies, the role of the study in the overall

---

[11] FDA Industry Guidance for SPAs, *supra* n.2, at p. 2.

[12] *Id.*

development plan should be clear to the Agency for it to answer the protocol-specific questions.

***To facilitate FDA's assessment of the issues raised by the sponsor, a request in the form of a document separate from the protocol should discuss in reasonable detail all data, <u>assumptions</u>, and information that should be included for an adequate evaluation of the protocol***. For example:

* * *

• The sponsor should submit information supporting the proposed trial, including ***power calculations***, the choice of study endpoints, and ***other critical design features*** (e.g., choice of control, ***duration***, methods of assessment).

FDA Industry Guidance for SPAs, at p. 6 (emphasis added).

48.   Under the heading "Assessment of the Protocol," the FDA explained:

The Agency's assessment will be based primarily on the questions posed by the sponsor, the underlying data, ***assumptions,*** information described by the sponsor, and relevant Agency policies and guidance documents. Any change in the underlying data, ***assumptions,*** and information could affect the assessment of the protocol.

FDA Industry Guidance for SPAs, at p. 7 (emphasis added).

49.   Finally, under the heading "Changes in Documented Special Protocol Assessments," the FDA stated:

As stated in the PDUFA goals for special protocol assessment and agreement,

> ***having agreed to the design, execution, and analyses proposed in protocols reviewed under this process*** [i.e., carcinogenicity protocols, stability protocols, and phase 3 protocols for clinical trials that will form the primary basis of an efficacy claim], the Agency will not later alter its perspective on the issues of design, execution, or analyses unless public health concerns unrecognized at the time of protocol assessment under this process are evident.

Thus, documented ***special protocol assessments should be considered binding*** on the review division and should not be changed at any time, except as follows:

> •    ***Failure of a sponsor to follow a protocol that was agreed upon with the Agency will be interpreted as the sponsor's understanding that the protocol assessment is no longer binding on the review division***.

> •    ***If the relevant data, <u>assumptions</u>, or information provided by the sponsor in a request for special protocol assessment change*** are found to be false statements or misstatements or are found to omit relevant facts, ***the review division will not be bound by any assessment that relied on such data, assumptions, or information***.

FDA Industry Guidance for SPAs, at p. 9 (emphasis added).

50.    In sum, adherence by a drug sponsor to the elements of a trial design agreed to between the drug sponsor and the FDA—including study size, power calculations, duration of treatment under the study, execution of the study, proposed analyses and protocols, ***and any other assumptions upon which the SPA is based***—is critical to the sponsor's ability to reap the full benefits of having reached an agreed-upon SPA.

51.    Moreover, a drug sponsor is at all times responsible for conducting its studies in accordance with an SPA and any applicable regulations.[13] As Defendants themselves recognized in the Company's annual Form 10-K filings during the Class Period, SPA compliance is non-delegable: "[W]e are responsible for ensuring that each of our studies is conducted in accordance with the applicable protocol, legal, regulatory and scientific standards, and our reliance on CROs does not relieve us of our regulatory responsibilities."  2014 Form 10-K, at 16; 2015 Form 10-K, at 14.

---

[13] *See* Guidance for Indus. Oversight of Clinical Investigations – A Risk-Based Approach to Monitoring, 2013 WL 4171675 (F.D.A.) (Aug. 1, 2013) ("Although sponsors can transfer responsibilities for monitoring to CRO(s), they retain responsibility for oversight of the work completed by the CRO(s) that assume this responsibility. Sponsors should evaluate CRO compliance with regulatory requirements … in an ongoing manner … In addition, sponsors and CROs should have processes in place for timely exchange of relevant information (e.g., significant monitoring findings, significant changes in risk for a trial).").

**C.** **The Critical Interdependence of Sample Size, Power, and Follow-Up Time**

52.     The "power" of a study generally refers to the ability of the study to correctly reject a null hypothesis (*i.e.*, to reject the idea that there is no relationship between two measured events), and, conversely, to detect an effect, if the effect actually exists. Simply put, as the power of a study increases, so does its reliability. If any of the assumptions upon which a power calculation is based are not met, the power calculation is likely to be negatively impacted. The statistical power of the study—and, by extension, the inputs or assumptions upon which such power calculations are based—is a critical design feature of a study scrutinized by the FDA as part of the SPA review process.

53.     Moreover, in trials measuring the length of time to an event, such as CytRx's Phase 3 trial of aldoxorubicin, which measured the length of time to objective tumor progression or death, the determinations of appropriate sample size and power calculations are interrelated and directly impacted by four interconnected inputs or assumptions: (i) the desired treatment effect (*i.e.*, the difference between the treatment group and the control group); (ii) the desired confidence level to detect that difference; (iii) the length of the accrual (or enrollment) period; and (iv) the length of the follow-up treatment period. A change in any one of these elements can materially impact the others. For example, if a lesser amount of follow-up data is obtained, the study size would have to be increased proportionately to achieve the same power.[14]

54.     According to the SPA in this case, CytRx's Phase 3 trial "estimated median PFS for aldoxorubicin was 5.6 months, compared to 3.5 months for the

---

[14] *See, e.g.*, "Sample Size Calculation in Clinical Trials," Bernd Röhrig, Jean-Baptist du Prel, Daniel Wachtlin, Robert Kwiecien, and Maria Blettner, Dtsch Arztebl Int., August 9, 2010 (noting "[i]f, for example, . . . adequate data cannot be collected for a proportion of the volunteers in a study—for whatever reason—, the sample size must be proportionately increased."), *available at* https://www.ncbi.nlm.nih.gov/ pmc/articles/PMC2933537/#R12. *See also* Dixon Decl. at ¶ 12

investigator's choice arm" (*i.e.*, the control group). The elements of the Phase 3 study design necessary to detect that difference in PFS between aldoxorubicin and the control group under the SPA at a .05 confidence level included an "18 month accrual [or enrollment] period and a 15 month follow-up period after enrollment of the last subject," a study size of "400 subjects," and the occurrence of "191 PFS events" (*i.e.*, objective tumor growth or deaths). Based on the foregoing assumptions, the Phase 3 trial was designed to power the study at 90%. *See also* ¶¶ 68, 70-72, *infra*.

### D.   Overview of CytRx and Its Development of Aldoxorubicin to Treat Soft Tissue Sarcoma

55.   CytRx is a biopharmaceutical research and development company specializing in oncology. During the Class Period, CytRx was primarily focused on the clinical development of aldoxorubicin, the Company's only late-stage product candidate for which Defendants were seeking FDA approval during the Class Period. Aldoxorubicin is a modified version of the widely-used chemotherapeutic agent, doxorubicin. Its primary intended use—and the use for which CytRx was preparing an NDA—was as a second-line treatment of soft tissue sarcoma.

56.   A "first-line" therapy is the treatment regimen or regimens that are generally accepted by the medical establishment for initial treatment of a given type and stage of cancer. It is also called primary treatment or primary therapy. "Second-line" therapies are those tried when first-line therapies do not work adequately. The management of a cancer case requires regular evaluation of treatment and adjustment as needed. A break with the primary treatment and an adoption of a new regimen signals "second-line treatment."

57.   Sarcoma is an umbrella term for more than 50 subtypes of cancer that occur in the muscles, fat, blood vessels, tendons and other connective tissues in the body. Bone sarcoma and soft tissue sarcoma, which is a cancer that develops in soft tissues like fat, muscle, nerves, fibrous tissues, blood vessels, or deep skin tissues, are among the most prevalent forms of sarcoma. Patients with metastatic, locally advanced,

or unresectable soft tissue sarcomas have an estimated progression-free survival time of between 2 and 4.6 months and median overall survival time of approximately 9 to 12 months. *See* CytRx press release, "*Oral Presentation of CytRx's Aldoxorubicin Phase 2b Clinical Trial in Soft Tissue Sarcoma Highlighted in The Lancet Oncology*" (Aug. 7, 2014).

58.     Attempting to address the toxicity concern associated with doxorubicin, CytRx created aldoxorubicin, which is intended to bind to albumin in the blood and allow the drug to be delivered to and accumulate preferentially at a tumor site (where tissue tends to be more acidic), thereby reducing toxic side effects to the heart and other healthy tissues, while at the same time allowing for more extended dosing of the drug. According to Defendants, the longer a patient could be dosed with aldoxorubicin (and thus, the more doxorubicin able to be delivered to tumor sites), the higher the likelihood that the Phase 3 trial results would demonstrate the drug's efficacy and support FDA approval.

59.     However, as Defendants also undoubtedly were aware, patients suffering from advanced soft tissue sarcoma, such as those patients participating in the Phase 3 study, were highly prone or susceptible to metabolic acidosis (meaning increased acidity throughout the body, not only in tumor sites, but also in healthy tissues). For example, lactic acidosis, a type of metabolic acidosis, is particularly common in soft tissue sarcoma patients due to the elevation of glycolysis (a side-effect of soft tissue sarcoma), called the Warburg effect, which produces high levels of lactic acid.[15]

60.     During the Class Period, the Company was also conducting Phase 2 clinical studies using aldoxorubicin for the treatment of: (i) unresectable glioblastoma multiforme (GBM), a form of brain cancer; (ii) HIV-related Kaposi's sarcoma (KS); and (iii) small-cell lung cancer. However, during the Class Period, Defendants had not

---

[15] *See* Xin Wang et al., *Therapeutic Response in Musculoskeletal Soft Tissue Sarcomas: Evaluation by Magnetic Resonance Imaging* (July 2011), *available at* https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3150732/.

1   yet set a target date for the completion of those studies or for submission of an NDA for

2   either of those indications.

    **E.     The SPA and Design of the Phase 3 Aldoxorubicin Study**

4       61.     On April 23, 2013, CytRx announced that it had reached an agreement

5   with the FDA under an SPA for a global pivotal Phase 3 trial with aldoxorubicin as a

6   treatment for patients with soft tissue sarcomas who had relapsed or were refractory

7   following prior treatment with chemotherapy. Defendant Kriegsman explained that:

> By reaching an agreement on an SPA, the FDA deems that results from
> the single Phase 3 clinical trial will be acceptable to support the
> regulatory approval of aldoxorubicin as a second-line treatment for
> patients with soft tissue sarcoma, with final marketing approval
> dependent on the results of the trial and other accomplishments… ***The
> ability to conduct the clinical trial under an SPA could save significant
> time compared with a standard regulatory pathway***.

(emphasis added).

        62.     Defendants touted the benefits of having entered into an SPA in the

Company's 2014 Form 10-K, stating in relevant part:

> The SPA means that the FDA agrees that the design and analyses
> proposed in the Phase 3 trial protocol are acceptable to support
> regulatory approval of the product candidate with respect to
> effectiveness of the indication studied, and will not subsequently change
> its perspective on these matters….

        63.     The Phase 3 clinical trial protocol set forth in the SPA was officially

amended in January 2014 with the FDA's approval to allow dosing patients with

aldoxorubicin until disease progression. According to the Company's 2014 Form 10-K,

filed on March 10, 2015, the FDA's approval "to amend the Phase 3 protocol to

continue dosing patients with aldoxorubicin until disease progression (defined as an

increase in the size of measurable tumors by 20% or the development of a new tumor

lesion), [ ] creat[ed] the potential for substantially improved Phase 3 efficacy results."

Thus, Defendants knew that the longer the period of follow-up, the higher the potential

for positive efficacy results.

64.     Defendants substantially repeated these claims regarding the benefits of the SPA, including the FDA's agreement to amend the SPA to allow dosing until disease progression, in the Company's other SEC filings and public statements made throughout the Class Period, as alleged herein in Sec. V, *infra*.

65.     Under the SPA, CytRx initiated its global, randomized, ***open-label*** prospective, multicenter Phase 3 clinical trial in March 2014 to evaluate the efficacy and safety of aldoxorubicin as a second-line treatment for patients with soft tissue sarcoma. These patients had tumors no longer responsive to initial treatment with chemotherapy, including doxorubicin.

66.     According to a May 1, 2014 press release announcing the Company's 1Q 2014 results:

> [t]his multicenter, randomized, open-label Phase 3 clinical study [was] designed to enroll approximately 400 patients with metastatic, locally advanced or unresectable soft tissue sarcomas who have either not responded to, or have progressed following treatment with, on or more systemic regimens of non-adjuvant chemotherapies.

CytRx further explained that, "[t]he primary endpoint of the study [was] progression-free survival ("PFS"), and secondary endpoints [were] overall survival, response rates and safety." Progression free survival constituted delayed tumor growth as compared to the investigator's choice of comparator drug.

67.     An "open-label" study means that both the patient and the study researcher knows what type of treatment the patient is receiving. Open-label is thus the opposite of a "double-blind" study, where neither the patient nor the study researcher knows what type of treatment is being administered to the patient. Here, Defendants had access to information concerning enrollment, what treatment was administered to individual patients, and when patients "evented," for example. Defendants knew when patients evented, with PFS results then "***reviewed and verified*** by an independent, blinded radiology organization contracted by CytRx to analyze all of the scans."

68.     In September 2014, at the European Society for Medical Oncology 2014

Congress, Defendants described the Phase 3 study design as follows, in relevant part:

- Estimated median PFS for aldoxorubicin is 5.6 months and 3.5 months for investigator's choice arm.

- Based on the use of a two-side log rank test at the α = 0.5 level of significance, *a total of 191 PFS events will be required for 90% power to detect this difference*.

- *Assuming an 18 month accrual period and a 15 month follow-up period after enrollment of the last subject, approximately 400 subjects will be needed to achieve the total of 191 PFS events*.

(emphasis added).

69.     At the same September 2014 conference, Defendants provided the Phase 3 enrollment status as of August 11, 2014, reporting that 32 subjects had been "Randomized" as of that date, with an additional 23 subjects then-currently "In Screening." While Defendants clearly had access to actual enrollment data, they never again provided such a status update on specific enrollment data during the Class Period.

70.     As set forth above, the Phase 3 trial's power calculation as set forth in the SPA was based upon key assumptions regarding the accrual period (or enrollment period) of the study, the length of follow-up treatment patients would receive after the study was fully enrolled, the number of patients to be enrolled, and the number of PFS "events" to be measured in assessing the endpoint. Each of these assumptions was a critical design element of the power calculation set forth in the SPA, and directly impacted the study's ability to reach its target median PFS for aldoxorubicin of 5.6 months, compared to and 3.5 months for investigator's choice arm.

71.     Indeed, each of these elements, as they were determined to be the appropriate inputs to power the study at 90% in order to be able to detect a statistically significant PFS effect from for aldoxorubicin versus the investigator's choice treatment, was a key element of the Phase 3 trial design.

72.     According to the SPA's 18-month accrual period, the Phase 3 trial (which commenced in March 2014) should have hit full enrollment in September 2015 in order to align with the assumptions underlying the power calculation of the SPA. The follow-

up period used to calculate the 90% power of the study would thus have ended 15-months later in December 2016.

**F.   Prior to the Imposition of the Partial Clinical Hold, Defendants Set Strong Expectations for Aldoxorubicin's Development Timelines**

73.   In a May 1, 2014 press release, CytRx reported that it "expect[ed] to complete trial enrollment in 2015."

74.   In a press release that was attached to a Form 8-K filed on August 6, 2014, the Company clarified that it expected to "[c]omplete enrollment in the ongoing pivotal global Phase 3 clinical trial of aldoxorubicin…in the second half of 2015."

75.   On September 12, 2014, the first day of the Class Period, at the Aegis Capital Corporate Healthcare & Technology Conference, Defendant Kriegsman stated, with respect to the Phase 3 clinical trial of aldoxorubicin:

> We have a Phase 3 pivotal trial going on under an SPA for approval. We expect to launch that product, aldoxorubicin, for second-line soft-tissue sarcoma sometime in 2017.

76.   Also during the Aegis Capital Corporate Healthcare & Technology Conference on September 12, 2014, Defendants expanded upon their timeline for aldoxorubicin. The Company's V.P. of Business Development explained:

> [W]e expect, in terms of the trial timing, to complete ***enrollment by the end of next year, end of 2015***, with the progression-free survival, the primary endpoint, ***data available mid-2016***. Our goal is to rapidly convert that data into an ***NDA submission and get that as quickly filed thereafter, towards the end of 2016***, with the goal -- again, we believe this trial will read out positive. And again, once we get through the FDA and if the FDA approves, to then ***launch in 2017***.

77.   In a press release attached to a Form 8-K filed on November 4, 2014, the Company announced its 3Q 2014 results and reiterated that it expected to complete enrollment by "year-end 2015[.]" CytRx continued to maintain that PFS data—*i.e.*, the results of the primary endpoint study—would be "announced in mid-2016." Additionally, Defendants reiterated that "[s]ubject to FDA approval, the Company project[ed] market launch [of aldoxorubicin] in 2017."

78.     In short, prior to the imposition of the partial clinical hold, Defendants had set strong market expectations for the timelines for CytRx's development of aldoxorubicin, including completion of Phase 3 trial enrollment by the end of 2015, primary endpoint PFS data results a mere six months later in mid-2016, an NDA by year-end 2016, and, subject to FDA approval, market launch in 2017.

**G.     Patient Death and Partial Clinical Trial Hold**

79.     In a press release dated November 18, 2014, CytRx announced that the FDA had placed a partial hold on the Phase 3 study because a patient taking aldoxorubicin through a compassionate use program offered by the Company had died as a result of the treatment.[16] The press release explained, in relevant part:

> CytRx Corporation (NASDAQ: CYTR), a biopharmaceutical research and development company specializing in oncology, today announced that the Company has received notice from the United States Food and Drug Administration (FDA) that its clinical trials for aldoxorubicin have been placed on partial clinical hold. All currently enrolled patients can continue receiving aldoxorubicin treatment, or comparator drugs, as per study protocols, but no new patients can be enrolled until the clinical hold is lifted.

> The FDA has indicated that the partial clinical hold is due to the reported death of a patient with advanced-stage cancer who did not qualify to participate in any of the ongoing aldoxorubicin clinical trials, but had received aldoxorubicin under the Company's expanded access ("compassionate use") program. At the FDA's request, the Company will amend all aldoxorubicin study protocols to include an appropriate inclusion/exclusion criteria, an additional patient screening assessment and an evaluation of serum electrolytes prior to aldoxorubicin administration. CytRx is working diligently in collaboration with the FDA to seek the release of the clinical hold and resume enrollment in its clinical studies as expeditiously as possible.

> ***CytRx currently believes that the partial hold issue will be expeditiously resolved and that enrollment rates and timelines for its ongoing trials***

---

[16] The FDA allows expanded access, also referred to as compassionate use, allowing patients who are not otherwise eligible for an ongoing clinical trial to nonetheless access  drugs that have yet to be approved by the FDA.

*will remain materially unchanged…. CytRx remains committed to completing enrollment of its ongoing pivotal global Phase 3 trial in second-line soft tissue sarcoma by the end of 2015.*

(emphasis added.)

80.   On December 3, 2014, Defendants reiterated their November 18, 2014, announcement, explaining that:

> the Company has received written notice from the United States Food and Drug Administration (FDA) that its clinical trials for aldoxorubicin have been placed on partial clinical hold. The news supplements and is consistent with the prior verbal communications from the FDA.
>
> * * *
>
> *CytRx currently believes that the partial hold issue will be expeditiously resolved and that enrollment rates and timelines for its ongoing trials will remain materially unchanged*, subject to FDA timing.

(emphasis added.)

81.   In a December 10, 2014 report "commissioned by" CytRx and titled "*CytRx: Partial clinical hold a minor setback*" (the "December 2014 Edison Report"), Edison Research commented that the partial clinical hold "following the death of a patient with metabolic acidosis" constituted only a "minor setback" on aldoxorubicin's path to FDA approval. The December 2014 Edison Report further reiterated Defendants' statement that "PFS data from STS Phase III study [was] anticipated in mid-2016."

**H.   After the Approximate 2-Month Hold Is Lifted, Defendants Continue to Insist that the Phase 3 Study Enrollment Rates and Timelines Remained On-Track**

82.   On January 20, 2015, Defendants announced the FDA's removal of the partial clinical trial hold. In a press release of the same date, Defendants stated:

> [T]he United States Food and Drug Administration (FDA) has removed the partial clinical hold on the Company's aldoxorubicin clinical trials. Enrollment and dosing of new patients is now permitted after study sites' Institutional Review Boards (IRBs) approve the revised trial protocols.
>
> "CytRx developed modified study parameters intended to avoid potential

risks, while allowing the company to evaluate the therapeutic impact of aldoxorubicin for patients with soft tissue sarcoma, glioblastoma, Kaposi's sarcoma, and small cell lung cancer, among other trials," said Steven A. Kriegsman, Chairman and CEO of CytRx. "Our staff worked closely with the FDA Oncology Division to resolve all partial clinical hold issues as rapidly as possible. We expect enrollment and dosing in the ongoing clinical trials to be back underway soon."

*CytRx currently believes that enrollment rates and timelines for its trials will remain materially unchanged. The Company expects to complete enrollment in its ongoing pivotal global Phase 3 trial in second-line soft tissue sarcoma by the end of 2015 and unblind the clinical data by mid-2016.* Subject to FDA approval, *CytRx's market launch of aldoxorubicin for second line soft tissue sarcoma is projected to commence in 2017*.

(emphasis added.)

83.    Defendants substantially reaffirmed CytRx's stated timelines and continued to present the Phase 3 trial as progressing according to plan throughout the remainder of 2015 and into 2016. For example, on May 1, 2015, in the press release attached to the Company's Form 8-K announcing the release of 1Q 2015 financial results, while Defendants slightly revised the enrollment target (from end of 2015 to Q1 2016), they otherwise reaffirmed that Phase 3 data would be available by mid-2016. Defendants stated, in part:

"*CytRx achieved several milestones in the early months of 2015, including the announcement of encouraging data from its clinical trial of aldoxorubicin in patients with soft tissue sarcoma*, …" said Steven A. Kriegsman, Chairman and CEO of CytRx.

Upcoming Milestones

*Complete enrollment in the ongoing pivotal global Phase 3 clinical trial of aldoxorubicin as a second-line treatment for STS in the first quarter of 2016, with PFS data announced in second half of 2016*.

(emphasis added.)

84.    In the press release attached to the Company's Form 8-K announcing the release of 2Q 2015 financial results, filed on August 3, 2015, Defendants stated that:

"The second quarter of 2015 has been very productive for CytRx. ***Enrollment in our ongoing pivotal global Phase 3 clinical trial of aldoxorubicin in soft tissue sarcoma (STS) continues on track*** to be completed in the first quarter of 2016…" said Steven A. Kriegsman, Chairman and CEO of CytRx.

(emphasis added.)

85.     In the press release attached to the Company's Form 8-K announcing the release of 3Q 2015 financial results, filed on November 3, 2015, Defendants again reiterated their timelines for the Phase 3 aldoxorubicin study:

"***Enrollment in our pivotal global Phase 3 clinical trial of aldoxorubicin in soft tissue sarcoma (STS) continues to progress quite favorably, and is on track to be completed next quarter as planned, with data expected in the second half of 2016***," said Steven A. Kriegsman, Chairman and CEO of CytRx.

(emphasis added.)

86.     In a press release dated December 1, 2015, the Company announced that, despite the partial hold, Phase 3 trial enrollment had completed *early* and that data analysis would begin after 191 events occurred:

[CytRx] ***has reached its enrollment target of 400 patients for the company's pivotal global Phase 3 clinical trial of aldoxorubicin in patients with previously treated soft tissue sarcoma (STS). Enrollment was originally estimated to be completed in Q1 2016.*** The Phase 3 trial is a randomized, comparative trial being conducted under a Special Protocol Assessment from the FDA at 79 sites in the United States, Canada, Israel, Australia, Western & Eastern Europe and Chile.

"It is a true testament to the dedicated work of our clinical team, the enthusiasm of our participating physicians, and the willingness of patients to participate in our study that ***enrollment in our global pivotal Phase 3 clinical trial was completed ahead of schedule***," said Steven A. Kriegsman, Chairman and CEO of CytRx. "***We now expect to report the primary endpoint of top-line progression-free survival (PFS) in the first half of 2016, and pre-commercial launch activities are underway***."

"As a member of the sarcoma research community, I am very excited to see the overwhelmingly positive response from my colleagues to this pivotal trial," said Sant P. Chawla, M.D., F.R.A.C.P., Principal

Investigator and Director of the Sarcoma Oncology Center. This trial is the first to compare a single agent, aldoxorubicin, to five of the most commonly used treatment options for STS patients that have received prior chemotherapy. The *rapid timeframe in which this Phase 3 trial reached its targeted enrollment reflects the desire of practitioners for more efficacious therapies*."

\* \* \*

The primary endpoint of the study is PFS and will be calculated after 191 events occur…. In January 2014, CytRx announced that it received approval from the FDA to amend the Phase 3 protocol to continue dosing patients with aldoxorubicin until disease progression as defined by RECIST 1.1 criteria. *The ability to dose until disease progression creates the potential for substantially improved Phase 3 efficacy results*.

(emphasis added).

87. In a March 11, 2016, Form 8-K and press release announcing the release of year-end 2015 financial results, Defendants again stated that they would initiate the submission of the NDA by the end of 2016 and "project[ed] aldoxorubicin's market launch in 2017." Defendants also again touted the fact that, despite the partial hold, Phase 3 trial enrollment had completed *early*:

"*2015 was an important year as CytRx achieved several key milestones, including completing the enrollment of our global, pivotal Phase 3 trial with aldoxorubicin one quarter ahead of schedule*," said Steven A. Kriegsman, CytRx's Chairman and CEO.

(emphasis added).

88. On April 4, 2016, Defendants announced that 191 events were reached and again reiterated that the Phase 3 data would be ready by the end of the second quarter 2016. Defendants announced, in relevant part:

CytRx Corporation (NASDAQ: CYTR), a biopharmaceutical research and development company specializing in oncology, today announced that it has reached the target number of progression events in its pivotal, global phase 3 clinical trial with aldoxorubicin as a treatment for patients with second-line soft tissue sarcomas. In accordance with the statistical analysis plan which is incorporated in the Special Protocol Assessment

(SPA) granted by the FDA, 191 events were required to trigger the analysis of the primary endpoint of progression-free survival (PFS). The events were reviewed and verified by an independent, blinded radiology organization contracted by CytRx to analyze all of the scans for the Phase 3 pivotal clinical trial.

> "**Reaching the number of events is an important milestone for the aldoxorubicin Phase 3 trial**," said Daniel Levitt, M.D., Ph.D., CytRx's EVP and Chief Medical Officer. "**Now we, along with our contract research organization, are in the process of collecting, verifying and analyzing all of the trial data from the 79 sites around the globe. While this is a large undertaking, we expect to have top-line results at the end of this quarter.**"

(emphasis added.)

89.     Defendants patted themselves on the back again in the Company's May 11, 2016 Form 8-K and press release announcing 1Q 2016 financial results. Reaffirming the timelines yet again, a mere month before Phase 3 results were due in, Defendants stated, in relevant part:

> "So far, 2016 has been a very productive year for CytRx," said Steven A. Kriegsman, Chairman and CEO of CytRx. "On the clinical front, **we reached the 191 progression events in our global, pivotal Phase 3 trial with aldoxorubicin in second-line soft tissue sarcoma to trigger the data verification and analysis. We look forward to announcing top-line results at the end of June 2016.**"

(emphasis added.)

90.     On June 6, 2016, Defendants assured the market that CytRx's aldoxorubicin data looked good, stating, in part, that:

> "**The clinical data presented this year at ASCO [American Society of Clinical Oncology] continues to support the safety and activity of aldoxorubicin** in multiple high unmet need tumor types, including in late-stage and heavily pre-treated patients," commented Daniel Levitt, M.D., Ph.D., CytRx's Executive Vice President and Chief Medical Officer.

(emphasis added.)

SECOND CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

29

91.     On June 7, 2016, Defendants revised the timeline for announcing the Phase 3 study results slightly, but still gave no indication that the data was in jeopardy as a result of running so far short of the SPA's assumed 15-month follow-up period. Instead, Defendants stated that they would "update our business information on our pivotal Phase 3 trial of aldoxorubicin as a therapy for patients with soft tissue sarcoma, or STS, whose tumors have progressed following treatment with chemotherapy, as follows: We now expect to report top-line results on progression-free survival, or PFS, the trial's primary endpoint, in July 2016."

**I.     The Truth Emerges: The Revelation of Delays and Materialization of Defendants' Previously Undisclosed Risks Threatening the Phase 3 Study Causes CytRx's Stock Price to Plummet**

92.     Defendants abruptly reversed their previously positive course when, after the close of regular market trading on July 11, 2016, they announced that the long-awaited results of the Phase 3 study had been negatively impacted by delays caused by the partial clinical hold and insufficient follow-up time. Defendants explained, in part:

> CytRx Corporation (NASDAQ: CYTR), a biopharmaceutical research and development company specializing in oncology, today announced the results of an analysis of its global, randomized, Phase 3 clinical trial of aldoxorubicin compared to investigator's choice therapy in patients with relapsed or refractory soft tissue sarcomas (STS).
>
> In accordance with the FDA-granted special protocol assessment, the current analysis occurred following 191 progression events. ***Because enrollment was interrupted by a partial clinical hold in November 2014, this analysis did not provide for sufficient follow-up for the nearly two-thirds of patients who entered the Phase 3 study after the hold was resolved and enrollment resumed. This resulted in nearly half of all patients being censored (excluded) from the current progression free survival (PFS) evaluation. CytRx expects to conduct a second analysis, which will include longer patient follow-up and allow for greater maturation of all endpoints.*** The Company expects to announce the results of this evaluation and hold an end-of-Phase 3 meeting with the Food and Drug Administration (FDA) in the fourth quarter of 2016. The partial clinical hold was related to a single patient enrolled in a compassionate use study, which was subsequently resolved successfully.

For the current evaluation, the study did not show a significant difference between aldoxorubicin and investigator's choice therapy for PFS, with a median of 4.17 months and 4.04 months, respectively, for the study's primary endpoint (hazard ratio: 0.91). However, the most immediate indications of therapeutic activity, objective response rate (ORR) and disease control rate (ORR + stable disease ≥ 4 months), showed a near doubling in the aldoxorubicin arm compared to investigator's choice, including in patients who previously received treatment with doxorubicin. Disease control rate for aldoxorubicin was significantly greater than investigator's choice therapy in the intent-to-treat population (p=0.048) as well as in patients who received prior doxorubicin (p=0.0415). Patients continue to be followed for overall survival (OS), a secondary endpoint of the trial.

"While results from this current analysis are immature, a near doubling of response rates with aldoxorubicin suggests a highly active therapy which may benefit certain patients with soft tissue sarcoma," said Sant Chawla, M.D., F.R.A.C.P., Principal Investigator and the Director of the Sarcoma Oncology Center in Santa Monica, California. "*Because enrollment was interrupted by a clinical hold, both PFS and response data need to be analyzed at a future date to account for patients enrolled later in the trial*. I look forward to this subsequent analysis providing a more complete understanding of aldoxorubicin's potential in this very challenging disease."

(emphasis added.)

93.    At 5:00 p.m. on July 11, 2016, Defendants held a Business Update conference call and webcast, during which Defendant Kriegsman explained: "As we announced a short while ago, *the unforeseen clinical hold that interrupted this study in 2014 impacted the outcome of the current evaluation, underscoring a need for subsequent analysis*." (emphasis added.)

94.    Also during the July 11, 2016 call and webcast, Daniel Levitt ("Levitt"), Executive Vice President and Chief Medical Officer, further explained on behalf of the Company:

Our study is a randomized, controlled Phase 3 trial, which enrolled 433 patients at 79 sites in 15 countries with the majority of patients in (technical difficulty) patients with metastatic, locally advanced or

unresectable soft tissue sarcomas who had either not responded to or who had progressed following treatment with one or more systemic regiments of non-adjuvant chemotherapy were randomized one-to-one to be treated with aldoxorubicin or the investigator's choice of an approved chemotherapeutic regimen, including doxorubicin, ifosfamide, dacarbazine, pazopanib, or gemcitabine plus docetaxel.

The primary endpoint of the study is progression-free survival. Secondary endpoints include overall survival, response rates and safety. Patient characteristics were well-balanced between the treatment and control arms.

In accordance with an FDA-granted Special Protocol Assessment, the current analysis we are reporting on today was triggered by the 191st event of progression. However*, because enrollment was interrupted by a partial clinical hold in November of 2014 and full enrollment did not resume until several months later, this analysis essentially captured a relatively short period of follow-up for anyone enrolled after the hold.*

*Because nearly two-thirds of patients fall into this category it had a substantial impact on our current analysis with nearly half of all patients (technical difficulty) survival evaluation. In other words, in March at the time of this data analysis cutoff, nearly half of patients were excluded from the analysis of the endpoint.*

As a reminder, the partial hold was related to an event with a single patient from a compassionate use protocol and was successfully resolved. *We now plan to conduct a second analysis which will include longer patient follow-up and allow for greater maturation of all endpoints later this year. And we expect to announce the outcome of this second analysis sometime in the fourth quarter of 2016.*

*All that being said, from the current evaluations we did not show a significant difference between aldoxorubicin and investigator's choice therapy for progression-free survival, the study's primary point.* Median PFS by blinded central review was 4.17 months for aldoxorubicin and 4.04 months for investigator's choice, resulting in a hazard ratio of 0.91.

Importantly, however, we saw a clear indication of activity in pre-planned secondary endpoints including objective response rate and disease control rate, defined as objective response rate plus stable disease of greater than four months. These outcomes showed a near doubling in

the aldoxorubicin arm compared to investigator's choice including in patients who previously received treatment with doxorubicin.

Disease control rate for aldoxorubicin was significantly greater than investigator's choice therapy in the intent-to- treat population as well as in patients who received prior doxorubicin. Treatment-related adverse events for aldoxorubicin were consistent with those observed in prior studies, and the drug was not associated with clinically significant cardiac, kidney or liver toxicities.

This first-of-its-kind study in soft tissue sarcoma has a comparator arm with multiple regiments, in many ways setting a very high bar for aldoxorubicin to clear by allowing for physicians to tailor the comparator to specific sarcoma subtypes. Despite this requirement under our SPA, aldoxorubicin demonstrated markedly greater activity over investigator's choice therapy in several outcomes.

While we would have preferred a clearer outcome, we are encouraged by a strong level of activity with aldoxorubicin and its manageable toxicity and expect to learn more from the subsequent analyses. We sincerely thank the trial investigators and clinical sites for their hard work and support. More importantly, we are deeply appreciative to the patients and their families for their ongoing participation in this important trial.

(emphasis added.)

95. Also during the same July 11, 2016 call and webcast, Levitt responded to an analyst's question regarding the censoring of patients:

Robin Davison, New Science Global Healthcare Fund: I'm still trying to understand what you are suggesting with this heavy censoring of the patients. My understanding is you've analyzed all 191 patients that have progressed, so there's no patients that you know to have progressed that haven't been censored, presumably? There is subsequent confirmation or anything like that is there, here?

Levitt: Not on the patients that have progressed. [B]ut certainly on the large number of patients that have been censored we don't yet know whether they've been censored because they have not progressed at the time of data cutoff, or whether they somehow fell out of the study and are no longer being followed. So there are (multiple speakers) of those patients.

ROBIN DAVISON: Yes, okay. Can I just understand it, is there a specific triggering event for the second analysis, like a number of progressions or an OS [overall survival] event? Or is it just that you have a meeting with the FDA so you will do a second analysis at that point, surely that can't be the triggering event?

DANIEL LEVITT: The triggering event for that, frankly, will occur when we would plan to have -- yes, it would be when we would plan to have a meeting with the FDA, and also in terms of when a number of patients, which I won't go into right now, have left the censoring roles, and where they have had progression. But I won't go into that right now.

96.     On this news and materialization of previously undisclosed risk, CytRx's stock price fell $1.50 per share, or over 59%, to close at $1.01 per share on July 12, 2016, on unusually heavy trading volume. The Company's stock price continued to decline over the next two trading days as investors digested the news, falling an additional 10%, to close at $0.90 per share on July 14, 2016.

**J.      Post-Class Period Events Shed Further Light on Defendants' Fraud**

97.     An article published by *Seeking Alpha* on July 19, 2016 explained the problem, essentially echoing Defendants' stated explanation that extended exposure to aldoxorubicin was required to yield beneficial results. The *Seeking Alpha* article explained the effect of delayed or late enrollment and insufficient dosing and follow-up time for aldoxorubicin patients, in relevant part, as follows:

Say a study has 400 patients, and say it was enrolled over 3 years with a very slow ramp the first year, gradually increasing ramp the second year, reaching its peak accrual rate, and maintaining that peak rate until fully enrolled. And say half of these patients then "event" sometime after it is fully enrolled. What are you seeing in those data? A pretty good representation of the whole. Because you have a good number of long tail patients who were enrolled those first 2 years especially. So it's a good glimpse of how the whole will do. And 50% of the sample "evented" is about the earliest for a sample of that size enrolled in that amount of time that you could reproduce data reliable enough to petition regulators for approval with (earlier is possible but data would have to be extremely significant).

And although final PFS or OS hazard ratios ("HR") will differ from what

they were recognized to be at this earlier junction, it's unlikely to be an appreciable enough difference to matter.

*This implies though that the trial ran according to design that it followed a preplanned accrual time and follow up.* And it assumes that control group performed about as expected. *If true, then the trial will be well powered to detect a difference between groups (over 80%). If not, the powering will be lower. How can you "power up" a trial? Just wait for more events. It will gain more "power" very simply this way. In other words, data will more accurately reflect a difference between groups (rejecting the null hypothesis) if such a difference does indeed exist.*

There are many studies that are designed to even "intervene" in effect by incorporating a sample size reestimation ("SSR") procedure part way through the test. Usually after a high percentage of the patients have been enrolled. If accrual time has been much slower than expected, or if control group is eventing slower than expected, more events will be required to derive a well powered result…. However there was no SSR conducted in the aldoxorubicin P3 study. And *due to the extremely fast back-half of enrollment, had insufficient follow-up time to attain the initially designed powering*.

As an example of why that's an issue, let's say you enrolled 400 patients in one month. All in one month. It's absurd, but it will illustrate the point. Now, let's also say you required 200 events for analysis of the final outcome measure. Call it PFS. What will happen? You will only see data up to the median. You will have no idea how right of median patients perform, and so the hazard ratio will be immature. *How to solve this? Require more follow up time. Or, de facto, more events*.

*Seeking Alpha*, "*Can Aldoxorubicin Still Pass the Test?*" (July 19, 2016) (emphasis added).

98.     The author of the July 19, 2016 *Seeking Alpha* report further investigated, compiled and analyzed statistics on the enrollment of CytRx's Phase 3 aldoxorubicin study in an attempt to model the study's enrollment curve.  According to the *Seeking Alpha* report:

The aldoxorubicin P3 study was 1/3 enrolled (about 140 patients) before the clinical hold lifted (mid-Jan 2015). After the hold lifted, it took some time for sites to begin accruing again. Some EU sites took up to 6

months to come back online. From Feb 2015 to July 2015 they randomized a further 70-100 patients (between 200-230 total). So it took from summer 2014 to July 2015 to randomize 200-230 patients, about 40% of whom were randomized in those 5 months after the hold. They then randomized 200-230 more in just 6 months. Then the 191 PFS event trigger was announced April 4th, but likely occurred in the trial sometime in March of 2016.

So the breakdown of enrollment is as follows:

-70 patients randomized to either arm by the lifting of the hold, which is about 14-18 months prior to the 191 event trigger.

-30-45 patients randomized to either arm from the time the hold lifted until mid-2015, which is about 8-12 months before the 191 event trigger.

-100-115 patients randomized to either arm in six months, which is 3-8 months before the 191 event trigger.

So 100-115 patients per arm from 8-18 months, with most enrolled around 8-15 months before the 191 event trigger, and the *remaining 100-115 per arm enrolled from 3-8 months before 191 trigger, with most of these enrolled from 3-5 months before trigger*.

*As you can see, there was a preponderance of patients enrolled in under 8 months before the trigger (about half), and 2/3rds in under 12 months. There may even have been about 100 patients (50 per arm) randomized within 3-5 months of the 191 trigger, which is nearly 25% of all patients.*

(emphasis added.)

99.    With these figures, the *Seeking Alpha* article further employed a model to explain how limited dosing, exposure and follow-up negatively impacted the Phase 3 results, and opined that extended dosing and follow up could positively impact results:

Let's say around 380 PFS events will be included in the final (by data cutoff). In this analysis, there will be few events contributing to left of *current* median (enrollment complete 4 months prior to April 191 event trigger announcement, and 3 months from over-enrollment; current median PFS is about 4 months). And so if there is a more pronounced long tail, or longterm effect with aldox, this final analysis will better reflect it.

(emphasis in original.)

100.    While the *Seeking Alpha* article remained optimistic that the drug would

show statistically significant results upon the additional follow-up and re-testing to support an NDA, other industry commentators have not been so kind, noting that the FDA was not likely to ignore the botched Phase 3 results, regardless of whether the failure to show efficacy really was merely a matter of data immaturity. In response to the Company's November 29, 2016, announcement that it had completed the collection of more "events" and would reassess the Phase 3 data, analyst Adam Feuerstein observed on his biotech blog, TheStreet.com:

> CytRx deleted half of the enrolled sarcoma patients and reanalyzed the failed study results. Poof! Aldoxorubicin works, or so the company now claims.
>
> * * *
>
> CytRx now wants investors to forget about the dismal aldoxorubicin study results of July and focus instead on a "new" analysis involving 246 of the 433 sarcoma patients. In this subgroup, aldoxorubicin reduced the risk of progression-free survival by 38% compared to the control arm -- a benefit CytRx claims is statistically significant.
>
> The U.S. Food and Drug Administration isn't likely to ignore the 187 sarcoma patients CytRx deleted just to claim victory from a failed study.
>
> CytRx says it will file a New Drug Application with the FDA in 2017, seeking approval of aldoxorubicin for the treatment of soft-tissue sarcoma. When in 2017 CytRx intends to file to FDA was not disclosed, but don't be surprised if the company works slowly. If history is a reliable guide (and there's no reason to doubt it) the outcome here will be an FDA rejection. For this reason, CytRx isn't going to be in any rush to start the FDA review clock.

101. In sum, Defendants' own explanation that the apparent failure of the drug is not really a failure of efficacy, but merely a result of immature data, only highlights their culpability in this case. Defendants knew or recklessly disregarded and omitted the risks that, as a result of insufficient follow-up time that fell short of the SPA's stated assumptions, which were part of the basis for the study's power calculations, the occurrence of the 191st event was more likely to occur when the data was immature (*i.e.*, that patients would be exposed to less dosing and shorter follow-up). Defendants

further knew or recklessly disregarded the risks that assessing the immature Phase 3 data would fail to yield efficacy results, but they charged on, not only concealing these risks from the market, but proudly trumpeting all along that the study and the timeline for NDA submission were on-track.

## V.    MATERIALLY FALSE AND MISLEADING CLASS PERIOD STATEMENTS

102.   The Class Period starts on September 12, 2014, when Defendants attended the Aegis Capital Corporation Healthcare & Technology Conference, during which they stated:

> We expect enrollment to go well. There are no other competing second-line trials that we are aware of. So we expect, in terms of the trial timing, to **complete enrollment by the end of next year, end of 2015, with the progression-free survival, the primary endpoint, data available mid-2016.**
>
> **Our goal is to rapidly convert that data into an NDA submission and get that as quickly filed thereafter, towards the end of 2016**, with the goal – again, we believe this trial will read out positive. And again, once we get through the FDA and if the FDA approves, **to then launch in 2017**.

(emphasis added).

103.   Defendants' representation that enrollment would be completed at the "end of 2015," but that PFS data would be "available mid-2016[,]" a mere six months later, was materially false or misleading and lacked a reasonable basis because it was contradicted by the 15-month follow-up period assumed under the SPA to support the power assumptions contained therein. .Defendants may have previously *hoped* that they could report statistically significant efficacy results while running afoul of the SPA by enrolling a large number of patients early in the enrollment period (*i.e.*, front-loading the study),  thereby allowing the follow-up on earlier-enrolled patients to essentially run concurrently during the 18-month enrollment period. But that was not the SPA design, and Defendants knew or recklessly disregarded and omitted the risks that, as a result of insufficient follow-up time that fell short of the SPA's stated assumptions, which were

part of the basis for the study's power assumptions, the Phase 3 clinical trial may yield immature results.

104.   This undisclosed risk was only heightened when, on November 18, 2014, the Company issued a press release entitled, "CytRx Announces Partial Clinical Hold Affecting Aldoxorubicin Clinical Trials." Therein, Defendants stated, in relevant part:

> CytRx Corporation (NASDAQ: CYTR), a biopharmaceutical research and development company specializing in oncology, today announced that the Company has received notice from the United States Food and Drug Administration (FDA) that its clinical trials for aldoxorubicin have been placed on partial clinical hold. All currently enrolled patients can continue receiving aldoxorubicin treatment, or comparator drugs, as per study protocols, but no new patients can be enrolled until the clinical hold is lifted.
>
> The FDA has indicated that the partial clinical hold is due to the reported death of a patient with advanced-stage cancer who did not qualify to participate in any of the ongoing aldoxorubicin clinical trials, but had received aldoxorubicin under the Company's expanded access ("compassionate use") program. At the FDA's request, the Company will amend all aldoxorubicin study protocols to include an appropriate inclusion/exclusion criteria, an additional patient screening assessment and an evaluation of serum electrolytes prior to aldoxorubicin administration. CytRx is working diligently in collaboration with the FDA to seek the release of the clinical hold and resume enrollment in its clinical studies as expeditiously as possible.
>
> CytRx currently believes that the partial hold issue will be expeditiously resolved and that ***enrollment rates and timelines for its ongoing trials will remain materially unchanged***. . . . CytRx remains committed to completing enrollment of its ongoing pivotal global Phase 3 trial in second-line soft tissue sarcoma by the end of 2015.

(emphasis added.)

105.   Defendants' assurance on November 18, 2014 that "enrollment rates and timelines…will remain materially unchanged" was materially false or misleading and lacked a reasonable basis when made. It affirmed—at a time when enrollment was not yet completed and was, in fact, halted—Defendants' previous timeline promising data

availability by the first half of 2016, where, according to the 15-month follow-up assumptions to fully power the study at 90%, enrollment would had to have been completed in or around April 2015 in order to report by the end of June 2016 results that included 15-months of follow-up data. Defendants recklessly disregarded the 15-month follow-up assumption of the SPA, and took a material undisclosed risk—*heightened by the delays occasioned by the hold*—in reiterating the timelines and hoping that the Phase 3 study would generate statistically significant positive efficacy results on stated timelines, despite the fact that Defendants could not, at that time in November 2014, both: (i) deliver PFS data results by mid-2016, and (ii) report results in accordance with the SPA's 15-month follow-up period.  And it was necessarily the case that obtaining the progression-free events sooner than estimated meant that the drug was showing less efficacy than estimated. *See* Dixon Decl. ¶ 12. Thus, truncating the follow-up period increased the risk that the study would not yield positive results.

106.    On December 3, 2014, Defendants issued another press release in which they again announced the partial clinical trial hold and reiterated that it would not materially impact the timeline for the Phase 3 study, or the timeline for the submission of the drug's NDA. Defendants explained, in relevant part:

> CytRx Corporation (NASDAQ: CYTR), a biopharmaceutical research and development company specializing in oncology, today announced that the Company has received written notice from the United States Food and Drug Administration (FDA) that its clinical trials for aldoxorubicin have been placed on partial clinical hold. The news supplements and is consistent with the prior verbal communications from the FDA.

> As previously announced, all currently enrolled patients can continue receiving aldoxorubicin treatment, or comparator drugs, as per study protocols, but no new patients can be enrolled until the clinical hold is lifted. At the FDA's request, the Company will amend all aldoxorubicin study protocols to include an appropriate inclusion/exclusion criteria, an additional patient screening assessment and an evaluation of serum electrolytes prior to aldoxorubicin administration. CytRx is working diligently in collaboration with the FDA to seek the release of the

clinical hold and resume enrollment in its clinical studies.

CytRx currently believes that the partial hold issue will be expeditiously resolved and that *enrollment rates and timelines for its ongoing trials will remain materially unchanged*, subject to FDA timing. . . . CytRx remains committed to completing enrollment of its ongoing pivotal global Phase 3 trial in second-line soft tissue sarcoma by the end of 2015.

(emphasis added).

107.    The relevant portions of the above-quoted statements from the December 3, 2014 press release are identical to the statements identified in Defendants' November 18, 2014 press release, and they were materially false and misleading and lacked a reasonable basis when made for the same reasons as set forth in ¶ 105, *supra*.

108.    On January 20, 2015, Defendants announced in a press release that the FDA had removed the partial hold and that "[e]nrollment and dosing of new patients is now permitted." In the press release, Defendants explained, in relevant part:

CytRx Corporation (Nasdaq: CYTR), a biopharmaceutical research and development company specializing in oncology, today announced that the United States Food and Drug Administration (FDA) has removed the partial clinical hold on the Company's aldoxorubicin clinical trials. Enrollment and dosing of new patients is now permitted after study sites' Institutional Review Boards (IRBs) approve the revised trial protocols.

"CytRx developed modified study parameters intended to avoid potential risks, while allowing the company to evaluate the therapeutic impact of aldoxorubicin for patients with soft tissue sarcoma, glioblastoma, Kaposi's sarcoma, and small cell lung cancer, among other trials," said Steven A. Kriegsman, Chairman and CEO of CytRx. "Our staff worked closely with the FDA Oncology Division to resolve all partial clinical hold issues as rapidly as possible. We expect enrollment and dosing in the ongoing clinical trials to be back underway soon."

*CytRx currently believes that enrollment rates and timelines for its trials will remain materially unchanged*. The Company expects to complete enrollment in its ongoing pivotal global Phase 3 trial in second-line soft tissue sarcoma by the end of 2015 and unblind the clinical data by mid-2016. Subject to FDA approval, *CytRx's market launch of aldoxorubicin for second line soft tissue sarcoma is projected to*

***commence in 2017***.

(emphasis added.)

109.   The above-quoted statements from the January 20, 2015 press release were materially false and misleading and lacked a reasonable basis when made for the same reasons as set forth in ¶ 105, *supra*. Moreover, in light of the study's assumed 15 month follow-up period after enrollment of the last subject and that 90% study power was required to yield the expected efficacy results, and Defendants' knowledge that longer dosing and patient follow-up "creat[ed] the potential for substantially improved Phase 3 efficacy results," Defendants knew or recklessly disregarded and failed to disclose that the 2-month delay in enrollment occasioned by the hold presented a material risk to the Phase 3 study's results and commercialization timeline, *especially* where Defendants already knew that their stated timelines ran afoul of *both* the accrual and follow-up timing assumptions of the SPA. Again, with the Phase 3 study commencing in March 2014, the SPA assumed an 18-month accrual period (or complete enrollment by September 2015) and a 15-month follow-up period after complete enrollment before data was reported (or follow-up extending into December 2016) in order to power the study at 90%.

110.   On January 22, 2015, Defendants announced the results of Phase 2b testing on aldoxorubicin's secondary endpoint, overall survival rates of subjects with soft-tissue sarcoma. In a conference call held the same day to discuss those results, Defendant Kreigsman again told investors:

> We expect to ***complete enrollment in the ongoing phase 3 trial by the end of this year***, evaluate the ***clinical trial results by mid-2016***, and subject to FDA approval, ***launch aldoxorubicin commercially in 2017***.

(emphasis added.)

111.   The above-quoted statements from the January 22, 2015 conference call were materially false and misleading and lacked a reasonable basis when made for the same reasons as set forth in ¶¶ 105, 109, *supra*.

112.    The Company announced its 4Q 2014 and year-end 2014 financial results on March 10, 2015. In the Form 10-K of the same date (the "2014 Form 10-K"), signed by Defendants Kriegsman and Caloz, Defendants stated the following regarding the commercialization of aldoxorubicin and the status of the Phase 3 trial, in relevant part:

> In the first quarter of 2014, we initiated a pivotal Phase 3 trial of aldoxorubicin as a therapy for patients with STS whose tumors have progressed following treatment with chemotherapy, and **_we have received approval from the FDA to continue dosing patients with aldoxorubicin until disease progression in that clinical trial_**. The Phase 3 trial is being conducted under a Special Protocol Assessment, or SPA, granted by the U.S. Food and Drug Administration, or FDA. **_The SPA means that the FDA agrees that the design and analyses proposed in the Phase 3 trial protocol are acceptable to support regulatory approval of the product candidate with respect to effectiveness of the indication studied, and will not subsequently change its perspective on these matters, unless previously unrecognized public or animal health concerns were to arise or we were to subsequently modify the protocol. Thus, if the study demonstrates an acceptable benefit-risk profile as determined by the FDA, it would suffice as the single pivotal trial to demonstrate effectiveness and would support registration of aldoxorubicin for this indication_**.
>
> * * *
>
> **_In January 2014, the Company announced it has received approval from the FDA to amend the Phase 3 protocol to continue dosing patients with aldoxorubicin until disease progression_** (defined as an increase in the size of measurable tumors by 20% or the development of a new tumor lesion), **_which creates the potential for substantially improved Phase 3 efficacy results_**.

(emphasis added.)

113.    The 2014 Form 10-K's description of the SPA was materially false and misleading because it misrepresented and failed to disclose that the SPA *was* "subsequently modif[ied]" at the FDA's insistence in January 2015 following a patient death and the FDA's imposition of the partial clinical hold. Moreover, Defendants' statement that the Phase 3 trial was "being conducted under" a SPA granted by the FDA, and their assurance that an SPA amendment allowing extended dosing until

disease progression created "potential for substantially improved Phase 3 efficacy results," were materially false and misleading, because they omitted that CytRx could not both (i) comply with the SPA's follow-up timing assumption and (ii) report the data on promised timelines.

114.    In a presentation at the Jefferies & Co. Healthcare Conference in June 2015, under the heading of "Timing," Defendants represented: (1) "enrollment to be completed by Q1 2016;" (2) "PFS data to be available 2H16;" (3) "Projected NDA filing at end of 2016;" and (4) "commercial launch in 2017."

115.    The above-quoted statements from the June 2015 Jefferies & Co. Healthcare Conference were materially false and misleading and lacked a reasonable basis when made because they misrepresented and failed to disclose that the results and timeline of the Phase 3 clinical trial of aldoxorubicin, including the NDA submission, were put at significant risk as a result of the partial clinical hold and insufficient follow-up time. In light of the study's assumed 15 month follow-up period after enrollment of the last subject to power the study at 90%, and Defendants' knowledge that longer dosing and patient follow-up "creat[ed] the potential for substantially improved Phase 3 efficacy results," Defendants knew or recklessly disregarded and failed to disclose that the delays occasioned by the hold presented a material risk to the Phase 3 study's results and commercialization timeline. Indeed, by this time in June 2015, while Defendants were projecting enrollment completion by 1Q 2016, Defendants knew or recklessly disregarded the effects of the study hold on relatively "late" enrollments (put another way, Defendants knew or recklessly disregarded that enrollment in the study was becoming disproportionately weighted toward the end of the enrollment period contrary to the study's assumptions), thereby posing significant risk to the ability to collect sufficient follow-up data to provide positive efficacy results prior to reporting results in mid-2016.

116.    In the July 22, 2015 Prospectus Supplement (to the Company's December 23, 2013 Prospectus signed by Defendants Caloz and Kriegsman) offering an additional

9.1 million shares, pursuant to which Defendants hoped to raise more than $23 million, Defendants stated of the Phase 3 study and eventual commercialization of aldoxorubicin:

> In the first quarter of 2014, under an SPA agreed to by the FDA, we initiated a pivotal global Phase 3 clinical trial to evaluate the efficacy and safety of aldoxorubicin as a 2nd-line treatment for patients with STS. This multicenter, randomized, open-label Phase 3 clinical trial is designed to enroll approximately 400 patients with metastatic, locally advanced or unresectable STS, who have either not responded to or have progressed following treatment with, one or more systemic regimens of non-adjuvant chemotherapies…. The primary endpoint of the study is PFS, and secondary endpoints include overall survival, response rates and safety. ***In January 2014, the Company announced it has received approval from the FDA to amend the Phase 3 protocol to continue dosing patients with aldoxorubicin until disease progression, which creates the potential for improved Phase 3 efficacy results.***
>
> * * *
>
> In the first quarter of 2014, we initiated a pivotal Phase 3 trial of aldoxorubicin as a therapy for patients with STS whose tumors have progressed following treatment with chemotherapy. ***The Phase 3 trial is being conducted under a Special Protocol Assessment, or SPA, granted by the FDA. The SPA means that the FDA agrees that the design and analyses proposed in the Phase 3 trial protocol are acceptable to support regulatory approval of the product candidate with respect to effectiveness of the indication studied, and will not change its perspective on these matters, except in limited circumstances such as where a sponsor fails to follow a protocol agreed to with the FDA or where previously unrecognized health concerns occur. Thus, if the study demonstrates an acceptable benefit-risk profile as determined by the FDA, it will support registration of aldoxorubicin for this indication. If approved for marketing, our current plan would be to commercially launch aldoxorubicin in late 2017***.

(emphasis added.)

117.   The July 22, 2015 Prospectus Supplement's description of the SPA was materially false and misleading because it misrepresented and failed to disclose that the SPA *was* amended at the FDA's insistence in January 2015 following a patient death and the FDA's imposition of the partial clinical hold. Moreover, Defendants' statement

that the Phase 3 trial was "being conducted under" a SPA granted by the FDA and their assurance that an SPA amendment allowing extended dosing until disease progression created "potential for substantially improved Phase 3 efficacy results," while simultaneously omitting that CytRx could not both (i) comply with the SPA's follow-up timing assumption and (ii) report the data and file the NDA on promised timelines, were materially false and misleading.

118.    In the press release attached to the Company's Form 8-K announcing the release of 2Q 2015 financial results, filed on August 3, 2015, Defendants stated that:

> "The second quarter of 2015 has been very productive for CytRx. **Enrollment in our ongoing pivotal global Phase 3 clinical trial of aldoxorubicin in soft tissue sarcoma (STS) continues on track** to be completed in the first quarter of 2016."

(emphasis added.)

119.    Defendants' statement that enrollment was "on track" was materially false and misleading when made because Defendants knew or recklessly disregarded that the clinical hold heightened the material risk to the study's underlying enrollment and follow-up assumptions and, by extension, the study's power calculations. Indeed, at this time in August 2015, "on track" enrollment in accordance with the assumptions underlying the SPA would have meant enrollment completion in September 2015, not early 2016.

120.    On November 3, 2015, Defendants continued to maintain the study timelines. In a press release of the same date, attached to a Form 8-K signed by Defendant Caloz, announcing the Company's 3Q 2015 financial results, Defendants stated, in part:

> "**Enrollment in our pivotal global Phase 3 clinical trial of aldoxorubicin in soft tissue sarcoma (STS) continues to progress quite favorably, and is on track to be completed next quarter as planned, with data expected in the second half of 2016**," said Steven A. Kriegsman, Chairman and CEO of CytRx.

(emphasis added.)

121.   Defendants' statement that enrollment was "on track to be completed next quarter as planned" was materially false and misleading when made because Defendants knew or recklessly disregarded that the clinical hold heightened the material risk to the study's underlying enrollment and follow-up assumptions and, by extension, the study's power calculations and ability to generate positive efficacy data. Indeed, at this time in November 2015, the study had already run afoul of the SPA's accrual assumption (which would have meant enrollment completion in September 2015). Moreover, the statement that "data [was] expected in the second half of 2016" was materially false and misleading because Defendants knew but omitted that they could not both: (i) deliver PFS data results by mid-2016, and (ii) report results in accordance with the SPA's 15-month follow-up period.

122.   In a corporate overview presentation in November 2015, Defendants again represented that: (1) "enrollment to be completed by Q1 2016;" (2) "PFS data to be available 2H16;" (3) "Projected NDA filing at end of 2016;" and (4) "commercial launch in 2017."

123.   The above-quoted statements from the corporate overview presentation in November 2015 are identical to the Company's June 2015 presentation and was materially false and misleading and lacked a reasonable basis when made for the same reasons as set forth in ¶ 115, *supra*. Moreover, by this time in November 2015, while Defendants were projecting enrollment completion by early 2016, Defendants knew or recklessly disregarded the effects of the study hold on relatively "late" enrollments (put another way, Defendants knew that enrollment in the study actually was disproportionately weighted toward the end of the enrollment period contrary to the study's assumptions), thereby heightening the already significant risk to CytRx's ability to conduct sufficient follow-up in accordance with the SPA's assumptions prior to reporting results in mid-2016.

124.   On December 1, 2015, Defendants again maintained the study timelines and announced the completion of patient enrollment, ahead of schedule. Specifically, in

a press release of the same date, the Company announced:

> [*The Company] has reached its enrollment target of 400 patients for the company's pivotal global Phase 3 clinical trial of aldoxorubicin* in patients with previously treated soft tissue sarcoma (STS). Enrollment was originally estimated to be completed in Q1 2016.
>
> * * *
>
> "It is a true testament to the dedicated work of our clinical team, the enthusiasm of our participating physicians, and the willingness of patients to participate in our study that *enrollment in our global pivotal Phase 3 clinical trial was completed ahead of schedule*," said Steven A. Kriegsman, Chairman and CEO of CytRx. "*We now expect to report the primary endpoint of top-line progression-free survival (PFS) in the first half of 2016, and pre-commercial launch activities are underway*."

(emphasis added.)

125.    The above-quoted statements from the December 1, 2015 press release were materially false and misleading and lacked a reasonable basis when made because they misrepresented and failed to disclose that the results and timeline of the Phase 3 clinical trial of aldoxorubicin, including the NDA submission, were put at significant risk as a result of the partial clinical hold and insufficient follow-up time. At this point in time, Defendants knew *the precise extent to which* enrollment failed to go according to the SPA (though they could see the rates and trends in enrollment statistics much earlier). When announcing full enrollment of the study in December 2015, Defendants *knew* that reporting PFS data in mid-2016 would run afoul of the SPA's assumed 15-month follow-up period, thus materially impacting the study's power calculation and putting the study's ability to generate the targeted median PFS of 5.6 months at risk. Specifically, the approximate 7-month timeframe within which Defendants promised to report results would mean an event rate at least 2.5 times that assumed by the study design. Dixon Decl. ¶ 14. And "the fact that the data was projected to be available in 6 months instead of 15 months as of December 2015 indicates that the trial was showing less efficacy than assumed." *Id.*

126.    In a study measuring the length of time to tumor progression, designed to

reach a median PFS of 5.6 months, too many patients hitting a PFS event early (*i.e.*, at a faster rate than the SPA assumed) would tend to skew the results *under* the median goal. *See* Dixon Decl. ¶ 12. Here, where Defendants knew the study design of the SPA assumed 15-months of follow-up on 400 patients to reach a median PFS of 5.6 months, and they stated that the study was conducted under an SPA, Defendants should have disclosed when they announced that the study had reached full enrollment that reporting the results in June 2016 would run afoul of the SPA study assumptions, thus putting the PFS results at risk. *See* Dixon Decl. ¶ 15 ("The trial actually accumulated 191 progression events only 4 months after enrollment of the last patient, indicating that overall efficacy was even *less* than the efficacy indicated by the data in December 2015 [which was already less efficacy than targeted, per Dixon Decl. ¶ 14.]").

127.   In the Company's Form S-3 Registration Statement filed on December 30, 2015 and signed by Defendants Caloz and Kriegsman, Defendants substantially repeated the same statements regarding the Phase 3 study and commercialization of aldoxorubicin, stating in relevant part:

> In the first quarter of 2014, we initiated a pivotal global Phase 3 clinical trial to evaluate the efficacy and safety of aldoxorubicin as a second-line treatment for patients with soft tissue sarcoma (STS) under a Special Protocol Assessment with the FDA. This multicenter, randomized, open-label Phase 3 clinical trial is designed to enroll approximately 400 patients with metastatic, locally advanced or unresectable soft tissue sarcomas who have either not responded to, or have progressed following treatment with, one or more systemic regimens of non-adjuvant chemotherapies … The primary endpoint of the study is progression-free survival (PFS), and secondary endpoints include overall survival, response rates and safety. ***In January 2014, the Company announced it has received approval from the FDA to amend the Phase 3 protocol to continue dosing patients with aldoxorubicin until disease progression*** (defined as an increase in the size of measurable tumors by 20% or the development of a new tumor lesion), ***which creates the potential for substantially improved Phase 3 efficacy results***.
>
> * * *
>
> ***The SPA means that the FDA agrees that the design and analyses***

*proposed in the Phase 3 trial protocol are acceptable to support regulatory approval of the product candidate with respect to effectiveness of the indication studied, and will not subsequently change its perspective on these matters, unless previously unrecognized public or animal health concerns were to arise or we were to subsequently modify the protocol. Thus, if the study demonstrates an acceptable benefit-risk profile as determined by the FDA, it would suffice as the single pivotal trial to demonstrate effectiveness and would support registration of aldoxorubicin for this indication.*

(emphasis added.)

128.   The December 30, 2015 Form S-3's description of the SPA was substantially similar to the Company's description of the SPA in other Class Period SEC filings, and was likewise materially false and misleading for the same reasons as set forth in ¶¶ 113 and 117, *supra*. Furthermore, at the time the Company's Form S-3 Registration Statement was filed on December 30, 2015, Defendants *knew* that reporting PFS data in mid-2016 would run afoul of the SPA's assumed 15-month follow-up period, thus materially impacting the study's power calculation and putting the study's ability to generate the targeted median PFS of 5.6 months at risk.

129.   As late as the Company's Form 10-K for year-end 2015, filed on March 11, 2016 (the "2015 Form 10-K") and signed by Defendants Kriegsman and Caloz, Defendants again misrepresented the Company's compliance with the SPA and continued to maintain the study timelines, stating in relevant part:

In the first quarter of 2014, we initiated a pivotal Phase 3 trial of aldoxorubicin as a therapy for patients with STS whose tumors have progressed following treatment with chemotherapy, and we have received approval from the FDA to continue dosing patients with aldoxorubicin until disease progression in that clinical trial. ***The Phase 3 trial is being conducted under a Special Protocol Assessment, or SPA, granted by the U.S. Food and Drug Administration, or FDA. The SPA means that the FDA agrees that the design and analyses proposed in the Phase 3 trial protocol are acceptable to support regulatory approval of the product candidate with respect to effectiveness of the indication studied, and will not subsequently change its perspective on these matters, unless previously unrecognized public or animal health concerns were to arise or we were to subsequently modify the protocol.***

> ***Thus, if the study demonstrates an acceptable benefit-risk profile as determined by the FDA, it would suffice as the single pivotal trial to demonstrate effectiveness and would support registration of aldoxorubicin for this indication.*** The clinical trial has completed its target enrollment of 400 patients at approximately 79 clinical sites in the U.S., Europe, Canada, Latin America and Australia. ***We expect to report the top-line results on PFS the trial's primary endpoint, in the first half of 2016.***
>
> * * *
>
> ***In January 2014, the Company announced it has received approval from the FDA to amend the Phase 3 protocol to continue dosing patients with aldoxorubicin until disease progression*** (defined as an increase in the size of measurable tumors by 20% or the development of a new tumor lesion), ***which creates the potential for substantially improved Phase 3 efficacy results***.

(emphasis added.)

130.   The above-quoted statements regarding the SPA are identical to Defendants' descriptions of the SPA in previous SEC filing and were false and misleading for the same reasons as set forth in ¶¶ 113 and 117, *supra*. Indeed, by this time in March 2016, over three months since Defendants announced that enrollment in the Phase 3 study was completed, Defendants knew the extent to which enrollment in the study was disproportionately weighted toward the end of the enrollment period (contrary to the study's assumptions), thereby posing significant risk to the ability to conduct sufficient dosing and patient follow-up prior to reporting results in mid-2016.

131.   In a press release also dated March 11, 2016, attached to a Form 8-K signed by Defendant Caloz, announcing the release of the year-end 2015 financial results, Defendants stated, in relevant part:

> "2015 was an important year as CytRx achieved several key milestones, ***including completing the enrollment of our global, pivotal Phase 3 trial with aldoxorubicin one quarter ahead of schedule***," said Steven A. Kriegsman, CytRx's Chairman and CEO.
>
> **Upcoming Milestones**
>
> * * *

> ***Announce top-line data from the global, pivotal Phase 3 clinical trial of aldoxorubicin as second-line treatment in patients with soft tissue sarcomas in the next quarter ending June 30, 2016. Subject to FDA approval, the Company projects aldoxorubicin's market launch in 2017.***

(emphasis added.)

132.   The above-quoted statements from the March 11, 2016 press release regarding aldoxorubicin's development timelines were false and misleading for the same reasons as set forth in ¶¶ 125-26, 128, and 130, *supra*.

133.   In a press release dated April 4, 2016, Defendants announced that the study had reached 191 events and that they would commence data analysis, explaining, in relevant part:

> CytRx Corporation (NASDAQ: CYTR), a biopharmaceutical research and development company specializing in oncology, today announced that ***it has reached the target number of progression events in its pivotal, global phase 3 clinical trial with aldoxorubicin as a treatment for patients with second-line soft tissue sarcomas. In accordance with the statistical analysis plan which is incorporated in the Special Protocol Assessment (SPA) granted by the FDA, 191 events were required to trigger the analysis of the primary endpoint of progression-free survival (PFS)***. The events were reviewed and verified by an independent, blinded radiology organization contracted by CytRx to analyze all of the scans for the Phase 3 pivotal clinical trial.
>
> "Reaching the number of events is an important milestone for the aldoxorubicin Phase 3 trial," said Daniel Levitt, M.D., Ph.D., CytRx's EVP and Chief Medical Officer. "Now we, along with our contract research organization, are in the process of collecting, verifying and analyzing all of the trial data from the 79 sites around the globe. ***While this is a large undertaking, we expect to have top-line results at the end of this quarter***. We are continuing to actively treat and follow patients who have not progressed and are analyzing data to determine the overall survival and safety."
>
> * * *
>
> CytRx plans to discuss with the FDA initiating a rolling ***New Drug Application by the end of 2016***, subject to the outcome of the Phase 3 pivotal trial. Pursuant to FDA approval, ***CytRx expects to launch***

***aldoxorubicin in the United States as a treatment for patients with second-line soft tissue sarcoma in the second half of 2017***.

(emphasis added.)

134.   The above-quoted statements from the April 4, 2016 press release were materially false and misleading and lacked a reasonable basis when made because Defendants misrepresented and failed to disclose that the results and timeline of the Phase 3 clinical trial of aldoxorubicin, including the NDA submission, had been materially impacted as a result of the partial clinical hold and insufficient follow-up time. When announcing the occurrence of 191 events in April 2016, Defendants *knew* that reporting PFS data in mid-2016 would run afoul of the SPA's assumed 15-month follow-up period, thus materially impacting the study's power calculation and putting at risk the study's ability to generate the targeted median PFS of 5.6 months. Specifically, at this point in time, Defendants *knew* that the study had attained only approximately 4-months of follow-up data after the completion of enrollment, a far cry short of the 15-month follow-up period assumed by the SPA. This corresponded to an event rate roughly 3.75 times faster than the study design in the SPA had assumed. Again, in a study measuring the length of time to tumor progression, designed to reach a median PFS of 5.6 months, too many patients hitting a PFS event early (*i.e.*, at a faster rate than the SPA assumed) would tend to skew the results *under* the median goal. Here, Defendants knew the study design of the SPA assumed 15-months of follow-up on 400 patients to reach a median PFS of 5.6 months, and they stated that the study was conducted under an SPA. Therefore, Defendants should have disclosed when they announced that 191 events had been reached that the actual data collected included only approximately 4-months of follow up after enrollment of the last patient, in contravention of the SPA design, and putting the PFS results at risk.

135.   In the Company's Q1 2016 Form 10-Q, filed on May 10, 2016 and signed by Defendant Caloz and certified by Defendants Caloz and Kriegsman, Defendants stated, in relevant part:

In the first quarter of 2014, we initiated a pivotal Phase 3 trial of aldoxorubicin as a therapy for patients with STS whose tumors have progressed following treatment with chemotherapy, and we have received approval from the FDA to continue dosing patients with aldoxorubicin until disease progression in that clinical trial. ***The Phase 3 trial is being conducted under a Special Protocol Assessment, or SPA, granted by the U.S. Food and Drug Administration, or FDA. The SPA means that the FDA agrees that the design and analyses proposed in the Phase 3 trial protocol are acceptable to support regulatory approval of the product candidate with respect to effectiveness of the indication studied, and will not subsequently change its perspective on these matters, unless previously unrecognized public or animal health concerns were to arise or we were to subsequently modify the protocol. Thus, if the study demonstrates an acceptable benefit-risk profile as determined by the FDA, it would suffice as the single pivotal trial to demonstrate effectiveness and would support registration of aldoxorubicin for this indication.*** The clinical trial has enrolled 433 patients at approximately 79 clinical sites in the U.S., Europe, Canada, Latin America and Australia. ***We expect to report the top-line results on progression-free survival, the trial's primary endpoint, towards the end of the second quarter of 2016***.

(emphasis added.)

136.   The above-quoted statements were substantially similar to CytRx's previous SEC filings during the Class Period and are false and misleading for the reasons set forth in ¶¶ 113 and 117, *supra*. Defendants' statements regarding study timing, including that PFS data would be reported towards the end of 2Q 2016, were false and misleading for the same reasons as Defendants' April 4, 2016 statement, as set forth in ¶ 134, *supra*.

137.   In a press release attached to a Form 8-K filed on May 11, 2016 and signed by Defendant Caloz, announcing the 1Q 2015 results, Defendants stated, in relevant part:

"So far, 2016 has been a very productive year for CytRx," said Steven A. Kriegsman, Chairman and CEO of CytRx. "***On the clinical front, we reached the 191 progression events in our global, pivotal Phase 3 trial with aldoxorubicin in second-line soft tissue sarcoma to trigger the***

*data verification and analysis. We look forward to announcing top-line results at the end of June 2016…..*"

\* \* \*

**First Quarter 2016 and Recent Highlights**

\* \* \*

**Reached the Target Number of Events in the Global Pivotal Phase 3 Trial.** In April 2016, CytRx achieved the target number of progression events in the aldoxorubicin global, pivotal Phase 3 trial in patients with second-line soft tissue sarcomas. Our contract research organization started the collection and verification of the trial data from all 433 patients enrolled at 79 sites around the globe. *CytRx expects to report top-line results following the analysis of the data in June 2016*.

(emphasis added.)

138. Defendants' statements regarding hitting the event trigger and study timing, including that PFS data would be reported in June 2016, were false and misleading for the same reasons as Defendants' April 4, 2016 statement, as set forth in ¶ 134, *supra*.

139. A CytRx press release dated June 6, 2016, Defendants assured the market that CytRx's aldoxorubicin data looked good, stating, in part, that:

"*The clinical data presented this year at ASCO [American Society of Clinical Oncology] continues to support the safety and activity of aldoxorubicin* in multiple high unmet need tumor types, including in late-stage and heavily pre-treated patients," commented Daniel Levitt, M.D., Ph.D., CytRx's Executive Vice President and Chief Medical Officer.

(emphasis added.)

140. The foregoing statement that the Company's aldoxorubicin data "continues to support the safety and activity of aldoxorubicin" was false or misleading when made because Defendants knew or recklessly disregarded that the clinical hold presented a material risk to the study's underlying enrollment and power assumptions and that the events had been accruing far faster than would be necessary to demonstrate the targeted efficacy. Indeed, by this time in June 2016—over 3 months since the data

review was triggered and the very month results were due—Defendants were acutely aware of the actual enrollment curve and the actual amount of time Phase 3 patients had been receiving the drug. Defendants also knew that the study ran afoul of the SPA's assumed 15 month follow-up period after enrollment of the last subject. Moreover, in light of Defendants' knowledge that longer dosing and patient follow-up "creat[ed] the potential for substantially improved Phase 3 efficacy results" (such that, conversely, delays to or interruptions in dosing posed a risk to efficacy results), Defendants knew or recklessly disregarded and failed to disclose that the delays occasioned by the hold and revised protocols presented a material risk to the Phase 3 study's results and commercialization timeline.

141.   At the Jefferies Health Care Conference on June 7, 2016, the Company reaffirmed its previous statements regarding aldoxorubicin approval in 2017. On behalf of the Company, Olivia Ware, Chief Commercial Officer, stated: "[Aldoxorubicin is] in Phase 3 studies and data is expected now in July of 2016 and we expect to have approval at the end of 2017." Similarly, David J. Haen ("Haen"), Vice President of Business Development, stated: "The goal is we hope to have a positive Phase 3 and subsequent [NDA] filing, and then to get this drug approved some time in 2017." Haen further explained: "We've been doing the pre-commercial activities now…. The Phase 3 is really what is the quickest path to market and that's where we are going…."

142.   Defendants' statements regarding study timing, including that PFS data would be reported in July 2016, were false and misleading for the same reasons as Defendants' April 4, 2016 statement, as set forth in ¶ 134, *supra*.

143.   In a Form 8-K dated June 7, 2016, and signed by Defendant Caloz, Defendants stated that they "***expect[ed] to report top-line results on progression-free survival, or PFS, the trial's primary endpoint, in July 2016***." (emphasis added.)

144.   Defendants' statements regarding study timing, including that PFS data would be reported in July 2016, were false and misleading for the same reasons as Defendants' April 4, 2016 statement, as set forth in ¶ 134, *supra*.

145.   In a subsequent amendment to the Company's Form S-3 Registration Statement, dated June 8, 2016, signed by Defendants Kriegsman and Caloz, Defendants stated that they "expect[ed] to report the top-line results on PFS the trial's primary endpoint, **[by mid-July]** 2016." While substantially repeating their previous statements regarding the Phase 3 study and the aldoxorubicin SPA, Defendants slightly revised the timeline for reporting PFS results, stating: "[w]e expect to report the top-line results on PFS the trial's primary endpoint, in July 2016."

146.   Defendants' statements regarding study timing, including that PFS data would be reported in July 2016, were false and misleading for the same reasons as Defendants' April 4, 2016 statement, as set forth in ¶ 134, *supra*.

147.   In the Company's June 2016 Corporate Overview presentation, under the heading "Timing" the Company reported: (1) "Achieved 191 events in April 2016[,] triggering the data analysis of the primary endpoint of PFS;" (2) "Enrollment completed ahead of schedule in Q415;" (3) "PFS data expected to be available July 2016;" (4) "Projected NDA filing at end of 2016;" and (5) "Commercial launch in 2017."

148.   Defendants' statements regarding study timing, including that enrollment had completed "ahead of schedule," that the event trigger had been reached, and that PFS data would be reported in July 2016, were false and misleading for the same reasons as Defendants' April 4, 2016 statement, as set forth in ¶ 134, *supra*.

149.   Finally, in the Company's July 2016 Corporate Overview presentation— just days before the end of the Class Period—Defendants *still* repeated the same baseless timelines for aldoxorubicin. Under the heading "Timing" the Company again reported: (1) "Achieved 191 events in April 2016[,] triggering the data analysis of the primary endpoint of PFS;" (2) "Enrollment completed ahead of schedule in Q415;" (3) "PFS data expected to be available July 2016;" (4) "Projected NDA filing at end of 2016;" and (5) "Commercial launch in 2017."

150.   Defendants' statements regarding study timing, including that enrollment

had completed "ahead of schedule," that the event trigger had been reached, and that PFS data would be reported in July 2016, were false and misleading for the same reasons as Defendants' April 4, 2016 statement, as set forth in ¶ 134, *supra*.

## VI.   ADDITIONAL SCIENTER ALLEGATIONS

### A.   The Company Did Not Generate Meaningful Revenue and Was Dependent Upon the Continued Development of Aldoxorubicin for Its Survival

151.   Defendants' motivation to minimize, misrepresent and/or conceal potential problems with the Phase 3 aldoxorubicin study while charging ahead with stated timelines and hoping for the best becomes apparent when viewed in light of the Company's financial situation at the time. Prior to and during the Class Period, the Company generated *de minimis* revenue and survived almost entirely on serial fundraising, including, for example: a $23 million offering in October 2012; a $25.9 million offering in October 2013; an $86 million offering in February 2014; a $28.8 million offering in July 2015; and a $40 million long-term loan facility secured in February 2016, tied to aldoxorubicin. (The October 2013 and February 2014 offerings later became the subject of a "pump and dump" shareholder lawsuit that Defendants settled for $8.5 million in May 2016.[17]) Moreover, for the two years encompassing 2015 and 2016, the Individual Defendants collectively pocketed almost $6,000,000 (not including stock option grants that were awarded in December 2016 and have not yet been valued) in total compensation.

152.   During the Class Period, other than $100,000 annually in licensing revenue, the Company generated *no* revenue. Instead, CytRx funded its operations through a combination of public offerings of securities and debt.

153.   For the four years incorporating 2012 to 2015, CytRx held four public offerings to fund "general corporate purposes" and various stages of commercialization

---

[17] *In re CytRx Corp. Sec. Litig.*, No. 2:14-CV-01956-GHK (PJWx) (C.D. Cal.) (Dkt. No. 162).

of aldoxorubicin:

- October 2012: CytRx raised approximately $23 million with the sale of 9,200,000 shares of common stock at $2.50 per share, to be used to "fund the clinical development of its drug candidate[] aldoxorubicin … and for general corporate purposes, [] include[ing] pre-commercialization activities relating to aldoxorubicin, working capital, capital expenditures, research and development and other commercial expenditures."

- October 2013: CytRx raised approximately $25.9 million with the sale of 11.5 million shares of common stock at a price of $2.25 per share.

- February 2014: CytRx raised approximately $86 million through the sale of 13,225,000 shares of common stock at $6.50 per share, to be used for "clinical trials of its drug candidate aldoxorubicin" and "general corporate purposes."

- July 2015: CytRx raised approximately $28.8 million with the sale of 10,465,000 shares valued at $2.75 per share, to be used to "fund clinical trials of its candidate aldoxorubicin," "pre-commercialization activities relating to aldoxorubicin," and other "general corporate purposes."

154.    In addition to public offerings of common stock, CytRx also relied upon debt. At the end of Q1 2016, the Company had approximately $70 million cash and cash equivalents, an amount that analysts believed was insufficient to get the Company through the 2H of 2017. *See* Seeking Alpha, *CytRx: Ok Science, Bad Past, Unknown Future* (April 25, 2016).

155.    To prolong the life of the Company, on February 5, 2016, CytRx secured a $40 million long-term loan, of which $25 million was received on February 8, 2016 and a "***second tranche of up to $15 million [would] become available on or before December 31, 2016 if CytRx announce[d] positive data from its global pivotal Phase 3 clinical trial of aldoxorubicin for the treatment of soft tissue sarcoma***" and initiated a clinical trial of a new drug candidate. The loan had a 48-month term and an interest "rate of 9.5% per annum, subject to the variability of the prime interest rate." Under the

terms of the loan, the first year was an "interest-only period," which could be extended an additional six months "[i]f the regulatory milestone relating to data from the aldoxorubicin Phase 3 trial [was] positive" and "another six months" if the second tranche of $15 million was funded. Desperate for working capital and hoping to extend the length of the interest-only period, Defendants were incentivized to announce the Phase 3 clinical trial results by the end of 2016, despite setbacks caused by the partial clinical delay, hoping against hope and failing to disclose the risk that the data that fell so far short of the 15-month follow-up period would nonetheless support efficacy.

156.   While a more "legitimate practice of securing capital" than their prior pump and dump schemes, analysts were quick to note that "the lack of partnerships was glaring." *See* Seeking Alpha, *CytRx: Ok Science, Bad Past, Unknown Future* (April 25, 2016).

157.   In short, during the time leading up to and throughout the Class Period, CytRx was desperate for operating cash and resorted to every form of available financing it could find to fund its operations. The Company's fundraising ability, indeed its very existence, was dependent on keeping the aldoxorubicin Phase 3 study alive.

158.   In the end, while Class Period investors have suffered tens of millions of dollars in damages as a result of Defendants' actions, the Individual Defendants have prospered greatly from developing what at least some industry analysts have observed to be an ineffective drug. As Adam Feuerstein, a noted biotech analyst writing for TheStreet.com, opined in an article dated November 29, 2016: "If you're looking for a reason to explain why CytRx would seek FDA approval for a drug based on a failed clinical trial, just follow the money. It flows directly from shareholders into Kriegsman's bank account."[18]

---

[18] *See* Adam Fuerstein, *CytRx CEO Pockets Millions of Dollars as Failed Sarcoma Drug          Moves          to          FDA          (Nov.          29,          2016),*

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

### B. Defendants Faced Stiff Competition In Racing To Bring Aldoxorubicin to Market

159. CytRx was also under immense pressure to introduce an STS treatment before its other competitors, even if it meant pursuing timelines that Defendants knew or recklessly disregarded could not be met while conforming to SPA assumptions. Those assumptions are parameters used to ensure that the study could detect the targeted efficacy with 90% power. Dixon Decl. ¶ 13.

160. In October 2015, the Janssen unit of Johnson & Johnson received FDA approval for trabectedin (Yondelis®) as a second-line treatment for leiomyosarcoma and liposarcoma, both of which are types of STS that were the subject of CytRx's Phase 3 study.

161. Also in October 2015, Eli Lilly, which was conducting a Phase 3 clinical trial of olaratumab in combination with doxorubicin as a first-line treatment of STS, announced that it would submit a rolling NDA based on its prior Phase 2 clinical trial results.

162. Hoping to keep pace with its competitors, in December 2015, CytRx announced that it had completed enrollment *ahead of schedule*. All the while, CytRx hid from its investors that the trial's event rate was far faster than assumed, which threatened the assumptions underlying the SPA, including the power assumptions necessary to render statistically significant results.

163. Next, in January 2016, eribulin (Halaven®) was approved by the FDA as a second-line treatment for patients with unresectable or metastatic liposarcoma liposarcoma. During this time, other treatments were also in clinical development, including: Morphotek's ontuxizumab in combination with chemotherapy, and Tracon Pharmaceuticals' TRC-105 in combination with pazopanib.

164. Overall, CytRx faced immense pressure to bring aldoxorubicin to market

---

https://www.thestreet.com/story/13907339/1/cytrx-ceo-pockets-millions-of-dollars-as-failed-sarcoma-drug-moves-to-fda.html.

quickly, or risk a competitor bringing a substantially similar product to market first.

### C.   Defendants Have Historically Employed Pump and Dump Schemes to Raise Much Needed Capital

165.   The October 2013 public offering, which raised approximately $25.9 million with the sale of 11.5 million shares of common stock at a price of $2.25 per share, and the February 2014 public offering, which raised approximately $86 million through the sale of 13,225,000 shares of common stock at $6.50 per share, became the subject of litigation. Between September 2013 and February 2014, CytRx retained a third-party, Dream Team, to publish promotional articles aimed at inflating the value of the Company's common stock immediately prior to (i) lucrative secondary offerings and (ii) the award of massive amounts of "perfectly-timed stock option grants" to members of the Board of Directors and Individual Defendants Kriegsman and Caloz. *In re CytRx Corp. Sec. Litig.*, No. 2:14-CV-01956-GHK (PJWx) (C.D. Cal.) (Dkt. No. 60 at ¶¶ 6-17). The Company paid Dream Team $65,000 and did not disclose to investors its relationship with Dream Team. *Seeking Alpha, Behind the Scenes with Dream Team, CytRx and Galena* (Mar. 13, 2014).

166.   As a result of the promotional articles paid for by CytRx and published by Dream Team, CytRx's stock price rose "from around $2.00 in November to around $8.00 in January." *Id.*

167.   Individual Defendants Kriegsman and Caloz profited immensely from this scheme. Defendant Kriegsman was awarded 925,000 stock options at an exercise price of $2.39 on December 10, 2013, which "generated over $3 million for Defendant Kriegsman in one day." *In re CytRx Corp. Sec. Litig.*, No. 2:14-CV-01956-GHK (PJWx) (C.D. Cal.) (Dkt. No. 60 at ¶ 86). Additionally, Kriegsman "hauled in $2.1 million for himself by selling" shares of Galena Biopharma—a former subsidiary of CytRx that similarly retained Dream Team to promote its stock—at inflated prices. *Id.* at ¶ 67 & *Seeking Alpha, Behind the Scenes with Dream Team, CytRx and Galena* (Mar. 13, 2014) ("CytRx CEO Steven Kriegsman is also a director of Galena and

recently took in nearly $3 million from selling Galena stock in January [2014], before the recent plunge.").

168.   In turn, Defendant Caloz was granted 150,000 stock options on December 10, 2013 at an exercise price of $2.39. *In re CytRx Corp. Sec. Litig.*, No. 2:14-CV-01956-GHK (PJWx) (C.D. Cal.) (Dkt. No. 60 at ¶ 86).

169.   Ultimately, the Company settled a shareholder lawsuit arising from this pump and dump scheme for $8.5 million in May 2016. *In re CytRx Corp. Sec. Litig.*, No. 2:14-CV-01956-GHK (PJWx) (C.D. Cal.) (Dkt. No. 162).

170.   However, this was not the end of CytRx's legal troubles. On April 10, 2017, the SEC entered a cease and desist order[19] against CytRx, stating that:

> CytRx violated Securities Act Section 5(b)(1) when, while it was in registration:  (1) articles appeared on an investment website that were generated by a firm hired by CytRx, (2) a third party publisher transmitted to his subscribers and other potential investors a report about CytRx, the content of which was largely drafted by CytRx, and subsequently published the report as an article on an investment website, and (3) CytRx forwarded the article published by the third party to a large number of potential investors via email. The publications and emails constituted prospectuses – written offers to sell CytRx's securities – that did not comply with Section 10.

171.   To settle the SEC's cease and desist proceeding, CytRx agreed to "cease and desist from committing or causing any violations and any future violations of Section 5(b) of the Securities Act" and "[w]ithin 14 days … pay a civil monetary fine of $75,000 to the [SEC] for transfer to the general fund of the United States Treasury."

**D.   Both Individual Defendants Enjoyed Generous Stock Option Grants During the Class Period**

172.   While Class Period investors have suffered tens of millions of dollars in damages as a result of Defendants' actions, the Individual Defendants have prospered greatly from developing what at least some industry analysts have observed to be an

---

[19] *Available at* https://www.sec.gov/litigation/admin/2017/33-10345.pdf.

ineffective drug. As Adam Feuerstein, a noted biotech analyst writing for TheStreet.com, concluded: "If you're looking for a reason to explain why CytRx would seek FDA approval for a drug based on a failed clinical trial, just follow the money. It flows directly from shareholders into Kriegsman's bank account." *See* Adam Fuerstein, *CytRx CEO Pockets Millions of Dollars as Failed Sarcoma Drug Moves to FDA* (Nov. 29, 2016).

173.   For the three years encompassing 2014 to 2016, Defendant Kriegsman earned approximately $6.8 million in total compensation (not including the December 13, 2016 stock option grant of 1,250,000 shares at $0.43 per share that has yet to be valued), of which approximately $4.2 million was earned during the Class Period:

- 2014: (i) base salary of $825,000 (of which, on a pro-rated basis, approximately $97,000 was earned during the Class Period); (ii) retention bonus of $300,000 awarded in March 2014, before the start of the Class Period; (iii) $150,000 cash bonus awarded during the Class Period in December , 2014; and (iv) stock option grants valued at $903,000, also awarded in December 2014.

- 2015: (i) base salary of $850,000; (ii) $150,000 cash bonus awarded in December 2015; and (iii) stock option grants valued at $1,593,000, also awarded in December 2015.

- 2016: (i) base salary of $850,000 (of which, on a pro-rated basis, approximately $449,000 was earned during the Class Period); (ii) $150,000 cash bonus awarded in December 2016 after the Class Period ended; (iii) $1,000,000 of restricted shares of common stock also awarded in December 2016; and (iv) stock option to purchase 1,250,000 shares of CytRx common stock at the December 13, 2016 exercise price of $0.43 per share.

174.   Similarly, for the three years encompassing 2014 to 2016, Defendant Caloz earned approximately $2.1 million in total compensation (not including the December 13, 2016 stock option grant of 350,000 shares at $0.43 per share that has yet to be valued), of which approximately $1.6 million was earned during the Class Period:

- 2014: (i) base salary of $350,000 (of which, on a pro-rated basis, approximately $41,000 was earned during the Class Period); (ii) $100,000 cash bonus awarded during the Class Period in

December 2014; and (iii) stock option grants valued at $301,000, also awarded in December 2014.

- 2015: (i) base salary of $375,000; (ii) cash bonus of $135,000 awarded in December 2015; and (iii) stock option grants valued at $477,900, also awarded in December 2015.

- 2016: (i) base salary of $400,000 (of which, on a pro-rated basis, approximately $212,000 was earned during the Class Period); and (ii) stock option to purchase 350,000 shares of CytRx common stock at the December 13, 2016 exercise price of $0.43 per share.

175.    In sum, the Individual Defendants have reaped enormous financial gains despite the precarious financial position of their Company and the potential that aldoxoribucin is an ineffective drug. *See, e.g.*, Adam Feuerstein, *CytRx CEO Pockets Millions of Dollars as Failed Sarcoma Drug Moves to FDA* (Nov. 29, 2016) (characterizing CytRx's plan to market aldoxorubicin as "based more on hocus-pocus than credible study results.").

## VII.   LOSS CAUSATION

176.    Plaintiff repeats and realleges each and every allegation set forth above as if fully set forth within.

177.    Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiff and other Class members. During the Class Period, Plaintiff and other Class members purchased or acquired CytRx securities at artificially inflated prices in reliance on Defendants' material misrepresentations and/or omissions. The price of those securities declined significantly when information was disclosed to the market for the first time during the Class Period, thereby revealing those material misrepresentations and/or omissions.

178.    Prior to July 11, 2016, Defendants had concealed material risks and misled investors regarding the timeline for the Company's Phase 3 trial and commercialization of aldoxorubicin. These concealed risks materialized and investors learned the truth about enrollment and insufficient follow-up time in the Phase 3 trial, when, on July 11, 2016, Defendants issued a press release announcing that the partial clinical hold placed

on the aldoxorubicin trials in November 2014 had caused insufficient follow-up of patients, resulting in patients being censored ("excluded") from the data evaluation, and, according to Defendants, necessitating a second analysis. In reaction to this news, the price of CytRx's stock fell $1.50 per share, or over 59%, to close at $1.01 per share on July 12, 2016, on unusually heavy trading volume. The Company's stock price continued to decline over the next two trading days, falling an additional 10%, to close at $0.90 per share on July 14, 2016.

## VIII.   PRESUMPTION OF RELIANCE

179.   At all relevant times, the market for CytRx's securities was efficient for the following reasons, among others:

> a.  CytRx's stock met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

> b.  As a regular issuer, CytRx filed periodic reports with the SEC and NASDAQ;

> c.  CytRx regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

> d.  CytRx was followed by securities analysts employed by brokerage firms who wrote reports that were publicly available and distributed to those brokerage firms' sales forces and certain customers.

180.   As a result of the foregoing, the market for CytRx stock promptly digested current information regarding the Company from all publicly available sources and reflected such information in its stock price. Under these circumstances, all purchasers of CytRx securities during the Class Period suffered similar injury through their purchase of such securities at artificially inflated prices, and a presumption of reliance applies.

181.   In addition, Plaintiff is entitled to a presumption of reliance under *Affiliated Ute Citizens of Utah v. United States*, 496 U.S. 128 (1972), because the

claims asserted herein are predicated in part on material omissions of fact that Defendants had a duty to disclose.

## IX.   INAPPLICABILITY OF THE STATUTORY SAFE HARBOR AND BESPEAKS CAUTION DOCTRINE

182.   The statutory safe harbor and/or bespeaks caution doctrine applicable to forward-looking statements under certain circumstances do not apply to the false or misleading statements pleaded in this Complaint.

183.   Many of the statements complained of herein were not forward-looking statements, nor were they identified as such when made. Rather, the statements at issue herein – including statements purporting to describe the SPA and statements describing enrollment in the Company's Phase 3 clinical trial of aldoxorubicin – were statements of historical fact or statements of purportedly current facts and conditions at the time the statements were made.

184.   To the extent that any of the false and misleading statements alleged herein can be construed as forward-looking, those statements were not accompanied by meaningful cautionary language identifying important factors that could cause actual results to differ materially from those in the statements. Such factors include, among others, the significant risk posed to the timeline for and results of the Phase 3 clinical trial of aldoxorubicin due to the company's decision to disregard the 15-month follow-up period, heightened by the effects of the partial clinical hold on both existing and new patients, as well as the continued potential delay as a result of the FDA-requested protocol amendment which required acidosis testing prior to drug administration and a deferral of treatment for any patient who failed the screening until such time as the patient's acid levels normalized (a particularly acute risk given that the patient population was highly prone to metabolic acidosis). Given these then-existing facts, which were not adequately disclosed, any generalized risk disclosures were insufficient to insulate Defendants from liability for their materially false and misleading statements.

185.   Alternatively, Defendants are also liable for any forward-looking statements because the speaker knew or recklessly disregarded that the statements were false or misleading when made, or the statement was approved by an Individual Defendant who knew or recklessly disregarded that the statement was false when made.

## X.   PLAINTIFF'S CLASS ACTION ALLEGATIONS

186.   Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired CytRx common stock during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosures. Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

187.   The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, CytRx common stock was actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by CytRx or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

188.   Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

189.   Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

190.   Common questions of law and fact exist as to all members of the Class and

predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of CytRx;

- whether the Individual Defendants caused CytRx to issue false and misleading financial statements during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- whether the prices of CytRx common stock during the Class Period were artificially inflated because of Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

191.   A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.

192.   There will be no difficulty in the management of this action as a class action.

XI.   CAUSES OF ACTION

## COUNT I

### Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Against All Defendants

193.   Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

194.   This Count is asserted against Defendants and is based upon Section 10(b)

of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

195.   During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of common stock. Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of CytRx common stock; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire CytRx common stock at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, each Defendant took the actions set forth herein.

196.   Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for CytRx common stock. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about CytRx's finances and business prospects.

197.   By virtue of their positions at CytRx, Individual Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, Individual Defendants acted with reckless disregard for the

truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to them. Said acts and omissions of Individual Defendants were committed willfully or with reckless disregard for the truth. In addition, Individual Defendants knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

198.   Information showing that Individual Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control. As the senior managers and/or directors of CytRx, Individual Defendants had knowledge of the details of CytRx's internal affairs.

199.   The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of CytRx. As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to CytRx's businesses, operations, future financial condition and future prospects. As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of CytRx common stock was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning CytRx's business and financial condition, which were concealed by Defendants, Plaintiff and the other members of the Class purchased or otherwise acquired CytRx common stock at artificially inflated prices and relied upon the price of the common stock, the integrity of the market for the common stock and/or upon statements disseminated by Defendants, and were damaged thereby.

200.   During the Class Period, CytRx common stock were traded on an active and efficient market. Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market,

purchased or otherwise acquired shares of CytRx common stock at prices artificially inflated by Defendants' wrongful conduct. Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said common stock, or would not have purchased or otherwise acquired them at the inflated prices that were paid. At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of CytRx common stock was substantially lower than the prices paid by Plaintiff and the other members of the Class. The market price of CytRx common stock declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

201.    By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

202.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's common stock during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

## COUNT II

### Violations of Section 20(a) of the Exchange Act Against the Individual Defendants

203.    Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

204.    During the Class Period, the Individual Defendants participated in the operation and management of CytRx and conducted and participated, directly and indirectly, in the conduct of CytRx's business affairs. Because of their senior positions, they knew the adverse nonpublic information about CytRx's current financial position and future business prospects.

205.    As officers and/or directors of a publicly owned company, the Individual

1  Defendants had a duty to disseminate accurate and truthful information with respect to
2  CytRx's business practices, and to correct promptly any public statements issued by
3  CytRx which had become materially false or misleading.

4  206. Because of their positions of control and authority as senior officers, the
5  Individual Defendants were able to, and did, control the contents of the various reports,
6  press releases and public filings which CytRx disseminated in the marketplace during
7  the Class Period concerning the Company's business, operational and accounting
8  policies. Throughout the Class Period, the Individual Defendants exercised their power
9  and authority to cause CytRx to engage in the wrongful acts complained of herein. The
10 Individual Defendants therefore, were "controlling persons" of CytRx within the
11 meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the
12 unlawful conduct alleged which artificially inflated the market price of CytRx common
13 stock.

14 207. Each of the Individual Defendants, therefore, acted as a controlling person
15 of CytRx. By reason of their senior management positions and/or being directors of
16 CytRx, each of the Individual Defendants had the power to direct the actions of, and
17 exercised the same to cause, CytRx to engage in the unlawful acts and conduct
18 complained of herein. Each of the Individual Defendants exercised control over the
19 general operations of CytRx and possessed the power to control the specific activities
20 which comprise the primary violations about which Plaintiff and the other members of
21 the Class complain.

22 208. By reason of the above conduct, the Individual Defendants are liable
23 pursuant to Section 20(a) of the Exchange Act for the violations committed by CytRx.

24 **XII. PRAYER FOR RELIEF**

25 WHEREFORE, Plaintiff demands judgment against Defendants as follows:

26     **A.**    Determining that the instant action may be maintained as a class action
27 under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the
28 Class representative;

**B.**     Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

**C.**     Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as his reasonable attorneys' fees, expert fees and other costs; and

**D.**     Awarding such other and further relief as this Court may deem just and proper.

## XIII.  DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.


DATED:  June 29, 2017              GLANCY PRONGAY & MURRAY LLP



                                  By:   *s/ Kara M. Wolke*
                                  Kara M. Wolke
                                  Jonathan M. Rotter
                                  Alexa J. Mullarky
                                  1925 Century Park East, Suite 2100
                                  Los Angeles, California 90067
                                  Telephone:  (310) 201-9150
                                  Facsimile:  (310) 201-9160
                                  Email:  info@glancylaw.com

                                  *Attorneys for Lead Plaintiff Gregory Callender*
                                  *and the Proposed Plaintiff Class*

## **PROOF OF SERVICE BY ELECTRONIC POSTING**

I, the undersigned say:

I am not a party to the above case, and am over eighteen years old.  On June 29, 2017, I served true and correct copies of the foregoing document, by posting the document electronically to the ECF website of the United States District Court for the Central District of California, for receipt electronically by the parties listed on the Court's Service List.

I affirm under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on June 29, 2017, at Los Angeles, California.


*s/ Kara M. Wolke*
Kara M. Wolke

## Mailing Information for a Case 2:16-cv-05519-SJO-SK Nicholas Crihfield v. CytRx Corporation et al

### Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Patrick V Dahlstrom**
  pdahlstrom@pomlaw.com

- **Lionel Zevi Glancy**
  lglancy@glancylaw.com

- **J Alexander Hood**
  ahood@pomlaw.com,abarbosa@pomlaw.com

- **Allen L Lanstra**
  allen.lanstra@skadden.com,dlmlclac@skadden.com,Rebecca.Isomoto@Skadden.com,al.chua@skadden.com

- **Jeremy A Lieberman**
  jalieberman@pomlaw.com,disaacson@pomlaw.com

- **Charles Henry Linehan**
  clinehan@glancylaw.com

- **Danielle Leigh Manning**
  dmanning@glancylaw.com

- **Adam C McCall**
  amccall@zlk.com

- **Alexa Mullarky**
  amullarky@glancylaw.com

- **Jennifer Pafiti**
  jpafiti@pomlaw.com,ahood@pomlaw.com,kmsaletto@pomlaw.com,disaacson@pomlaw.com,abarbosa@pomlaw.com

- **Clifford H Pearson**
  cpearson@pswlaw.com,mpearson@pswlaw.com,mwilliams@pswlaw.com,egrant@pswlaw.com

- **Michael Harrison Pearson**
  mpearson@pswlaw.com

- **Lesley F Portnoy**
  LPortnoy@glancylaw.com

- **Robert Vincent Prongay**
  rprongay@glancylaw.com,CLinehan@glancylaw.com,info@glancylaw.com,echang@glancylaw.com,bmurray@glancylaw.com

- **Laurence M Rosen**
  lrosen@rosenlegal.com

- **Jonathan M Rotter**
  Jrotter@glancylaw.com

- **Neil Swartzberg**
  nswartzberg@pswlaw.com,mwilliams@pswlaw.com,egrant@pswlaw.com

- **Kara M Wolke**

kwolke@glancylaw.com,info@glancylaw.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- `(No manual recipients)`